IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RONALD JAMES HAMILTON, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:15–cv–01996 |
| | § | **DEATH PENALTY CASE** |
| BOBBY LUMPKIN, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| Respondent. | § | |

## RESPONDENT LUMPKIN'S AMENDED ANSWER
## WITH BRIEF IN SUPPORT

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
For Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

*STEPHEN M. HOFFMAN
Assistant Attorney General
Criminal Appeals Division

P.O. Box 12548, Capitol Station
Austin, Texas 78711–2548
(512) 936–1400

*Counsel of Record

_____

ATTORNEYS FOR RESPONDENT

_____

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................vii

AMENDED ANSWER WITH BRIEF IN SUPPORT .................................. 1

HAMILTON'S ALLEGATIONS ........................................................ 3

STATEMENT OF THE CASE ............................................................ 5

STATEMENT OF THE FACTS .......................................................... 7

    I.    Facts of the Crime ................................................... 7

    II.    Evidence Relating to Punishment ......................................... 11

        A.    The State's evidence ......................................... 11

        B.    The defense's evidence ........................................ 14

STANDARD OF REVIEW ................................................................ 19

ARGUMENT ................................................................................ 26

    I.    Hamilton's Claim That the Prosecution Committed Misconduct Was Reasonably Denied by the State Court, Precluding Relief under AEDPA. (Claim 1) ............ 26

        A.    The CCA reasonably denied Hamilton's claims concerning the bottle. ...................................... 31

            1.    Background ............................................. 31

                a.    The incident report..................................... 31

                b.    The fingerprint evidence............................ 33

                c.    The DNA evidence ...................................... 37

                d.    The expert testimony on eyewitness identifications ..................................... 39

            2.    The State did not violate *Brady*. ......................... 39

i

3.      The State did not violate *Napue*. ........................ 54

4.      The State did not violate *Johnson*. .................... 58

B.      The Director understands Hamilton to have abandoned his claims concerning the prosecution's dealings with Smith as well as any *Simmons* claim relating to Smith or the bottle. ......... 65

II.     Hamilton's Second Claim for Relief Is Procedurally Defaulted. Alternatively, Hamilton's Counsel Was Not Ineffective. (Claim 2) .................................................. 66

A.      These claims are procedurally defaulted. .................. 68

B.      Hamilton's claims are insubstantial and meritless. .............................................................. 75

1.      Hamilton's claim that trial counsel failed to object to unnoticed extraneous offenses and bad acts is largely conclusory and entirely meritless. ................................. 76

2.      Counsel effectively cross-examined Montoyer. ............................................... 80

3.      Counsel effectively cross-examined Johnson. .................................................. 83

4.      Counsel effectively investigated, prepared, and presented mitigating evidence. .................. 87

a.      Hamilton has not shown any deficiency. ...................................... 87

b.      Hamilton has not shown prejudice. ........ 100

C.      Hamilton's request for an evidentiary hearing should be denied. ............................................. 104

III.    The State Court Reasonably Denied Hamilton's Claim That One of His Attorneys Had a Conflict of Interest

ii

Stemming from the Attorney's Prior Interactions with Joseph Montoyer. (Claim 3) ................................................... 110

A.    Background ................................................... 111

B.    This claim is procedurally barred because Hamilton did not raise it on direct appeal............... 116

C.    Alternatively, the state court reasonably held that Hamilton's conflict-of-interest claim is meritless. ........................................................... 119

    1.    No actual conflict existed. ................................... 119

    2.    Even assuming arguendo that an actual conflict existed, Hamilton was not prejudiced and/or the conflict did not adversely impact counsel's representation of Hamilton. ............................................ 125

        a.    Application of presumed prejudice is barred by AEDPA and nonretroactivity. ......................................... 125

        b.    Even if presumed prejudice applied, there was no adverse effect stemming from the purported conflict.................... 127

D.    Hamilton's related *Brady* claims are unexhausted and procedurally defaulted, as well as meritless. ........................................... 135

IV.    Hamilton's Claim That Attorney Muldrow Had a Conflict of Interest Because She Was Purportedly Law Partners with Smith's Lawyer Is Unexhausted and Procedurally Defaulted. Alternatively, This Claim Is Without Merit. (Claim 4) ......................................... 137

A.    This claim is procedurally defaulted......................... 138

B.    This claim is meritless. .................................... 142

V.  Hamilton's Claim That His Attorneys Were Ineffective Because They Did Not Object to Purported Victim Impact Testimony Is Unexhausted and Procedurally Defaulted. Alternatively, the State Court Reasonably Denied Hamilton's Claim. (Claim 5) ................................... 148

    A.  Hamilton's claims that counsel should have objected under Rule 403 is unexhausted and procedurally defaulted. ................................................ 150

    B.  Both the exhausted version of this claim (raised on direct appeal) and its current incarnation are meritless. ........................................................ 151

        1.  The IATC standard under AEDPA ................... 151

        2.  Hamilton fails to show deficiency. ................... 152

        3.  No prejudice accrued from counsel's alleged deficiencies. .............................................. 159

VI.  The State Court Reasonably Denied Hamilton's Claim That the Trial Court Improperly Admonished Him. (Claim 6) .................................................................... 160

    A.  The state court reasonably denied relief on these claims. .......................................................... 161

    B.  The Fifth Circuit has repeatedly held that *Boykin* does not require explicit waiver of the three rights mentioned therein—only that a guilty plea be voluntarily and intelligently given. ............................................................ 165

    C.  Hamilton's guilty plea was knowing and voluntary and made with an awareness of the applicable range of punishment. ................................. 168

    D.  The trial proceedings show that Hamilton was aware of his right against self-incrimination as well as his ability to waive it. ....................... 174

iv

VII. Hamilton's *Apprendi/Ring/Hurst* Claim Is Procedurally Barred and Meritless. (Claim 7) ................. 177

    A.   This claim is procedurally barred for lack of a contemporaneous objection........................................... 177

    B.   Hamilton's claim is meritless. ...................................... 179

VIII. The State Court Reasonably Rejected Hamilton's 12–10 Rule Claim. (Claim 8) ........................................... 182

IX.  The State Court Reasonably Determined That the Trial Court Was Not Required to Define All Terms in Its Instructions. (Claim 9) ........................................ 184

X.   One of Hamilton's Claims Under *Bush* Is Procedurally Barred for Lack of a Contemporaneous Objection, and Both Are Meritless. (Claims 10 & 11) .................................... 186

    A.   Hamilton's tenth claim is procedurally barred for lack of a contemporaneous objection. ................. 187

    B.   Alternatively, the state court reasonably found that these two claims were meritless. ........................ 188

        1.   Hamilton's race-based claim is meritless. ....... 188

        2.   Hamilton's geography-based claim is meritless. ................................................. 193

XI.  Hamilton's Claim That the Texas Mitigation Special Issue Sends Mixed Signals to the Jury Is Procedurally Barred for Lack of a Contemporaneous Objection. Alternatively, the State Court Reasonably Found That This Claim Is Meritless. (Claim 12) ....................................... 195

    A.   Hamilton's claim is procedurally barred for lack of a contemporaneous objection................................. 196

    B.   Alternatively, the state court reasonably determined that this claim is meritless. ................... 197

XII.   **Hamilton's Claim That Execution by Lethal Injection Is Cruel and Unusual Is Without Merit. (Claim 13)**..........**200**

     A.     **This claim must be raised under § 1983, not § 2254.** ....................................... Error! Bookmark not defined.

     B.     **The state court's disposition is entitled to deference.** .......................................................... **202**

     C.     **Hamilton's request for discovery should be denied.** ................................................................. **205**

XIII.  **Hamilton's Cumulative-Error Claim Is Time-Barred, Defaulted, and Meritless (Claim 14).** .................................... **206**

**CONCLUSION** ...................................................................................... **209**

**CERTIFICATE OF SERVICE** .................................................................. **211**

## TABLE OF AUTHORITIES

**Cases**

*Ables v. Scott*, 73 F.3d 591 (5th Cir. 1996) ..................................................... 146

*Aguilar v. Dretke*, 428 F.3d 526 (5th Cir. 2005) ....................................... 69, 138

*Aguirre-Mata v. State*, 125 S.W.3d 473 (Tex. Crim. App. 2003) .................. 162

*Alexander v. Johnson*, 211 F.3d 895 (5th Cir. 2000)..................... 182, 183, 209

*Alexander v. McCotter*, 775 F.2d 595 (5th Cir. 1985)..................................... 90

*Allen v. Vannoy*, 659 F. App'x 792 (5th Cir. 2016)........................................ 209

*Amos v. Scott*, 61 F.3d 333 (5th Cir. 1995) ..................................................... 68

*Anderson v. Harless*, 459 U.S. 4 (1982) ........................................................ 150

*Andrus v. Texas*, 140 S. Ct. 1875 (2020) ....................................... 100, 101, 102

*Apprendi v. New Jersey*, 530 U.S. 466 (2000)...........................................*passim*

*Ayestas v. Stephens*, 817 F.3d 888 (5th Cir. 2016) ....................................... 109

*Balentine v. Lumpkin*, No. 18–70035, 2021 WL 3376528 (5th Cir. Aug. 3, 2021) ........................................................................................... 98, 103

*Banister v. Davis*, 140 S. Ct. 1698 (2020) ....................................................... 69

*Banks v. Dretke*, 540 U.S. 668 (2004)........................................... 29, 41, 47, 136

*Barksdale v. Blackburn*, 670 F.2d 22 (5th Cir. 1982) ................................... 167

*Barr v. Lee*, 140 S. Ct. 2590 (2020) ............................................................... 203

*Barrientes v. Johnson*, 221 F.3d 741 (5th Cir. 2000) ...............................*passim*

*Batiste v. Davis*, CV H–15–1258, 2017 WL 4155461 (S.D. Tex. Sept. 19, 2017) ........................................................................................................ 65

*Baze v. Rees*, 553 U.S. 35 (2008) ........................................................... 203, 204

*Beatty v. Stephens*, 759 F.3d 455 (5th Cir. 2014) ..................................... 74, 207

*Beazley v. Johnson*, 242 F.3d 248 (5th Cir. 2001) ............................ 25, 197, 199

*Beets v. Scott*, 65 F.3d 1258 (5th Cir. 1995).................................................... 131

*Bell v. Cone*, 535 U.S. 685 (2002) ......................................................... 20, 80, 98

*Blackledge v. Allison*, 431 U.S. 63 (1977) ....................................................... 107

*Blanton v. Quarterman*, 543 F.3d 230 (5th Cir. 2008)...................................... 98

*Blue v. Thaler*, 665 F.3d 647 (5th Cir. 2011) ................................. 183, 198, 199

*Bobby v. Van Hook*, 558 U.S. 4 (2009) ......................................................... 93, 96

*Bone v. State*, 77 S.W.3d 828 (Tex. Crim App. 2002) ..................................... 149

*Bordenkircher v. Hayes*, 434 U.S. 357 (1978) ................................................. 189

*Boswell v. Davis*, 4:16–CV–729–A, 2017 WL 5635822 (N.D. Tex. Nov. 22, 2017) ................................................................................... 121, 123, 125

*Bousley v. United States*, 523 U.S. 614 (1998) ............................................... 171

*Boykin v. Alabama*, 395 U.S. 238 (1969) ...................................................*passim*

*Boyle v. Johnson*, 93 F.3d 180 (5th Cir. 1996)................................................... 95

*Bracy v. Gramley*, 520 U.S. 899 (1997) .......................................................... 205

*Bradshaw v. Stumpf*, 545 U.S. 175 (2005) ...................................................... 165

*Brady v. Maryland*, 373 U.S. 83 (1963) ............................................................ 26

*Brady v. United States*, 397 U.S. 742 (1970) .......................................... 165, 168

*Brecht v. Abrahamson*, 507 U.S. 619 (1993).................................................... 29

*Brown v. Jernigan*, 622 F.2d 914 (5th Cir. 1980)........................................... 166

*Buck v. Thaler*, 345 F. App'x 923 (5th Cir. 2009)........................................... 179

*Bucklew v. Precythe*, 139 S. Ct. 1112 (2019)........................................... 203, 204

*Buntion v. Lumpkin*, 982 F.3d 945 (5th Cir. 2020).................................*passim*

*Burdick v. Quarterman*, 504 F.3d 545 (5th Cir. 2007).................. 170, 171, 173

*Burger v. Kemp*, 483 U.S. 776 (1987)..................................................... 142, 145

*Burt v. Titlow*, 571 U.S. 12 (2013) ..................................................... 91, 152, 153

*Burton v. Terrell*, 576 F.3d 268 (5th Cir. 2009)........................... 166, 170, 171

*Busby v. Davis*, 925 F.3d 699 (5th Cir. 2019) .................................................. 101

*Busby v. Dretke*, 359 F.3d 708 (5th Cir. 2004)................................. 69, 111, 117

*Bush v. Gore*, 531 U.S. 98 (2000) ...................................................................... 5

*Canales v. Stephens*, 765 F.3d 551 (5th Cir. 2014) ......................................... 74

*Cannady v. Dretke*, CIV. A. C–01–273, 2005 WL 5226384 (S.D. Tex. Apr. 29, 2005) ....................................................................................... 190, 191

*Carty v. Thaler*, 583 F.3d 244 (5th Cir. 2009) ......................................... 93, 131

*Cash v. Maxwell*, 565 U.S. 1138 (2012) .......................................................... 56

*Castillo v. Stephens*, 640 F. App'x 283 (5th Cir. 2016) ................................... 81

*Catalan v. Cockrell*, 315 F.3d 491 (5th Cir. 2002) ......................................... 22

*Chapman v. California*, 386 U.S. 18 (1967) ................................................... 29

*Charles v. Thaler*, 629 F.3d 494 (5th Cir. 2011).............................................. 79

*Chi v. Quarterman*, 223 F. App'x 435 (5th Cir. 2007)........................... 192, 194

*Clark v. Johnson*, 227 F.3d 273 (5th Cir. 2000) ......................................... 26, 64

*Clark v. Thaler*, 673 F.3d 410 (5th Cir. 2012) ........................................ 101, 129

*Clemons v. Mississippi*, 494 U.S. 738 (1990) .................................................... 63

*Coble v. Quarterman*, 496 F.3d 430 (5th Cir. 2007)..................... 93, 94, 99, 208

*Coleman v. Quarterman*, 456 F.3d 537 (5th Cir. 2006) ......................... 192, 198

*Coleman v. Thompson*, 501 U.S. 722 (1991)....................................... 62, 68, 110

*Cullen v. Pinholster*, 563 U.S. 170 (2011)..................................................*passim*

*Cuyler v. Sullivan*, 446 U.S. 335 (1980) .....................................................*passim*

*Davila v. Davis*, 137 S. Ct. 2058 (2017) .................................................. 138, 141

*Day v. Quarterman*, 566 F.3d 527 (5th Cir. 2009) ........................................... 90

*Diaz v. Martin*, 718 F.2d 1372 (5th Cir. 1983) .............................................. 146

*Dickson v. Quarterman*, 462 F.3d 470 (5th Cir. 2006).................................... 41

*Dorsey v. Quarterman*, 494 F.3d 527 (5th Cir. 2007).................................... 117

*Dowthitt v. Johnson*, 230 F.3d 733 (5th Cir. 2000) ......................................... 98

*Druery v. Thaler*, 647 F.3d 535 (5th Cir. 2011)....................................... 95, 183

*Duncan v. Morton*, 256 F.3d 189 (3d Cir. 2001) ............................................ 144

*Duncan v. Walker*, 533 U.S. 167 (2001) ......................................................... 207

*Dunham v. Travis*, 313 F.3d 724 (2d Cir. 2002).............................................. 81

*Dunn v. Reeves*, 141 S. Ct. 2405 (2021) ..................................... 78, 91, 152, 153

*Early v. Packer*, 537 U.S. 3 (2002) .................................................................. 23

*Edwards v. Vannoy*, 141 S. Ct. 1547 (2021) .................................................. 181

*Emery v. Johnson*, 139 F.3d 191 (5th Cir. 1997) ........................................... 158

*Engle v. Isaac*, 456 U.S. 107 (1982) ................................................................ 71

*Estelle v. McGuire*, 502 U.S. 62 (1991) ........................................................ 118

*Evans v. Davis*, 875 F.3d 210 (5th Cir. 2017) ............................................. 127

*Ex parte Barber*, 879 S.W.2d 889 (Tex. Crim. App. 1994) ............................ 201

*Ex parte Chabot*, 300 S.W.3d 768 (Tex. Crim. App. 2009) ............................. 56

*Ex parte Chavez*, 213 S.W.3d 320 (Tex. Crim. App. 2006) ............................ 179

*Ex parte Chi*, 256 S.W.3d 702 (Tex. Crim. App. 2008) .................................. 202

*Ex parte De La Cruz*, 466 S.W.3d 855 (Tex. Crim. App. 2015) ....................... 40

*Ex parte Graves*, 70 S.W.3d 103 (Tex. Crim. App. 2002) ............................... 62

*Ex parte Hamilton*, No. 78,114–01 slip op., 2015 WL 3899185 (Tex. Crim.
 App. Jun. 24, 2015) ............................................................................*passim*

*Ex parte Hamilton*, WR-78,114–02, 2018 WL 4344324 (Tex. Crim. App. Sept.
 12, 2018) ..................................................................................... 2, 7, 27

*Ex parte Hamilton*, WR–78,114–02, 2020 WL 6588560 (Tex. Crim. App. Nov.
 11, 2020) .............................................................................................*passim*

*Ex parte Kimes*, 872 S.W.2d 700 (Tex. Crim. App. 1993) ................................ 66

*Ex parte Martinez*, 195 S.W.3d 713 (Tex. Crim. App. 2006) ......................... 104

*Ex parte McFarland*, 163 S.W.3d 743 (Tex. Crim. App. 2005) ........................ 81

*Ex parte Reed*, 271 S.W.3d 698 (Tex. Crim. App. 2008) ................................. 27

*Ex parte Thuesen*, 546 S.W.3d 145 (Tex. Crim. App. 2017) ............................ 27

*Fisher v. Texas*, 169 F.3d 295 (5th Cir. 1999) ................................................ 69

*Flores v. Davis*, No. H–15–1208, 2016 WL 8223054 (S.D. Tex. Dec. 19, 2016) ................................................................................................ 176

*Floyd v. Vannoy*, 894 F.3d 143 (5th Cir. 2018).................................... 45, 46, 47

*Ford v. Davis*, 910 F.3d 232 (5th Cir. 2018) ...................................................... 50

*Franklin v. Lynaugh*, 487 U.S.164 (1988) ...................................................... 184

*Garcia v. Davis*, 704 F. App'x 316 (5th Cir. 2017) ................................. 110, 180

*Garza v. Stephens*, 738 F.3d 669 (5th Cir. 2013) ............................................. 74

*Gaston v. State*, 136 S.W.3d 315 (Tex. App.—Houston [1st Dist.] 2004)...... 119

*Giglio v. United States*, 405 U.S. 150 (1972) ........................................ 29, 54, 57

*Gilday v. Callahan*, 59 F.3d 257 (1st Cir. 1995) .............................................. 29

*Glossip v. Gross*, 576 U.S. 863 (2015) ..................................................... 200, 203

*Godfrey v. Georgia*, 446 U.S. 420 (1980) ........................................................ 185

*Goss v. Johnson*, 199 F.3d 439 (5th Cir. 1999).............................................. 190

*Graham v. Collins*, 506 U.S. 461 (1993) ........................................................ 181

*Granados v. Quarterman*, 455 F.3d 529 (5th Cir. 2006).............................. 180

*Greer v. Thaler*, 380 F. App'x 373 (5th Cir. 2010) ........................................ 182

*Gregg v. Georgia*, 428 U.S. 153 (1976) ................................................... 189, 193

*Gregory v. Thaler*, 601 F.3d 347 (5th Cir. 2010) ............................................ 78

*Guevara v. State*, 97 S.W.3d 579 (Tex. Crim. App. 2003)............................... 51

*Guevara v. Thaler*, CIV. A. No. 4:08–CV–1604, 2011 WL 4455261 (S.D. Tex. 2011) ................................................................................................ 159

*Gutierrez v. State*, 85 S.W.3d 446 (Tex. App.—Austin 2002, pet. ref'd).......... 45

*Gutierrez v. Stephens*, No. 1:09–CV–22, 2013 WL 12092544 (S.D. Tex. Oct. 3, 2013) ................................................................................................. 79

*Hall v. Quarterman*, 534 F.3d 365 (5th Cir. 2008). ..................................... 107

*Hall v. Thaler*, 504 F. App'x 269 (5th Cir. 2012)................................... 124, 148

*Hamilton v. State*, No. 74,523 slip op., 2004 WL 3094382 (Tex. Crim. App. Oct. 13, 2004) ................................................................................*passim*

*Hamilton v. Texas*, 545 U.S. 1130 (2005) .................................................. 6, 160

*Hampton v. State*, 86 S.W.3d 603 (Tex. Crim. App. 2002) ....................... 41, 42

*Harrington v. Richter*, 562 U.S. 86 (2011)...............................................*passim*

*Harris v. Nelson*, 394 U.S. 286 (1969) ........................................................ 205

*Harris v. Reed*, 489 U.S. 255 (1989).............................................................. 68

*Henderson v. Norris*, 118 F.3d 1283 (8th Cir. 1997) ...................................... 80

*Hernandez v. Johnson*, 108 F.3d 554 (5th Cir. 1997) ................................... 105

*Hernandez v. Johnson*, 213 F.3d 243 (5th Cir. 2000) .................................... 59

*Hernandez v. Stephens*, 537 F. App'x 531 (5th Cir. 2013) ........................ 74, 75

*Hill v. Davis*, 781 F. App'x 277 (5th Cir. 2019) .................................. 208, 2099

*Hill v. Lockhart*, 474 U.S. 52 (1985) ............................................................ 146

*Hill v. McDonough*, 547 U.S. 573 (2006) ............................................. 200, 201

*Hobbs v. Blackburn*, 752 F.2d 1079 (5th Cir. 1985).............................. 146, 167

*Hogue v. Johnson*, 131 F.3d 466 (5th Cir. 1997) ........................................... 63

*Holloway v. Arkansas*, 435 U.S. 475 (1978) .................................................. 142

*Holloway v. Lynaugh*, 838 F.2d 792 (5th Cir. 1988) ...................................... 166

*Howell v. Mississippi*, 543 U.S. 440 (2005) .................................................. 150

*Hughes v. Dretke*, 160 F. App'x 431 (5th Cir. 2006) .............................. 190, 192

*Hughes v. Dretke*, 412 F.3d 582 (5th Cir. 2005) ............................................ 183

*Hughes v. Johnson*, 191 F.3d 607 (5th Cir. 1999) .................................. 178, 185

*Hughes v. Quarterman*, 530 F.3d 336 (5th Cir. 2008) .................................... 60

*Hummel v. Davis*, 908 F.3d 987 (5th Cir. 2018).............................................. 199

*Hurst v. Florida*, 577 U.S. 92 (2016)......................................... 4, 177, 178, 180

*In re Medina*, 475 S.W.3d 291 (Tex. Crim. App. 2015) ................................... 97

*James v. Cain*, 56 F.3d 662 (5th Cir. 1995)................................................... 167

*James v. Collins*, 987 F.2d 1116 (5th Cir. 1993) ........................................... 185

*Jamison v. Lockhart*, 975 F.2d 1377 (8th Cir. 1992) ..................................... 141

*Johnson v. Cain*, CV 14–2676, 2019 WL 4921933 (E.D. La. Sept. 9, 2019) . 125

*Johnson v. Cockrell*, 306 F.3d 249 (5th Cir. 2002) .......................................... 90

*Johnson v. Mississippi*, 486 U.S. 578 (1988) ....................................... 26, 29, 58

*Johnson v. State*, 583 S.W.3d 300 (Tex. App.—Fort Worth 2019) ............... 119

*Johnson v. Stephens*, CIV.A. H–11–2466, 2013 WL 4482865 (S.D. Tex. Aug. 19, 2013) ...................................................................................................... 190

*Johnson v. Texas*, 509 U.S. 350 (1993) ......................................................... 184

*Johnson v. Williams*, 568 U.S. 289 (2013)...................................................... 62

*Jones v. Davis*, 890 F.3d 559 (5th Cir. 2018)...................................................... 27

*Jones v. United States*, 527 U.S. 373 (1999).................................................. 182

*Jurek v. Texas*, 428 U.S. 262 (1976) ............................................................ 184

*Kansas v. Carr*, 577 U.S. 108 (2016)............................................................. 197

*Kansas v. Cheever*, 571 U.S. 87 (2013)........................................................... 94

*Kelly v. Cockrell*, 72 F. App'x 67 (5th Cir. 2003) .......................................... 61

*Kerr v. Thaler*, 384 F. App'x 400 (5th Cir. 2010)........................................... 204

*Knight v. Quarterman*, 186 F. App'x 518 (5th Cir. 2006). ............................. 101

*Knowles v. Mirzayance*, 556 U.S. 111 (2009)................................................ 151

*Koch v. Puckett*, 907 F.2d 524 (5th Cir. 1990) ................................................ 77

*Kopycinski v. Scott*, 64 F.3d 223 (5th Cir. 1995) ........................................... 42

*Kubat v. Thieret*, 867 F.2d 351 (7th Cir. 1989) ............................................. 183

*Kutzner v. Cockrell*, 303 F.3d 333 (5th Cir. 2002).......................................... 43

*Kyles v. Whitley*, 514 U.S. 419 (1995) .................................................. 41, 42, 48

*Ladd v. Cockrell*, 311 F.3d 349 (5th Cir. 2002) ............................................ 101

*Lagrone v. State*, 942 S.W.2d 602 (Tex. Crim. App. 1997) ............................ 94

*Langley v. Prince*, 926 F.3d 145 (5th Cir. 2019)............................................ 126

*Leal v. Dretke*, 428 F.3d 543 (5th Cir. 2005) ....................................... 185, 186

*LeBlanc v. Henderson*, 478 F.2d 481 (5th Cir. 1973) .................................... 166

*Lee v. Cain*, 519 F. App'x 869 (5th Cir. 2013)............................................... 124

*Lewis v. Thaler*, 701 F.3d 783 (5th Cir. 2012)............................................... 129

*Lincecum v. Collins*, 958 F.2d 1271 (5th Cir. 1992) ......................................... 61

*Little v. State*, 991 S.W.2d 864 (Tex. Crim. App. 1999) .................................. 52

*Lockett v. Anderson*, 230 F.3d 695 (5th Cir. 2000) ......................................... 77

*Lockhart v. Fretwell*, 506 U.S. 364 (1993) ....................................................... 98

*Lockhart v. McCotter*, 782 F.2d 1275 (5th Cir. 1986) ..................................... 90

*Lockyer v. Andrade*, 538 U.S. 63 (2003)........................................................... 20

*Lovett v. State of Florida*, 627 F.2d 706 (5th Cir. 1980) ................................. 92

*Luna v. State*, 301 S.W.3d 322 (Tex. App.—Waco 2009, no pet.)................... 79

*Manning v. Foster*, 224 F.3d 1129 (9th Cir. 2000) ........................................ 141

*Manns v. Quarterman*, 236 F. App'x 908 (5th Cir. 2007) ............................. 197

*Marshall v. Lonberger*, 459 U.S. 422 (1983)................................................. 168

*Martinez v. Dretke*, 404 F.3d 878 (5th Cir. 2005)........................................... 95

*Martinez v. Dretke*, 99 F. App'x. 538 (5th Cir. 2004) ..................................... 99

*Martinez v. Ryan*, 566 U.S. 1 (2012) .........................................................*passim*

*Matchett v. Dretke*, 380 F.3d 844 (5th Cir. 2004) ........................................... 69

*Matthew v. Johnson*, 201 F.3d 353 (5th Cir. 2000) ....................................... 168

*Mayle v. Felix*, 545 U.S. 644 (2005).............................................................. 206

*Maynard v. Cartwright*, 486 U.S. 356 (1988) ............................................... 185

*Mays v. Hines*, 141 S. Ct. 1145 (2021) .................................................... 31, 57

*McCamey v. Epps*, 658 F.3d 491 (5th Cir. 2011) .......................................... 105

*McChesney v. Henderson*, 482 F.2d 1101 (5th Cir. 1973) ..................... 166, 167

*McCleskey v. Kemp*, 481 U.S. 279 (1987) ................................ 188, 189, 190, 192

*McCoskey v. Thaler*, 478 F. App'x 143 (5th Cir. 2012) .................................. 197

*McDonald v. Johnson*, 139 F.3d 1056 (5th Cir. 1998). .................................. 107

*McWherter v. State*, 571 S.W.2d 312 (Tex. Crim. App. 1978) ............... 172, 173

*Mickens v. Taylor*, 535 U.S. 162 (2002) ......................................... 125, 130, 145

*Miller v. Johnson*, 200 F.3d 274 (5th Cir. 2000) .................... 77, 136, 137, 146

*Mills v. Maryland*, 486 U.S. 367 (1988) .......................................... 182

*Milton v. Procunier*, 744 F.2d 1091 (5th Cir. 1984) ...................................... 186

*Miniel v. Cockrell*, 339 F.3d 331 (5th Cir. 2003). .................................... 88, 101

*Mitchell v. Esparza*, 540 U.S. 12 (2003) ......................................... 23

*Montoya v. Scott*, 65 F.3d 405 (5th Cir. 1995) ................................. 206

*Moody v. State*, 827 S.W.2d 875 (Tex. Crim. App. 1992) ................................. 64

*Morales v. Thaler*, 714 F.3d 295 (5th Cir. 2013) ........................................... 53

*Mosely v. Quarterman*, 306 F. App'x 40 (5th Cir. 2008) ................................ 159

*Mosely v. Quarterman*, CIV.A. 3:03–CV–1577–N, 2008 WL 656887 (N.D. Tex. Mar. 6, 2008) ...................................................................... 154

*Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998) .............. 149, 155, 158

*Moss v. United States*, 323 F.3d 445 (6th Cir. 2003) ..................... 120, 123, 127

*Murphy v. Davis*, 901 F.3d 578 (5th Cir. 2018) ......................................... 27, 48

*Murphy v. Johnson*, 205 F.3d 809 (5th Cir. 2000). ............................... 106, 107

*Murray v. Maggio, Jr.*, 736 F.2d 279 (5th Cir. 1984) ................................. 90, 92

*Napue v. Illinois*, 360 U.S. 264 (1959) ....................................................... 26, 57

*Neal v. Puckett*, 286 F.3d 230 (5th Cir. 2002) ......................................... 22, 103

*Nealy v. Cabana*, 782 F.2d 1362 (5th Cir. 1986) ........................................... 127

*Nelson v. Davis*, 952 F.3d 651 (5th Cir. 2020) ................................................ 81

*Nethery v. Collins*, 993 F.2d 1154 (5th Cir. 1993) ........................................ 186

*Newbury v. Stephens*, 756 F.3d 850 (5th Cir. 2014) ........................................ 98

*Neyland v. Blackburn*, 785 F.2d 1283 (5th Cir. 1986) .......... 161, 166, 167, 174

*Oliver v. Quarterman*, 254 F. App'x 381 (5th Cir. 2007) .............................. 198

*Ortiz v. State*, 93 S.W.3d 79 (Tex. Crim. App. 2002).................................... 149

*Oyler v. Boles*, 368 U.S. 448 (1962) ............................................................... 189

*Padilla v. Kentucky*, 559 U.S. 356 (2010) ....................................................... 67

*Paredes v. Quarterman*, 574 F.3d 281 (5th Cir. 2009) ................................. 159

*Parke v. Raley*, 506 U.S. 20 (1992) ................................................................ 168

*Parr v. Quarterman*, 472 F.3d 245 (5th Cir. 2006). ..................................... 101

*Payne v. Tennessee*, 501 U.S. 808 (1991) ....................................... 153, 154, 155

*Penry v. Johnson*, 532 U.S. 782 (2001) ................................................... 195, 197

*Perillo v. Johnson*, 205 F.3d 775 (5th Cir. 2000)....................................*passim*

*Pierre v. Vannoy*, 891 F.3d 224 (5th Cir. 2018) .............................................. 56

*Pippin v. Dretke*, 434 F.3d 782 (5th Cir. 2005)........................................ 51, 171

*Pitts v. Anderson*, 122 F.3d 275 (5th Cir. 1997) .............................................. 70

*Pondexter v. Quarterman*, 537 F.3d 511 (5th Cir. 2008) ............................... 208

*Powell v. Quarterman*, 536 F.3d 325 (5th Cir. 2008) ................................. 43, 52

*Pulley v. Harris*, 465 U.S. 37 (1984) ............................................... 184

*Quinones v. State*, 592 S.W.2d 933 (Tex. Crim. App. 1980) ........................... 40

*Raby v. Livingston*, 600 F.3d 552 (5th Cir. 2010) ......................................... 203

*Ramey v. Davis*, 314 F. Supp. 3d 785  (S.D. Tex. 2018)................................. 206

*Ramey v. Davis*, 942 F.3d 241 (5th Cir. 2019)................................................ 74

*Ransom v. Johnson*, 126 F.3d 716 (5th Cir. 1997) .................................. 88, 101

*Reed v. Quarterman*, 504 F.3d 465 (5th Cir. 2007)................................. 29, 204

*Reed v. Stephens*, 739 F.3d 753 (5th Cir. 2014)............................................ 183

*Rhoades v. Davis*, 914 F.3d 357 (5th Cir. 2019) .................................. 110, 198

*Riley v. Cockrell*, 339 F.3d 308 (5th Cir. 2008)..................................... 128, 150

*Ring v. Arizona*, 536 U.S. 584 (2002).................................................... 4

*Ringo v. Lombardi*, 677 F.3d 793 (8th Cir. 2012) ......................................... 204

*Rivas v. Thaler*, 432 F. App'x 395 (5th Cir. 2011)........................................ 204

*Roach v. Quarterman*, 220 F. App'x 270 (5th Cir. 2007) ............................. 196

*Roberts v. Thaler*, 681 F.3d 597 (5th Cir. 2012) ...................................... 70, 178

*Rocha v. Thaler*, 619 F.3d 387 (5th Cir. 2010) ............................................. 48

*Rocha v. Thaler*, 626 F.3d 815 (5th Cir. 2010) ............................................ 179

*Rockwell v. Davis*, 853 F.3d 758 (5th Cir. 2017) .......................................... 198

*Rockwell v. Davis*, CIV. A. 4:14–CV–1055–O, 2016 WL 4398378 (N.D. Tex.
     Aug. 18, 2016) ................................................................. 81, 84

*Romano v. Oklahoma*, 512 U.S. 1 (1994) ......................................................... 63

*Rompilla v. Beard*, 545 U.S. 374 (2005) ....................................................... 100

*Ross v. Estelle*, 694 F.2d 1008 (5th Cir. 1983) ................................................ 77

*Rowell v. Dretke*, 398 F.3d 370 (5th Cir. 2005) ............................. 180, 187, 195

*Russell v. Collins*, 944 F.2d 202 (5th Cir. 1991) ............................................... 83

*Russell v. Lynaugh*, 892 F.2d 1205 (5th Cir. 1989) ....................................... 101

*Salazar v. State*, 90 S.W.3d 330 (Tex. Crim. App. 2002) .............................. 155

*Santellan v. Cockrell*, 271 F.3d 190 (5th Cir. 2001) ........................................ 22

*Sayre v. Anderson*, 238 F.3d 631 (5th Cir. 2001) ............................................ 90

*Schaefer v. Davis*, A–16–CA–1273–SS, 2017 WL 3822750 (W.D. Tex. Jun. 21, 2017) ...................................................................... 167, 174

*Schaetzle v. Cockrell*, 343 F.3d 440 (5th Cir. 2003) ...................................... 151

*Scheanette v. Quarterman*, 482 F.3d 815 (5th Cir. 2007) ........................*passim*

*Schriro v. Landrigan*, 550 U.S. 465 (2007)................................... 107, 108, 198

*Segundo v. Davis*, 831 F.3d 345 (5th Cir. 2016)....................................... 93, 109

*Sells v. Livingston*, 750 F.3d 478 (5th Cir. 2014) .......................................... 200

*Sepulvado v. Jindal*, 729 F.3d 413 (5th Cir. 2013) ....................................... 204

*Sharp v. Puckett*, 930 F.2d 450 (5th Cir. 1991) ............................................... 71

*Sheppard v. Davis*, 967 F.3d 458 (5th Cir. 2020)........................... 92, 101, 102

*Simmons v. South Carolina*, 512 U.S. 154 (1994).................................... 65, 182

*Skinner v. Quarterman*, 576 F.3d 214 (5th Cir. 2009)..................................... 98

*Smith v. Cain*, 565 U.S. 73 (2012)..............................................................48, 51

*Smith v. Collins*, 977 F.2d 951 (5th Cir. 1992)..................................................92

*Smith v. Johnson*, 216 F.3d 521 (5th Cir. 2000) ....................................118, 187

*Smith v. Quarterman*, 471 F.3d 565 (5th Cir. 2006)......................................101

*Smith v. Robbins*, 528 U.S. 259 (2000) .......................................................71, 73

*Soliz v. Davis*, CIV. A. 3:14–CV–4556–K, 2017 WL 3888817 (N.D. Tex. Sept. 6, 2017) ........................................................................................................82

*Sonnier v. Quarterman*, 476 F.3d 349 (5th Cir. 2007)..................................101

*South Carolina v. Gathers*, 490 U.S. 805 (1984) ...........................................199

*Sparks v. Davis*, 756 F. App'x 397 (5th Cir. 2018) ........................................180

*Spence v. Johnson*, 80 F.3d 989 (5th Cir. 1996) .........................................30, 60

*Spinelli v. Collins*, 992 F.2d 559 (5th Cir. 1993)...................................146, 167

*Sprouse v. Stephens*, 748 F.3d 609 (5th Cir. 2014) ...............................183, 185

*Stewart v. Estelle*, 634 F.2d 998 (5th Cir. 1981).............................................167

*Strickland v. Washington*, 466 U.S. 668 (1984) .......................................*passim*

*Strickler v. Greene*, 527 U.S. 263 (1999) ......................................29, 41, 42, 136

*Swarthout v. Cooke*, 562 U.S. 216 (2011) .......................................................118

*Swearingen v. Collier*, 4:19–CV–3079, 2019 WL 3935285 (S.D. Tex. Aug. 20, 2019) .......................................................................................................201

*Thang Lai v. Cain*, CIV. A. 08–3984, 2009 WL 324059 (E.D. La. Feb. 6, 2009) ..................................................................................................................81

*Thompson v. Davis*, 916 F.3d 444 (2019)...............................................106, 180

*Thompson v. Davis*, CV H–13–1900, 2017 WL 1092309 (S.D. Tex. Mar. 23, 2017) ........................................................................... 200, 202

*Thompson v. State*, 9 S.W.3d 808 (Tex. Crim. App. 1999)............................ 149

*Thompson v. Stephens*, No. CIV.A. H–13–1900, 2014 WL 2765666 (S.D. Tex. Jun. 18, 2014)................................................................... 205

*Thorson v. Epps*, 701 F.3d 444 (5th Cir. 2012)................................................ 204

*Trevino v. Davis*, 829 F.3d 328 (5th Cir. 2016) ............................................... 71

*Trevino v. Johnson*, 168 F.3d 173 (5th Cir. 1999)........................................... 65

*Trevino v. Thaler*, 569 U.S. 413 (2013) ........................................................... 67

*Trottie v. Stephens*, 720 F.3d 231 (5th Cir. 2013) ........................................... 99

*Turner v. Quarterman*, 481 F.3d 292 (5th Cir. 2007) ................... 180, 185, 208

*Turner v. United States*, 137 S. Ct. 1885 (2017) ............................................. 48

*United States v. Agurs*, 427 U.S. 97 (1978) ..............................................*passim*

*United States v. Armstrong*, 517 U.S. 456 (1996) ......................................... 189

*United States v. Bagley*, 473 U.S. 667 (1985) ...................................... 40, 41, 54

*United States v. Ballard*, 779 F.2d 287 (5th Cir. 1986) .................................. 97

*United States v. Batchelder*, 442 U.S. 114 (1979) ......................................... 189

*United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002) ............................... 159

*United States v. Bernard*, 762 F.3d 467 (5th Cir. 2014) ........................... 81, 82

*United States v. Culverhouse*, 507 F.3d 888 (5th Cir. 2007)......................... 127

*United States v. Dong Dang Huynh*, CRIM.A.H–05–351–2, 2009 WL 3784393 (S.D. Tex. Nov. 10, 2009) ........................................................... 142, 145

*United States v. Duran-Gomez*, 4:10–CR–0459–S, 2019 WL 11853411 (S.D. Tex. Oct. 7, 2019) ................................................................................ 191

*United States v. Fields*, 761 F.3d 443 (5th Cir. 2014) ................................... 205

*United States v. Frontero*, 452 F.2d 406 (5th Cir. 1971) .............................. 166

*United States v. Gatti*, CRIM03–CR–500333, 2010 WL 1049586 (W.D. La. Feb. 9, 2010) ......................................................................................... 144

*United States v. Glinsey*, 209 F.3d 386 (5th Cir. 2000) ................................ 146

*United States v. Goodwin*, 457 U.S. 368 (1982) ........................................... 189

*United States v. Harris*, 408 F.3d 186 (5th Cir. 2005) .................................. 131

*United States v. Howard*, 991 F.2d 195 (5th Cir. 1993) ............................... 167

*United States v. Infante*, 404 F.3d 376 (5th Cir. 2005) ............................*passim*

*United States v. Kimler*, 167 F.3d 889 (5th Cir. 1999) ................................. 159

*United States v. Mendoza*, 522 F.3d 482 (5th Cir. 2008) ............................... 63

*United States v. Olivares*, 786 F.2d 659 (5th Cir. 1986) .............................. 122

*United States v. Palacios*, 928 F.3d 450 (5th Cir. 2019) .............................. 146

*United States v. Rosnow*, 981 F.2d 970 (8th Cir. 1992) ........................ 124, 148

*United States v. Salinas*, C.A. C–09–122, 2010 WL 2606519 (S.D. Tex. Jun. 24, 2010) ............................................................................................. 126

*United States v. Sanders*, CRIM.A. 10–00351, 2014 WL 3122418 (W.D. La. July 3, 2014) ......................................................................................... 191

*United States v. Shepard*, 675 F.2d 977 (8th Cir. 1982) .............................. 120

*United States v. Thomas*, 724 F.3d 632 (5th Cir. 2013) ............................... 208

*United States v. Tijerina*, 35 F. App'x 390 (5th Cir. 2002) ............................ 147

*United States v. Varca*, 896 F.2d 900 (5th Cir. 1990) .................................... 144

*United States v. Vonn*, 535 U.S. 55 (2002) .................................................... 171

*United States v. Wade*, CIV.A. H–10–3973, 2011 WL 2604826 (S.D. Tex. Jun. 30, 2011) ........................................................................................................ 142

*United States v. Williamson*, 183 F.3d 458 (5th Cir. 1999) ............................ 72

*Valdez v. Cockrell*, 274 F.3d 941 (5th Cir. 2001) ............................................ 24

*Valdez v. State*, AP–77,042, 2018 WL 3046403 (Tex. Crim. App. Jun. 20, 2018) ............................................................................................................... 45

*Van Poyck v. Wainwright*, 595 F.2d 1083 (5th Cir. 1979) ..................... 166, 167

*Velez v. State*, AP–76,051, 2012 WL 2130890 (Tex. Crim. App. Jun. 13, 2012) ................................................................................................................... 63

*Walker v. Epps*, 550 F.3d 407 (5th Cir. 2008) ............................................... 201

*Walker v. Maggio*, 738 F.2d 714 (5th Cir. 1984) ........................................... 166

*Ward v. Stephens*, 777 F.3d 250 (5th Cir. 2015) ............................................. 98

*Wayte v. United States*, 470 U.S. 598 (1985) ................................................ 189

*Wearry v. Cain*, 577 U.S. 385 (2016) ....................................................... 41, 51

*Webb v. Collins*, 2 F.3d 93 (5th Cir. 1993) .................................................... 183

*West v. Johnson*, 92 F.3d 1385 (5th Cir. 1996) ............................................... 91

*Westley v. Johnson*, 83 F.3d 714 (5th Cir. 1996) ........................................... 208

*Whitaker v. Collier*, 862 F.3d 490 (5th Cir. 2017) ......................................... 201

*Whitaker v. Livingston*, 597 F. App'x 771 (5th Cir. 2015) ............................ 202

*White v. Thaler*, 522 F. App'x 226 (5th Cir. 2013) ........................................ 190

*White v. Thaler*, H–02–1805, 2011 WL 4625361 (S.D. Tex. Sept. 30, 2011) 190, 194

*White v. Woodall*, 572 U.S. 415 (2014).................................................. 57, 59, 126

*Wiggins v. Smith*, 539 U.S. 510 (2003). ..................................................*passim*

*Wilder v. Cockrell*, 274 F.3d 255 (5th Cir. 2001) .......................................... 150

*Wilkerson v. Collins*, 950 F.2d 1054 (5th Cir. 1993) ....................................... 91

*Wilkins v. Stephens*, 560 F. App'x 299 (5th Cir. 2014).................................. 120

*Williams v. Illinois*, 399 U.S. 235 (1970) ...................................................... 194

*Williams v. Scott*, 35 F.3d 159 (5th Cir. 1994) ........................................ 47, 136

*Williams v. State*, 674 S.W.2d 315 (Tex. Crim. App. 1984) .......................... 163

*Williams v. Taylor*, 529 U.S. 362 (2000) ........................................... 20, 23, 101

*Williams v. Taylor*, 529 U.S. 420 (2000) ................................................ 25, 105

*Williams v. Thaler*, 602 F.3d 291 (5th Cir. 2010) .................................... 68, 141

*Willy v. Admin. Review Bd.*, 423 F.3d 483 (5th Cir. 2005) ............................ 97

*Wilson v. State*, 7 S.W.3d 136 (Tex. Crim. App. 1999)................................... 45

*Wood v. Bartholomew*, 516 U.S. 1 (1995).................................................... 51

*Wood v. Collier*, 836 F.3d 534 (5th Cir. 2016) ............................................. 204

*Woodard v. Beto*, 447 F.2d 103 (5th Cir. 1971) ............................................ 78

*Woodford v. Visciotti*, 537 U.S. 19 (2002) .................................................. 21

*Wyatt v. Dretke*, 165 F. App'x 335 (5th Cir. 2006)........................................ 192

*Wyatt v. State*, 23 S.W.3d 18 (Tex. Crim. App. 2003) ..................................... 43

*Yarborough v. Alvarado*, 541 U.S. 652 (2002) ........................................... 21, 23

*Yohey v. Collins*, 985 F.2d 222 (5th Cir. 1993) ............................................. 208

*Young v. Davis*, 835 F.3d 520 (5th Cir. 2016) ....................................... 182, 183

*Young v. Herring*, 938 F.2d 543 (5th Cir. 1991). ........................................... 107

*Young v. Stephens*, MO–07–CA–002–RAJ, 2014 WL 509376 (W.D. Tex. Feb. 10, 2014) ........................................................................................................ 191

*Zimmerman v. Cockrell*, 69 F. App'x 658 (5th Cir. 2003) ............................. 209

**Statutes**

28 U.S.C. § 2244(d) ........................................................................................ 207

28 U.S.C. § 2244(d)(1)(A) .............................................................................. 207

28 U.S.C. § 2244(d)(2) .................................................................................... 207

28 U.S.C. § 2254 ...................................................................................... 200, 201

28 U.S.C. § 2254(a) .......................................................................................... 19

28 U.S.C. § 2254(b)(1) ...................................................................................... 19

28 U.S.C. § 2254(b)(2) ...................................................................................... 19

28 U.S.C. § 2254(d) ................................................................................... *passim*

28 U.S.C. § 2254(d)(1) .............................................................................. *passim*

28 U.S.C. § 2254(d)(2) ..................................................................... 25, 53, 111

28 U.S.C. § 2254(e)(1) ............................................................. 24, 25, 51, 86

28 U.S.C. § 2254(e)(2) .............................................................................. *passim*

42 U.S.C. § 1983 ................................................................................ 200, 201, 206

Tex. Code Crim. Proc. art. 11.071, § 5 ............................................... 7, 68

Tex. Code Crim. Proc. art. 26.13(a) .................................................... 162, 164

Tex. Code Crim. Proc. art. 37.07, § 3(g) ............................................ 79

Tex. Code Crim. Proc. art. 37.071 § 2(b)(1) ....................................... 4

Tex. Code Crim. Proc. art. 37.071, § 2(b) ........................................... 6

Tex. Code Crim. Proc. art. 37.071, § 2(e) ........................................... 6

Tex. Code Crim. Proc. art. 37.071, § 2(h) ........................................... 6

**Rules**

Rule 6(a) of the Rules Governing Habeas Corpus Cases Under Section 2254
.............................................................................................................. 205

Rule 8(a) of the Rules Governing Habeas Corpus Cases Under Section 2254
.............................................................................................................. 107

Tex. R. Evid. 403 ............................................................................... 150, 157, 158

**Other Authorities**

The Antiterrorism and Effective Death Penalty Act of 1996 ................. *passim*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RONALD JAMES HAMILTON, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:15–cv–01996 |
| | § | **DEATH PENALTY CASE** |
| BOBBY LUMPKIN, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| Respondent. | § | |

## AMENDED ANSWER WITH BRIEF IN SUPPORT

Ronald James Hamilton[1] shot and killed Ismail Yousef Matalkah while robbing a convenience store. After Hamilton pleaded guilty to the offense, a Texas jury convicted Hamilton of capital murder and sentenced him to die. Following unsuccessful direct appeal and state writ proceedings, Hamilton filed a federal habeas petition with this Court. ECF No. 19. The Director answered the petition, and Hamilton replied. ECF Nos. 27, 34. This Court then stayed the case to allow Hamilton to present unexhausted claims to the state

---

[1]    Respondent Bobby Lumpkin will be referred to as "the Director." The Director employs the following citation conventions: "ECF" refers to entries on the Court's electronic docket sheet; "CR" refers to the clerk's record of pleadings and documents filed during Hamilton's capital-murder trial; "RR" refers to the reporter's record of transcribed trial proceedings; "SX" and "DX" refer to the State and defense trial exhibits; "SHCR–01, –02" refer to the clerk's record of pleadings and documents filed during Hamilton's initial and subsequent state habeas proceedings; and "SHRR–02" refers to the reporter's record of transcribed subsequent state habeas proceedings. All references are preceded by volume number and followed by page number where applicable.

court. ECF No. 37. Hamilton filed a subsequent state habeas application, and the Texas Court of Criminal Appeals (CCA) remanded one claim for consideration on the merits.[2] Following a hearing, the trial court recommended granting relief, but the CCA rejected the recommendation and instead denied and dismissed Hamilton's subsequent state habeas application.[3] With exhaustion complete, this Court reopened the case and lifted the stay. ECF No. 47. Hamilton has filed his amended petition, ECF No. 50, and the Director now answers.

As shown below, Hamilton does not establish that he is entitled to any relief. Some of his claims are procedurally defaulted or barred, and these defaulted claims are meritless even under de novo review. Failing to meet his burden under the governing statute, Hamilton also does not demonstrate that the state courts unreasonably applied clearly established federal law in rejecting his claims; nor does he overcome the state courts' factual findings with clear and convincing evidence. Accordingly, this Court should deny Hamilton's bid for a writ of habeas corpus.[4]

---

[2]    *Ex parte Hamilton*, WR–78,114–02, 2018 WL 4344324, at *1 (Tex. Crim. App. Sept. 12, 2018).

[3]    *Ex parte Hamilton*, WR–78,114–02, 2020 WL 6588560, at *1–*3 (Tex. Crim. App. Nov. 11, 2020) (per curiam) (not designated for publication).

[4]    The Director denies all allegations of fact made by Hamilton except those supported by the record and those specifically admitted herein. The Director also reserves all affirmative defenses concerning Hamilton's claims. To the extent that any unexhausted,

## HAMILTON'S ALLEGATIONS

The Director understands Hamilton to allege that:

1. "Hamilton's death sentence was obtained in violation of the Due Process Clause and the Eighth Amendment because the prosecution suppressed favorable evidence prior to and during trial, presented false and misleading evidence, and because his death sentence is grounded upon evidence that has been revealed to be materially inaccurate";

2. "Hamilton received ineffective assistance of trial counsel [(IATC)] during the punishment phase of his trial in violation of the [S]ixth and [F]ourteenth [A]mendments," because:

    (a) "[t]rial counsel repeatedly failed to object to inadmissible and prejudicial extraneous offense and bad act evidence";

    (b) "[t]rial counsel was ineffective for failing to investigate, prepare for, and effectively cross-examine [the jailhouse snitch] who testified that he overheard Hamilton admit to committing the extraneous capital murder";

    (c) "[t]rial counsel was ineffective for failing to investigate, prepare for, and effectively cross-examine Wanda Johnson—a witness to the [extraneous] murder who observed the shooter had an afro"; and

    (d) "Hamilton's counsel failed to adequately investigate, prepare, and present mitigating evidence";

---

procedurally defaulted, or time-barred claims or facts are not specifically addressed, the Director fully intends to exert all of her affirmative defenses in this matter and does not waive them, either implicitly or explicitly. The Director also retains the right to raise additional defenses (i.e., jurisdiction, statute-of-limitations, exhaustion/procedural default, etc.) should Hamilton later contend that he raised more or different issues than the ones listed.

3.    "Hamilton is entitled to a new trial because of his counsel's actual conflict of interest—representing [a] jailhouse snitch on the very case on which [he] derived benefit for testifying against Hamilton";

4.    "Hamilton is entitled to a new trial because of his counsel's actual conflict of interest—being law firm partners with co-defendant [Shawon] Smith's attorney";

5.    "[t]rial counsel was ineffective for failing to properly object to victim impact evidence";

6.    "Hamilton's Due Process Rights under the Fifth and Fourteenth Amendments were violated when the trial court failed to admonish him concerning the range of punishment and his right against compulsory self-incrimination before accepting his guilty plea to capital murder";

7.    "Texas'[s] capital sentencing scheme violates the Fifth, Sixth, and Fourteenth Amendments [], as interpreted under *Apprendi v. New Jersey*[5], *Ring v. Arizona*[6], and *Hurst v. Florida*[7]";

8.    "Texas'[s] 12–10 [r]ule [v]iolated Hamilton's [r]ights under the Eighth and Fourteenth Amendments";

9.    "Texas'[s] death penalty scheme violated Hamilton's right against cruel and unusual punishment and rights to an impartial jury and due process of law under the Sixth, Eighth, and Fourteenth Amendments [. . .] because [Texas Code of Criminal Procedure] Article 37.071 § 2(b)(1) employs undefined terms leading to an arbitrary infliction of the death penalty";

---

5    530 U.S. 466 (2000).

6    536 U.S. 584 (2002).

7    577 U.S. 92 (2016).

10. "Hamilton was denied equal protection and due process of law under the [F]ourteenth [A]mendment and subjected to cruel [and unusual punishment under the Eighth Amendment], under the principles of *Bush v. Gore*[8], because he was subjected to disparate treatment on account of his race";

11. "Hamilton was denied equal protection and due process of law under the [F]ourteenth [A]mendment and subjected to cruel [and unusual punishment under the Eighth Amendment], under the principles of [*Bush*], because he was subjected to disparate treatment on account of where he live[d] in the state";

12. "Texas'[s] [c]apital [s]entencing [s]cheme [v]iolates the Eighth Amendment [w]ith [r]espect to the [b]urden of [p]roof and [the] internal inconsistencies within the [m]itigation [i]ssue, by giving the [j]ury [m]ixed [s]ignals as to [h]ow the [m]itigation [i]ssue is to be [a]pplied"; and

13. The Texas [s]cheme for [e]xecuting [d]efendants by [l]ethal [i]njection is [. . .] in [v]iolation of the Eighth Amendment's [p]rotection [a]gainst [c]ruel and [u]nusual punishment."

Am. Pet., ECF No. 50 at 2–5 (table of contents), 60, 82, 84, 94, 99, 103, 127, 150, 163, 170, 185, 196, 203, 209, 217, 223 (formatting omitted); Pet., ECF No. 19 at iii–vi (table of contents), 33, 43, 57, 62, 69, 75–76, 85, 90, 94, 118, 129, 136, 141, 146, 150, 156.

## STATEMENT OF THE CASE

Indicted for capital murder, Hamilton pleaded guilty to killing Matalkah while committing a robbery. 1–2 CR 2, 11, 328, 334–35; 16 RR 10; 22 RR 4.

---

[8]   531 U.S. 98 (2000).

Pursuant to the jury's answers to the punishment special issues, the trial court sentenced Hamilton to death. 2 CR 329–31; 22 RR 4–7; Tex. Code Crim. Proc. art. 37.071, § 2(b), (e). The CCA upheld Hamilton's conviction and death sentence on automatic direct appeal. *Hamilton v. State*, No. 74,523 slip op., 2004 WL 3094382, at *6 (Tex. Crim. App. Oct. 13, 2004) (per curiam) (not designated for publication), *cert. denied* 545 U.S. 1130 (2005); Tex. Code Crim. Proc. art. 37.071, § 2(h).

Hamilton also filed a state application for a writ of habeas corpus. 1 SHCR–01 2. After briefing, the trial court issued findings of fact and conclusions of law and recommended that the CCA deny relief. 4 SHCR–01 776–809. Following its own review, the CCA adopted the trial court's findings of fact and conclusions of law and denied Hamilton's application. *Ex parte Hamilton*, No. 78,114–01, 2015 WL 3899185, at *1 (Tex. Crim. App. Jun. 24, 2015) (per curiam) (not designated for publication).

Hamilton filed his federal petition for a writ of habeas corpus on June 17, 2016. Pet., ECF No. 19. The Director answered the petition, and Hamilton replied. ECF Nos. 27, 34. This Court then stayed the case to allow Hamilton to present unexhausted claims to the state court. ECF No. 37. The CCA found that one allegation satisfied the requirements for consideration of a subsequent application under Texas Code of Criminal Procedure Article

11.071, § 5—namely, that recently tested fingerprint evidence established Hamilton's innocence of an extraneous capital murder introduced at punishment. *Ex parte Hamilton*, 2018 WL 4344324, at *1. Following a hearing, the trial court adopted Hamilton's proposed findings of fact and conclusions of law recommending that relief be granted. *Ex parte Hamilton*, 2020 WL 6588560, at *1. But the CCA independently reviewed the case and rejected the trial court's findings and conclusions as not supported by the record or law. *Id.* at *1. The CCA then denied relief on Hamilton fingerprint claims and dismissed the remainder of Hamilton's claims as procedurally barred. *Id.* at *3. Hamilton has petitioned for certiorari review of the CCA's decision. *Hamilton*, *Jr. v. Texas*, No. 20–7687. His petition remains pending.

With exhaustion complete, the Court reopened the case and lifted the stay. ECF No. 47. Hamilton filed his amended petition and a motion for an evidentiary hearing on April 26, 2021. Am. Pet., No. ECF No. 50; ECF No. 52.

## STATEMENT OF THE FACTS

## I.    Facts of the Crime

Ahmad Naimi was the manager of a Sun Mart gas station located on Yellowstone Street in Houston, Texas. 16 RR 252–53. On November 7, 2001, around 6:45 p.m., Naimi saw Hamilton enter the store, ask the cashier, Matalkah, about an item, and then leave. *Id.* at 253–55. Two to three minutes

later Naimi heard someone talking to Matalkah. *Id*. at 255, 260. Investigating, he saw that Hamilton had returned and was pointing a gun at Matalkah's face. *Id*. When Hamilton saw Naimi, he shot Matalkah. *Id*. at 255, 262. Hamilton then chased and shot at Naimi, who fell to the ground and was still. *Id*. at 262–65. Hamilton left, taking with him a cash register containing about two hundred dollars. *Id*. at 263, 276.

Josephine Miller saw Hamilton leaving the Sun Mart. Hamilton had the cash register and entered the passenger side of an older grey Cutlass or Regal. 16 RR 57, 65. The car was driven by Hamilton's friend Smith (also known as "Big Shawn"). 16 RR 88–89, 242; SX 38-A at 4. Miller provided police a partial license plate number, noted the car's driver was heavyset, and described Hamilton's clothing. 16 RR 63–65. Miller later identified Smith's car as the getaway vehicle. *Id*. at 242.

After Hamilton left, Naimi called the police and tended to Matalkah. *Id*. at 264–66. Matalkah eventually succumbed to a gunshot wound to the head. 18 RR 67, 86–87. The store's security camera captured the robbery, and Naimi identified Hamilton as Matalkah's shooter. 16 RR 243–46, 277–84; SX 41.

Billy Norris was Hamilton and Smith's friend. At the time of Matalkah's murder, Norris was staying with Smith about two blocks from the Sun Mart. 16 RR 72–73. Norris testified that Smith drove a late 1980s two-door smoke

grey Regal. *Id*. Shortly after Matalkah's murder, Norris heard Hamilton and Smith arguing and hitting something with a hammer. *Id*. at 74–76. Hamilton and Smith were attempting to open a cash register. *Id*. at 76. Smith said that he drove Hamilton to a store because Hamilton was hungry. *Id*. at 77. While Smith waited in the car, he heard a gunshot and then saw Hamilton leave the store with the cash register. *Id*. Smith told Norris that Hamilton was using fry when he murdered Matalkah. *Id*. at 101–02. Fry is marijuana laced with PCP. 17 RR 46. Hamilton himself was evasive with Norris about what happened, but he did say that he had made a mistake and was sorry. 16 RR 78–79. Hamilton started attending church with Norris about a week after Matalkah's murder and expressed remorse. *Id*. at 80. After a month or two, though, Hamilton stopped attending church. *Id*. at 80–81. In December 2001, Norris witnessed Hamilton and Smith fighting. *Id*. at 81–84. Hamilton threatened Smith not to tell anyone about the murder. *Id*. at 84–85.

On January 21, 2002, police responded to a family disturbance involving Hamilton and Brooke Rogers at a Stop-N-Go store. 16 RR 124–25. Rogers had met Hamilton in 1995, was romantically involved with him for three years, and was the mother of his three-year-old son. *Id*. at 138–39. Hamilton and Rogers had been at Rogers's house arguing about her relationship with another man and her refusal to have sex with Hamilton. *Id*. at 148. They continued to fight

as Rogers drove Hamilton home. *Id*. at 148–49. Rogers eventually grew frightened that Hamilton might hit her and stopped her car. *Id*. at 150. Hamilton got out, and Rogers called the police. *Id*. at 150–51. When Rogers locked herself in the car, Hamilton slashed her tires with a knife. *Id*. at 120, 129, 150–51. After the police arrived, Hamilton told them that Rogers was wanted for writing hot checks. *Id*. at 152. In turn, Rogers told police that Hamilton had confessed to shooting a man at a gas station. *Id*. at 152–53. Rogers had recognized Hamilton's picture from the news. *Id*. at 153–54. Hamilton told Rogers that he robbed the convenience store because he was broke. *Id*. at 155. But he also claimed that he had shot Matalkah because Matalkah was reaching for a gun in "a drug deal gone bad." *Id*. at 154, 157. Hamilton told Rogers that he threw the murder weapon and the cash register into the ship channel and threatened Rogers to keep quiet. *Id*. at 158–59, 181. Police arrested Hamilton for criminal mischief[9] and placed a homicide hold on him. *Id*. at 130–31. Rogers gave police a statement. 16 RR 229.

Hamilton himself also gave a videotaped statement. Hamilton confessed that he had accompanied Smith and a man named "Black" to the Sun Mart in Smith's car, but he did not admit to committing the murder or robbery—instead, he blamed "Black" and Smith. 16 RR 229–38, SX 38, 38-A, 39.

---

[9]     Hamilton was convicted of criminal mischief and sentenced to fifty days in the county jail. 23 RR 53; SX 51.

Hamilton acknowledged recently having a cast on his right hand. 16 RR 243. The robber in the Sun Mart surveillance tape also had a cast, albeit on the left hand. *Id.*

## II.   Evidence Relating to Punishment

### A.   The State's evidence

In addition to Matalkah's murder, the State presented evidence concerning Hamilton's other bad acts and convictions. Rogers testified that Hamilton was nice to her before their son was born, but Hamilton later contributed little time or money to their son's upbringing. 16 RR 140–43. Hamilton and Rogers fought often, and Hamilton would physically hurt Rogers. *Id.* at 159–60. Once, Hamilton shot a gun at Rogers from across a field. *Id.* at 182–84. Another time, Hamilton grew angry about a comment made by a friend of a man that Rogers knew, and Hamilton pushed or tripped Rogers. *Id.* at 160–61. Hamilton took their son from Rogers, and when she went for help, he followed Rogers down the street, cursing, hitting, kicking, and pushing her while she wept. *Id.* at 161–64. In another incident, the police came to Rogers's apartment after Hamilton had beaten her. 17 RR 62. Hamilton had grown upset when their baby was crying while Hamilton was on the phone. *Id.* at 64. Hamilton threw the phone at Rogers, and Rogers sprayed air freshener

at Hamilton. *Id*. at 64–65. Hamilton then punched Rogers three times. *Id*. at 66. Rogers testified that Hamilton sold drugs for a living. 16 RR 198–99.

The State also elicited testimony about Hamilton's poor behavior in jail. Hamilton had assaulted one inmate, calling him a "fucking Mexican" and beating him until the guards arrived. 17 RR 80–85. Hamilton hit another inmate hard enough that he injured his own hand and left the inmate with a permanent scar on his forehead. *Id*. at 143–46, 165. Hamilton put hair remover in another inmate's shampoo bottle and stole an inmate's food tray. *Id*. at 113–17, 127–31.

Inmate Joseph Montoyer testified that Hamilton was a bully who picked on Caucasians and Hispanics. 17 RR 185. Montoyer heard Hamilton tell friends that he shot a man on Yellowstone Street and took a cash drawer. *Id*. at 186. Hamilton also told Montoyer that Hamilton's sister and aunt would testify that Hamilton was in Dallas during a killing, and Montoyer overheard Hamilton discuss his alibi during a phone call. *Id*. at 189–90, 193.

The State introduced evidence that Hamilton was previously convicted of: (1) possession of a controlled substance in 1994; (2) possession of marijuana in 1997; and (3) possession of cocaine in 1998. SX 48–50. As noted, Hamilton was also convicted of criminal mischief in 2002. SX 51. Hamilton's 1997 conviction stemmed from police executing a narcotics search warrant at a

12

Houston residence after receiving complaints that drugs were being sold there. 17 RR 31–34. The police arrested Hamilton and Smith and found numerous plastic baggies and envelopes filled with marijuana. *Id*. at 39, 41. Hamilton's 1998 conviction arose when police stopped Hamilton for driving a vehicle listed as stolen. *Id*. at 93–103, 106. Inside the car, police found crack cocaine, a pistol under the driver's seat, and two soda bottles filled with codeine and another liquid. *Id*. at 106–07.

The State also presented evidence that Hamilton committed another murder at a convenience store on Holman Street in Houston on December 9, 2001. Charles Douglas and Wanda Johnson arrived at the convenience store around 7:00 p.m. 17 RR 276. Inside, Hamilton was talking with owner Son Vinh Huynh (also known as "Tulson"). 17 RR 216, 239–42, 262–63; 18 RR 98. Hamilton and Huynh began fighting. 17 RR 242–43. Hamilton then drew a gun and shot Huynh. *Id*. at 244–45, 264, 284–85. After shooting Huynh, Hamilton tried unsuccessfully to open the store cash register and used a shirt to wipe his fingerprints off it. *Id*. at 247. He eventually left, getting into the passenger seat of an older car driven by a heavyset African American man. *Id*. at 246, 276, 279.

When police arrived at the scene, Huynh was dead and lying face down in a pool of blood. 17 RR 205. The cause of Huynh's death was similar to

Matalkah's—a gunshot to the head. 18 RR 86–87. The type of wound suggested the gun had been pressed against Huynh's skin when fired. *Id.* at 80–81. Huynh also had injuries consistent with a struggle. *Id.* at 82, 84–86. Douglas and Johnson later identified Hamilton from a photospread and in court. 17 RR 241, 266, 268; 18 RR 22–24. Inmate Montoyer also overheard Hamilton discussing a robbery on Holman Street involving an Asian victim. 17 RR 187–88.

Hamilton's mother had seen him with a gun on several occasions. 18 RR 232–34. Hamilton had an Uzi and possibly a .38 caliber handgun. Hamilton was proud of his weapons. *Id.* at 233–36.

Muhamed Alli, Matalkah's brother-in-law, testified that Matalkah came to the United States from Jordan, leaving behind his wife and four children, because he was unable to find employment in his home country. 19 RR 158–59. Alli sent money to Matalkah's family in Jordan because there was no one else to care for Matalkah's family except neighbors and relatives after Matalkah's death. *Id.* at 160–61.

## B.   The defense's evidence

The defense presented evidence that the getaway vehicle used in Matalkah's murder was wrecked on December 2, 2001 (i.e., a week before

Huynh's murder). 18 RR 109–12. Hamilton was arrested in connection with the car accident, but he was released prior to Huynh's murder. *Id*. at 111, 116.

Hamilton's father and mother—Ronald James Hamilton, Sr., and Elsie Tippins—testified. Hamilton was the couple's only child. 18 RR 121. Hamilton's father was a construction worker who sometimes worked offshore. *Id*. at 122, 129. Hamilton's father had been in the penitentiary three times and was only recently released. *Id*. at 140. He had previously received an eighteen-year sentence for attempted burglary of a building and a fifteen-year sentence for robbery. *Id*. at 140–41. Hamilton's mother was a full-time housewife. *Id*. at 122. She had attended school until the eleventh grade and took some special education classes. *Id*. at 122, 183. Hamilton's mother was twenty years old when she gave birth to Hamilton in 1977 and considered herself to be a poor mother. *Id*. at 183, 204. Hamilton's parents were divorced, and his mother had remarried. *Id*. at 121, 128–29.

According to Hamilton's father, both he and Hamilton's mother regularly smoked marijuana and drank beer—even when Hamilton's mother was pregnant. 18 RR 123–25. Hamilton's father sold marijuana in late 1975 or 1976, and Tippins continued to sell marijuana after the couple separated. *Id*. at 127–28. When Hamilton was little, his parents occasionally gave Hamilton a medicine that they believed contained opium so that he would sleep. *Id*. at

125. Hamilton's father testified that he and his wife had physical and verbal altercations. *Id*. at 130–31.

Between 1977 and 1978, Hamilton lived at his maternal grandmother's house on Lozier Street. 18 RR 130. Hamilton's grandmother suffered from diabetes, had her leg amputated, and required dialysis. *Id*. at 134, 187. Hamilton's uncles lacked regular employment and also lived at the Lozier Street house. *Id*. at 134, 144. Two of the uncles used drugs, and a third was considered slow. *Id*. at 144–45, 202. According to Hamilton's mother, her brothers were crack addicts. *Id*. at 202–03. Hamilton's grandmother and her disability check supported the household financially. *Id*. at 134–35. Hamilton's father testified that large rats ran through the Lozier Street house, and the toilets did not work properly. *Id*. at 132–33, 143.

After Hamilton's grandmother mother died in the 1980s, the Lozier Street house further deteriorated, and Hamilton had to take care of himself because his parents were not there for him. 18 RR 135, 145, 203. Hamilton's father testified that he had no time for young Hamilton because he was addicted to drugs. *Id*. at 135–36. Hamilton's father quit using drugs in 1996 or 1997, and his mother quit at some point as well. 18 RR 157–59. Hamilton's mother used cocaine, was arrested twice for prostitution, and was sent to jail four or five times. *Id*. at 190, 204, 240. Hamilton saw his mother sell drugs but

did not see her engage in prostitution. *Id*. at 193, 216–20. Hamilton's mother eventually had more children with another husband, Robert Tippins, but those children lived with their father while Hamilton remained at the Lozier Street house. *Id*. at 224–25.

Hamilton attended school until the tenth grade and took special education classes. 18 RR 194. According to his father, Hamilton could not read or write as an adult and received social promotions in school. *Id*. at 147. While imprisoned, Hamilton wrote his father letters that seemed as if they were written by a seven-year-old child. *Id*. Hamilton had dealt drugs since he was ten years old. *Id*. at 148. Once, Hamilton's father caught an elementary-age Hamilton sniffing aerosol deodorant. *Id*. at 138. Hamilton's mother learned that Hamilton was using fry about three years prior to trial. *Id*. at 204. Hamilton father was afraid to try fry because he saw others lose control because of it. *Id*. at 136.

Darious Graves, Hamilton's cousin, testified that Hamilton had little supervision after Tippins's mother died, and Hamilton stayed at various places when he was fifteen or sixteen. 19 RR 17–18. Graves testified that Hamilton was not generally violent; however, when Hamilton used fry, he would punch holes in the wall, cry, and run naked in the streets. *Id*. at 19, 25–28.

Deedee Halpin, an educational diagnostician, testified that Hamilton had average intellectual ability with an IQ of 92. 19 RR 53. Hamilton started attending special education classes prior to second grade. *Id*. at 55–56. As an elementary student, Hamilton's academics lagged behind his age and grade. *Id*. at 53–54, 56–57. Hamilton was also diagnosed with a severe visual perception deficit, meaning that Hamilton's brain was not interpreting what Hamilton saw at an age-appropriate level. *Id*. at 54. Halpin believed that Hamilton had a severe learning disability (particularly in the area of reading) that never significantly improved. *Id*. at 62. Halpin reviewed two writing samples from Hamilton and observed that Hamilton was writing at a first or third grade level when he was twenty years old. *Id*. at 63–65. Halpin testified that children with learning disabilities commonly act out or misbehave, and Hamilton would have difficulty maintaining a job requiring written communication. *Id*. at 67–68.

In rebuttal, the State presented a 1998 pretrial services interview in which Hamilton reported that he completed the eleventh grade and obtained his GED. 19 RR 136–42. Hamilton also stated that he did not have a drug or alcohol problem. *Id*. At that time, Hamilton worked part-time for a temporary agency and had been previously employed as a laborer for seven months. *Id*.

However, the Texas Education Agency had no record of Hamilton's GED certificate. 20 RR 10; DX 43.

## STANDARD OF REVIEW

Confined pursuant to a state court judgment, Hamilton is entitled to relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Thus, any claims Hamilton raises which are based solely on alleged violations of state law should be denied as a matter of law.

Habeas relief is also inappropriate for claims which are either unexhausted and procedurally defaulted or claims which were exhausted yet dismissed in a successive state habeas application and, thus, are also procedurally defaulted. Indeed, under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal habeas application shall not be granted unless:

(A)   the applicant has exhausted the remedies available in the courts of the State; or

(B)   (i)   there is an absence of available State corrective process; or

(ii)   circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1). A writ may be denied on the merits, notwithstanding any failure to exhaust available state court remedies. 28 U.S.C. § 2254(b)(2).

Regarding exhausted claims, under AEDPA, federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless that adjudication:

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). The Supreme Court has explained that a state court decision is "contrary to" clearly established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or confronts facts that are "materially indistinguishable" from relevant Supreme Court precedent but reaches an opposite result.[10] (*Terry*) *Williams*, 529 U.S. at 405–06.

A "run-of-the-mill" state court decision applying the correct Supreme Court rule to the facts of a particular case is to be reviewed under the "unreasonable application" clause. *Id.* at 406. To this end, a state court

---

[10]     "Clearly established Federal law" refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (citing (*Terry*) *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). "In other words, 'clearly established federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court reaches its decision." *Id.* at 71–72 (citing (*Terry*) *Williams*, 529 U.S. at 405, 413, and *Bell v. Cone*, 535 U.S. 685, 698 (2002)).

unreasonably applies Supreme Court precedent *only if* it correctly identifies the governing precedent but unreasonably applies it to the facts of the particular case. *Id.* at 407–09. As the Supreme Court described this deferential standard, in order to determine if the state court made an unreasonable application, a federal court "must determine what arguments or theories supported or . . . *could have supported*, the state court's decision; and then it must ask *whether it is possible fairminded jurists could disagree* that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (emphasis added). Indeed, this is the "only question that matters under § 2254(d)(1)." *Id.*

Thus, "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the state court's decision. *Id.* at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2002)); *see also Woodford v. Visciotti*, 537 U.S. 19, 27 (2002) (federal habeas relief is only merited where the state court decision is both incorrect *and* objectively unreasonable, "whether or not [this Court] would reach the same conclusion"). Moreover, "evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway the courts have in reaching outcomes in case-by-case determinations." *Alvarado*, 541 U.S. at 644. This is particularly

21

true when reviewing a state court's application of *Strickland v. Washington*, 466 U.S. 668 (1984), which when analyzed in conjunction with § 2254(d) creates a difficult to surmount and "doubly" deferential assumption in favor of the state court denial. *Richter*, 562 U.S. at 105.

It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable:

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court litigation of claims already rejected in state proceedings. It preserves the authority to issue the writ in cases where there is *no possibility fairminded jurists could disagree* that the state court's decision conflicts with this Court's precedents. It goes no farther. [28 U.S.C. §] 2254(d) reflects the view that habeas corpus is a "guard against *extreme malfunctions* in the state court criminal justice systems, *not a substitute for ordinary error correction through appeal*."

*Id.* at 102–03 (emphasis added, internal citations omitted).

Moreover, it is the state court's "ultimate decision" that is to be tested for unreasonableness, "not every jot of its reasoning." *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001); *see also Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (holding that a federal court's "focus on the 'unreasonable application' test under [§] 2254(d) should be on the ultimate legal conclusion the state court reached and not on whether the state court considered and discussed every angle of the evidence"); *Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) ("[W]e review only the state court's decision, not its reasoning

or written opinion[.]"). And a state court's decision need not expressly cite any federal law or even be aware of applicable Supreme Court precedent in order to be entitled to deference. *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003); *Early v. Packer*, 537 U.S. 3, 7–8 (2002) (state court decision must be upheld so long as the result does not contradict Supreme Court precedent).

If the Supreme Court has not "broken sufficient legal ground to establish [a] . . . constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficiently to satisfy the AEDPA bar" under either the "contrary to" or "unreasonable application" standard. (*Terry*) *Williams*, 529 U.S. at 381. Stated differently:

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there *was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

*Richter*, 562 U.S. at 103 (emphasis added). And a federal court must be wary of circumstances in which it must "extend a [legal] rationale" of the Supreme Court "before it can apply it to the facts at hand" because such a process suggests the proposed rule is not "clearly established." *Alvarado*, 541 U.S. at 666.

Regarding questions of fact, federal courts must presume correct the factual findings of the state courts unless the petitioner "rebut[s] the

presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "This presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).

Additionally, except for the narrow exceptions contained in § 2254(e)(2), the evidence upon which a petitioner would challenge a state court finding must have been presented to the state court.[11] *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011) (explaining that § 2254(d)(1) "refers in the past tense, to a state court adjudication that 'resulted in' a decision that was contrary to, or 'involved' an unreasonable application of, established law." This language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at the time, i.e., the record before the state court."). Further, because a federal habeas court is also prohibited from granting relief unless a decision was based on an "unreasonable determination of the facts in light of the evidence *presented in the state court proceeding*," it follows that demonstrating the incorrectness of a state court fact finding based upon evidence not presented to the state court

---

[11]     Throughout this answer, the Director has pointed out specific instances where Hamilton has presented *Pinholster*-barred evidence. However, the Director asks the Court to apply *Pinholster* to all evidence not presented to the state courts in relation to claims resolved on the merits, and he does not waive any *Pinholster* objection, either explicitly or implicitly.

would be of no avail to a habeas petitioner. 28 U.S.C. § 2254(d)(2) (emphasis added).

Finally, where a habeas petitioner has failed to fully develop the factual bases of his claims in state court, he is precluded from further factual development in federal court unless (1) his claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise of due diligence; *and* (2) he establishes by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found him guilty. 28 U.S.C. § 2254(e)(2).[12] A failure to meet this standard of "diligence" will bar a federal evidentiary hearing in the absence of a convincing claim of actual innocence that can only be established by newly discovered evidence. (*Michael*) *Williams v. Taylor*, 529 U.S. 420, 436 (2000); *Beazley v. Johnson*, 242 F.3d 248, 272–73 (5th Cir. 2001). For example, a petitioner's failure to present controverted, previously unresolved factual issues to the state court is sufficient to constitute "failure" under the plain meaning of § 2254(e)(2). (*Michael*) *Williams*, 529 U.S. at 433; *Beazley*, 242 F.3d at 273. But even if a petitioner can meet the foregoing standard, it is within this Court's

---

[12]   As with *Pinholster*, the Director's amended answer has pointed out specific instances where Hamilton has presented evidence that cannot be considered pursuant to § 2254(e)(2). However, the Director asks the Court to apply § 2254(e)(2) to all evidence not presented to the state courts (especially in relation to defaulted/barred claims), and he does not waive any § 2254(e)(2) objection, either explicitly or implicitly.

discretion to deny a hearing if sufficient facts exist to make an informed decision on the merits. *Clark v. Johnson*, 227 F.3d 273, 284–85 (5th Cir. 2000).

## ARGUMENT

### I.   Hamilton's Claim That the Prosecution Committed Misconduct Was Reasonably Denied by the State Court, Precluding Relief under AEDPA. (Claim 1)

As explained in the Statement of Facts, *supra*, during punishment, two eyewitnesses testified that Hamilton committed a *second* murder during another convenience store robbery. In addition to the eyewitnesses, jailhouse informant Montoyer linked Hamilton to this second murder. However, the police candidly admitted that no fingerprints or physical evidence from the second murder "tie[d] back" to Hamilton. Hamilton now alleges that the State failed to disclose fingerprint comparison results relevant to the second murder, the State offered false and misleading evidence about the killing, and new fingerprint evidence proves that someone else was the murderer. Accordingly, Hamilton contends that the State violated his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Napue v. Illinois*, 360 U.S. 264 (1959), and his sentence is constitutionally unreliable per the Supreme Court's holding in *Johnson v. Mississippi*, 486 U.S. 578 (1988). Am. Pet., ECF No. 50 at 33–46, 60–82; Pet., ECF No. 19 at 62–68.

26

After this Court stayed federal proceedings to allow Hamilton to exhaust his state remedies, Hamilton raised a claim to the state court asserting that "recently tested fingerprint evidence establishes [his] innocence of [the] extraneous capital murder introduced at punishment." *Ex parte Hamilton*, 2018 WL 4344324, at *1. The CCA remanded the claim to the trial court for consideration. *Id*. Following a hearing, the trial court adopted Hamilton's proposed findings of fact and conclusions of law recommending that relief be granted. *Ex parte Hamilton*, 2020 WL 6588560, at *1. But the CCA conducted an independent review and rejected the trial court's findings and conclusions as not supported by the record or law.[13] *Ex parte Hamilton*, 2020 WL 6588560, at *1, *3. Because the trial court's findings and conclusions were expressly rejected by the CCA, they are entitled to no deference by this Court. *Murphy v. Davis*, 901 F.3d 578, 596 (5th Cir. 2018) (citing *Jones v. Davis*, 890 F.3d 559, 565 (5th Cir. 2018)).

Independently evaluating Hamilton's claim that he had been sentenced based on false evidence and was innocent of the extraneous killing, the CCA

---

[13] In disagreeing with the trial court, the CCA simply served its function as the "ultimate factfinder" in Texas state habeas proceedings. *See Ex parte Reed*, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008); *see also Ex parte Thuesen*, 546 S.W.3d 145, 157 (Tex. Crim. App. 2017) ("[W]hen our independent review of the record reveals circumstances that contradict or undermine the trial judge's findings and conclusions, we have exercised our authority to enter contrary findings and conclusions."). Hamilton complains that rejecting the trial court's recommendation of relief in capital cases is a trend with the CCA, Am. Pet., ECF No. 50 at 46 n.28, but obviously Hamilton must show that error occurred in his own case to obtain relief.

noted that "fingerprint testing in 2017 identified another person as having handled the bottle." *Ex parte Hamilton*, 2020 WL 6588560, at *2. But the CCA found that "the State's trial evidence about the fingerprints was consistent with the fingerprint evidence developed at the habeas stage" because the jury heard the essence of Hamilton's claim—that the fingerprints did not tie to Hamilton or Smith—through police testimony.[14] *Id.* The CCA further found that Hamilton failed to show that the prints were "material to the identity of the [killer]" because Hamilton failed to show that the killer actually handled the bottle. *Id.* The CCA then denied relief. *Id.* at *3. As shown below, the CCA acted reasonably in making this decision, and Hamilton's claims merit no relief.

---

[14]     This is essentially the same argument that the Director made in his original answer before the Court entered a stay. Ans., ECF No. 27 at 83–84. Relatedly, the Director would note that Hamilton inaccurately characterizes the Director's earlier answer. Hamilton states that the Director "suggested there were no DNA samples available for testing," Am. Pet., ECF No. 50 at 61, but what the Director actually said was the trial testimony suggested that no urine was recovered that could be tested for DNA, Ans., ECF No. 27 at 84, and that "since Hamilton has not yet done any testing on the bottle or the fingernail scrapings, there is no indication that any testable DNA exists, let alone DNA that is either material or exculpatory." *Id.* at 85. Also, Hamilton states that the Director "suggested that no forensic testing had been conducted prior to trial," Am. Pet., ECF No. 50 at 61, but (again) the Director clearly expressed his view that the record indicated that "[c]ounsel also brought out at trial that the bottle was tested for fingerprints and those prints did not match Hamilton." Ans., ECF No. 27 at 83–84 (quoting 18 RR 40–41). Finally, Hamilton complains that the Director "faulted Hamilton for not testing the evidence himself" and notes that Texas Code of Criminal Procedure Article 38.43 (i)–(j) was unavailable at the time of trial. Am. Pet., ECF No. 50 at 61. However, the Director's answer did not make mention of this provision, Ans., ECF No. 27 at 83–84, and Hamilton has not shown that the absence of this provision is what precluded him from moving for fingerprint or DNA testing at the time of trial. At the state habeas hearing, Hamilton's counsel acknowledged that she did not move for testing. 6 SHRR–02 128.

In order to establish a *Brady* violation based on withheld evidence, a defendant must prove: (1) "[t]he evidence in question was favorable to him;" (2) the "evidence [was] suppressed by the State;" and (3) the evidence was material. *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Strickler v. Greene*, 527 U.S. 263, 280–82 (1999). Under *Napue*, a conviction must be set aside where the defendant has demonstrated that: (1) a witness gave false testimony; (2) the falsity was material;[15] and (3) the prosecution knew the testimony was false. *Reed v. Quarterman*, 504 F.3d 465, 473 (5th Cir. 2007). In *Johnson*, the Supreme Court reversed a death sentence predicated on a materially inaccurate aggravating factor—a prior violent felony conviction that was vacated after the petitioner's trial. 486 U.S. at 580–82, 590.

Hamilton's three theories thus all share a materiality component, and therefore, the CCA's adverse materiality determination is fatal to all three. As the CCA recognized, without demonstrating that the killer touched the bottle, the fingerprints on it are worthless. *Ex parte Hamilton*, 2020 WL 6588560, at *2. The bottle was found outside a convenience store where people would drink

---

[15]    The *Giglio* materiality standard—which embraces the harmless-error rule of *Chapman v. California*, 386 U.S. 18 (1967)—was abrogated by the Supreme Court's opinion in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *See Barrientes v. Johnson*, 221 F.3d 741, 756–57 (5th Cir. 2000) (assuming *Brecht* harmless-error standard applies to *Giglio* claims raised in federal habeas proceedings) (citing *Gilday v. Callahan*, 59 F.3d 257, 268 (1st Cir. 1995)). Because this is a postconviction proceeding, the government no longer bears the onus of proving harmlessness of trial error under *Chapman*; rather, it is Hamilton who must prove harm.

and loiter and may have been sitting there when the killer arrived. 17 RR 202–03; 8 SHRR–02 352. It was imperative for Hamilton to conclusively show that the killer handled the bottle, and he failed to do so. *Ex parte Hamilton*, 2020 WL 6588560, at *2. In any event, the jury was aware that fingerprints on the bottle did not tie back to Hamilton and Smith. 18 RR 40–41. Additional evidence on this point would have been cumulative and, thus, not material. *See Spence v. Johnson*, 80 F.3d 989, 995 (5th Cir. 1996).

And for the same reason that the evidence was cumulative, no false testimony was actually presented—the police truthfully told the jury that the fingerprints did not tie back to Hamilton or Smith. Hamilton does not contend anyone knew at the time of trial who the prints matched. Am. Pet., ECF No. 50 at 78. In fact, Hamilton does not appear to identify a statement made at trial that was actually false; rather, Hamilton seems to simply believe that he has proved he did not kill Huynh and thus any testimony that suggests that he did must necessarily be incorrect and misleading. *Id*. at 62 ("These claims were based upon the idea that all of the evidence suggesting Mr. Hamilton committed the [ ] murder was false and misleading[.]").

Having apparently decided to view Hamilton's claim concerning prosecutorial misconduct vis-à-vis Smith's plea bargain as part and parcel of the fingerprint claim permitted in the subsequent habeas application, the CCA

denied relief on that claim as well. *Ex parte Hamilton*, 2020 WL 6588560, at *1 n.1 & *3. The CCA found that the prosecution's statements to the trial court were not testimony and were not heard by the jury. *Id*. at *3. But notwithstanding, Hamilton still failed "to show by a preponderance of the evidence that the State misled the trial court or misrepresented any information." *Id*.

As shown further below, the state court's denial of these related claims was not unreasonable, precluding relief under AEDPA. *See Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021) ("The term 'unreasonable' refers not to ordinary error or even to circumstances where the petitioner offers a strong case for relief, but rather to extreme malfunctions in the state criminal justice system.") (internal quotation and alteration marks omitted).

## A. The CCA reasonably denied Hamilton's claims concerning the bottle.

### 1. Background

#### a. The incident report

Hamilton's instant contentions originate in the Houston Police Department's (HPD) incident report[16] detailing Huynh's murder. 8 SHRR–02

---

[16]     Hamilton asserts that the parties agreed that the trial court could consider this report, Am. Pet., ECF No. 50 at 9 n.2, but the State qualified that the court must find the contents admissible first. 2 SHRR–02 16. The admissibility of the contents, particularly pages 2.011 and 2.025, was the subject of some debate at the evidentiary hearing. 5 SHRR–02 29–39. Hamilton attempted to introduce the pages under the rule of optional completeness with witness Johnson's police statement, but the State successfully argued that admission under

337–64. Police officers Larry Hoffmaster and Connie Park investigated the killing.[17] *Id*. at 337. According to the report, latent print examiner Debbie Benningfield was called to the crime scene to aid in the collection and processing of potential evidence. *Id*. at 347, 351–52, 358–59. Benningfield developed a single usable palm print from the inside of the store's glass front door. 4 SHRR–02 45. Benningfield also collected various items for processing, including four alcohol containers outside of the store. 4 SHRR–02 45–46; 8 SHRR–02 351–52. She developed three usable fingerprints. 3 SHRR–02 91; 4 SHRR–02 47–48, 53; 8 SHRR–02 358–59. These fingerprints came from a Schlitz can found on top of a cooler and a Schlitz bottle found on top of a railing. *Id*. Benningfield requested that the container mouths be swabbed for DNA. 8 SHRR–02 347, 352. Police also requested fingernail scrapings from Huynh. 8 SHRR–02 346. While the report shows that items were available for testing, it

---

that rule was improper and the contents were hearsay. *Id*. However, the whole report was later admitted over the State's renewed hearsay objections, although likely with the qualification that it was not offered to prove the truth of the matters asserted within. 6 SHRR–02 10–21.

[17]     Hoffmaster was retired and testified in the subsequent state proceedings via deposition. 4 SHRR–02 891. Hoffmaster's memory was compromised by the passage of time and the number of cases that he had worked on. *Id*. at 896–98, 901, 908, 920–21, 934–36. He mostly related the information contained in the incident report. Park did not testify at the hearing. 5 SHRR–02 949.

does not appear to show any results.[18] 3 SHRR–02 93–94, 101; 4 SHRR–02 97–98; 8 SHRR–02 337–64.

### b.    The fingerprint evidence

The trial court conducted an evidentiary hearing in late May and early June of 2019. 1 SHRR–02. At the hearing, the parties presented evidence concerning the fingerprints taken from the scene. Benningfield, since retired, testified. 3 SHRR–02 57–150; 4 SHRR–02 31–117. She acknowledged that her supplements to the incident report do not reflect that she compared the fingerprints to anyone. 3 SHRR–02 93–94, 101; 4 SHRR–02 97–98. However, when she reviewed photographs of the evidence, she recognized that she had made certain comparisons and Automatic Fingerprint Identification System (AFIS)[19] searches based on her own markings and notations. 3 SHRR–02 94–95; 4 SHRR–02 40–41, 49–53, 57–94. At the time, if a comparison did not yield an identification, no supplement was made.[20] 3 SHRR–02 90, 101; 4 SHRR–02

---

[18]    It does not seem that samples were obtained from Hamilton for DNA testing. 7 SHRR–02 118.

[19]    AFIS refers to any database of fingerprint records. 2 SHRR–02 35, 41, 101; 3 SHRR–02 70; 4 SHRR–02 69.

[20]    During the subsequent state writ proceedings, lawyers for the Harris County District Attorney's Office became aware that, despite the lack of reports or supplements documenting the results of pretrial forensic testing, pretrial comparisons had occurred and contrary representations in the District Attorney's answer had been incorrect. Hearing (May 21, 2019) at 4–11. This was due to the aforementioned policy not to record eliminations. *Id.* The District Attorney disclosed this information to habeas counsel, as well as a memorandum discussed below noting that Hamilton was eliminated. *Id.* at 7. The State also provided its file to the

61–62, 65–68. Benningfield did not make a positive identification on any palm or fingerprint developed from the crime scene. 4 SHRR–02 65, 87–90, 93–94. Hamilton's prints were compared and eliminated, but pursuant to policy no supplement was made. *Id.* at 52, 58, 65–68, 93. Benningfield did not recall the specific person to whom she reported Hamilton's elimination. 3 SHRR–02 101–02; 4 SHRR–02 62. Benningfield explained that in 2001 or 2002, the defense could learn comparison results by contacting HPD's legal department. 4 SHRR–02 62–64, 68, 96.

George Barringer, a retired investigator for the Harris County District Attorney's Office, also testified at the evidentiary hearing. 5 SHRR–02 40–53. Barringer reviewed a memorandum that he had prepared for the prosecution. 5 SHRR–02 41–42; 8 SHRR–02 365. In this document, Barringer noted that he "[c]heck[ed] for print results 169781801[21] prints found were compared to defendants and eliminated." 5 SHRR–02 48; 8 SHRR–02 365. Based on the chronology of his notetaking, Barringer believes he would have made this entry before April 15, 2002—i.e., before main trial proceedings in November 2002. 5 SHRR–02 52–53; 16 RR 8.

---

trial court for an in-camera review. *Id.* at 9–10. It does not seem that the trial court found any additional disclosable items. 5 SHRR–02 1139.

[21]   This is the incident number associated with Huynh's murder. 8 SHRR–02 338.

Rebecca Green, latent print technical lead at the Houston Forensic Science Center (HFSC)[22], testified at the evidentiary hearing. 2 SHRR–02 30–143. Pursuant an order of the court, Green had examined the fingerprint evidence from the Huynh murder investigation. *Id*. at 85–86. Green testified that AFIS algorithms are periodically upgraded to newer, better versions. *Id*. at 103–04. Green agreed that the 2019 algorithms were "exponentially better" than those used when she started work in 2006. *Id*. at 104. After excluding Hamilton as the source of the three fingerprints from the crime scene, Green ran AFIS searches. *Id*. at 100. One fingerprint was linked to witness Charles Douglas. 2 SHRR–02 71, 117–18; 8 SHRR–02 77. The other two linked to a man named Marshall Knight. 2 SHRR–02 67–68, 72, 121; 8 SHRR–02 77. Knight's counsel stated at the hearing that Knight would not answer questions pursuant to the Fifth Amendment. 6 SHRR–02 4–5, 7–10.

Loretta Muldrow, Hamilton's lead trial counsel, testified at the evidentiary hearing. 6 SHRR–02 21–143. She only reviewed portions of the record before the hearing (*id*. at 60, 122–23), no longer had the defense file (*id*. at 58, 60, 142), and her memory of the case details and her interactions with the State had been somewhat compromised by the passage of years and her participation in other cases. *Id*. at 58–60. Muldrow acknowledged that before

---

[22]     HFSC became an accredited lab separate from HPD in 2014. 2 SHRR–02 83–84.

trial she was aware from the incident report regarding the Schlitz bottle and that usable latent prints had been collected from the Huynh murder scene. *Id*. at 42, 47–48, 114–15, 119–20. But Muldrow claimed she was not given notice that Hamilton had been excluded as the source of any prints. 6 SHRR–02 42–43, 49–50, 114. Muldrow did not file pretrial motions seeking comparison of the fingerprint evidence to Hamilton or DNA testing. *Id*. at 128. Hamilton did not call the prosecutors or Hamilton's trial co-counsel to validate any of Muldrow's assertions regarding the State's disclosures.

Wanda Johnson testified at the evidentiary hearing, having previously testified at trial as an eyewitness to Huynh's murder. 5 SHRR–02 5–39. At the hearing, Johnson confirmed that she had testified truthfully at trial and told police the truth after Huynh's murder. *Id*. at 19, 26. Johnson mostly testified that she saw Huynh's killer set down a bottle, 5 SHRR–02 9, 11–12, 17, 27–29, although there was confused testimony that she knew the shooter did not touch the bottle. *Id*. at 13. Johnson also first stated that she had told police about the shooter setting down the bottle, *id*. at 11–13, 16–19, 27–28, but then qualified, "Well I don't know if I told the police, but I think when they brung me to court to testify. . . I told the Court." *Id*. at 28. Johnson was not happy to testify; she perplexingly stated that her memory was better eighteen years after the

crime;[23] she incorrectly asserted that it was a long time after the shooting before she spoke to police when it had only been a day; she claimed she did not read her sworn police statement[24] before signing it and the police made omissions; and she had recently told a defense investigator that her memory was not what it used to be, had trouble remembering what had happened, and conveyed inconsistent information about the timing of events. *Id*. at 11, 14–18, 20–23.

### c.     The DNA evidence

The parties also presented testimony about DNA evidence from the Huynh murder. Jessica Powers, HFSC DNA analyst, testified. 7 SHRR–02 69–140. Powers could not reliably make any comparisons using the DNA profile developed from the Schlitz bottle. 7 SHRR–02 88–89, 112; 8 SHRR–02 21. Along the same lines, Powers believed "there very well could be more than one contributor" to the Schlitz bottle's DNA profile, "but the data is just so low and unreliable to make an interpretation on that." 7 SHRR–02 91, 106, 108, 111–12; 8 SHRR–02 21. DNA profiles suggesting a mixture of at least two contributors, at least one male, were developed from Huynh's left- and right-

---

[23]    *But see* 5 SHRR–02 26 ("[H]ow you expect me to remember what I told somebody 17 years ago and I'm 54? I was younger then, but now I'm older.").

[24]    Witnesses who gave sworn statements at the HPD police station were given an opportunity to read their typed statements and make any changes before signing them; officers typed statements using a witness's own words. 4 Supp.SHCR–02 929–30.

hand fingernail scrapings. 7 SHRR–02 106–09, 11. Powers found both major and minor contributors to the DNA mixture derived from the scrapings. 7 SHRR–02 106–09; 8 SHRR–02 21. Powers excluded Hamilton as a possible contributor to the major component of the scraping profiles, but the minor component was "not suitable for comparison due to insufficient data." 7 SHRR–02 109; 8 SHRR–02 21. Four people at HFSC checked Powers's work. 7 SHRR–02 99–100, 139.

Dr. Robert Collins, Hamilton's DNA expert, testified at the evidentiary hearing. 5 SHRR–02 55–100; 7 SHRR–02 14–67. Collins had not worked in a forensic DNA laboratory. 5 SHRR–02 61, 65. Collins also did not perform his own DNA testing, even though the DNA evidence had not been fully consumed. 5 SHRR–02 71; 7 SHRR–02 27, 44, 76. Nevertheless, Collins disagreed that the partial male profile developed from the bottle had insufficient data for comparison purposes, believed the evidence did not indicate an additional contributor, and believed that Hamilton was excluded as the contributor of the partial male profile. 5 SHRR–02 91–95; 7 SHRR–02 58–61. Similarly, Collins disagreed that the minor contributor profile from the fingernail scrapings had insufficient data for comparison purposes and believed that Hamilton was excluded. 5 SHRR–02 96–99; 7 SHRR–02 61–62.

### d.   The   expert   testimony   on   eyewitness identifications

Over the State's scope objections, Hamilton called Trent Terrell, a psychology professor at the University of Mary Hardin-Baylor, to testify as an expert on eyewitness identifications. 3 SHRR–02 151–66; 4 SHRR–02 122–213. Terrell never spoke with Douglas or Johnson about their identifications. 4 SHRR–02 172. He did not offer an opinion on their credibility, assert that they misidentified Hamilton as Huynh's killer, or claim that they made false identifications. *Id* at 174–75. Rather, Terrell identified several factors that he believed may have affected the reliability of their identifications. *Id*. at 175–76. Of the factors, Terrell believed that previous exposure to a police sketch was most detrimental. *Id*. at 162.[25]

### 2.   The State did not violate *Brady*.

Hamilton believes that Huynh's killer set down a bottle outside the store on Holman Street and then urinated on or over it. Am. Pet., ECF No. 50 at 100. Hamilton alleges that the State then withheld fingerprint evidence derived from the bottle that excluded him from touching it. *Id*. at 63–73. However, the CCA correctly determined that Hamilton is not entitled to relief on this claim, explaining:

---

[25]   Alvin Nunnery, Smith's trial attorney, and Darrell Stein, HFSC Director of Information Strategy and former HPD firearms examiner, also testified at the hearing. 4 SHRR–2 13–31; 5 SHRR–02 107–41.

[Hamilton] argues that because recent fingerprint testing in 2017 identified another person as having handled the bottle[ ], the State presented false evidence, and, therefore, he is innocent of the Holman murder. But the State's trial evidence about the fingerprints was consistent with the fingerprint evidence developed at the habeas stage.

Investigating Houston Police Detective Connie Park testified at trial that the Holman fingerprint evidence—including that found on the 40-ounce bottle—did not "tie back" to [Hamilton] or his co-defendant in the Yellowstone murder, [Smith]. The habeas evidence merely confirmed Park's testimony by specifying whose prints they were—not [Hamilton]'s or Smith's. Since the jury heard the "essence" of the habeas evidence—that the prints on the bottle were not [Hamilton]'s or Smith's—[Hamilton] has not established the falsity of the State's trial evidence. *See Ex parte De La Cruz*, 466 S.W.3d 855, 866–67 (Tex. Crim. App. 2015) (because jury heard the first medical examiner's opinion, which conflicted with the eyewitness's testimony, and resolved the conflict against applicant, post-conviction evidence of an additional gunshot wound, viewed in light of the totality of the record, failed to demonstrate by a preponderance of the evidence the eyewitness's testimony gave the jury a false impression, and this Court denied habeas relief).

Further, [Hamilton] fails to show that this bottle or the print recovered from it is material to the identity of the Holman shooter. *See U.S. v. Bagley*, 473 U.S. 667, 682 (1985) (evidence is material when there is a reasonable probability that, had the evidence been disclosed to the defense, the outcome of the trial would have been different); *Quinones v. State*, 592 S.W.2d 933 (Tex. Crim. App. 1980) (when determining materiality, any omission must be evaluated in the context of the entire record). No one identified the bottle in question as having been handled by the shooter. And the witness who testified in the habeas hearing that the shooter handled a bottle just before the shooting equivocated about that assertion.

*Ex parte Hamilton*, 2020 WL 6588560, at *2.

As previously noted, to establish a *Brady* violation Hamilton must prove: (1) the evidence in question was favorable; (2) the evidence was suppressed by the State; and (3) the evidence was material. *Banks*, 540 U.S. at 691; *Strickler*, 527 U.S. at 281–82. Concerning materiality, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109–10 (1978); *Dickson v. Quarterman*, 462 F.3d 470, 478 (5th Cir. 2006) ("alleging a speculative outcome is insufficient"); *Hampton v. State*, 86 S.W.3d 603, 612–13 (Tex. Crim. App. 2002). Rather, "[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682.[26]

*Brady* materiality does not require a defendant to demonstrate by a preponderance that disclosure of the suppressed evidence would have resulted in acquittal nor is it identical to a sufficiency-of-the-evidence test. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *Wearry v. Cain*, 577 U.S. 385, 392 (2016).

---

[26]   Hamilton states that the CCA did not identify the appropriate materiality standard, Am. Pet., ECF No. 50 at 67–68, but the CCA correctly cited *Bagley. Ex parte Hamilton*, 2020 WL 6588560, at *2.

However, the State's evidence is relevant. *See*, *e.g.*, *Hampton*, 86 S.W.3d at 613; *Kopycinski v. Scott*, 64 F.3d 223, 226–27 (5th Cir. 1995). To determine materiality, the proper inquiry is "whether 'the favorable evidence could reasonably be taken to put *the whole case* in such a different light as to undermine confidence in the verdict.'" *Strickler*, 527 U.S. at 290 (quoting *Kyles*, 514 U.S. at 435) (emphasis added).

Here, the CCA held that the jury heard the essence of the habeas evidence. *Ex parte Hamilton*, 2020 WL 6588560, at *2. Indeed, the record clearly shows that the defense brought out at trial that the bottle had fingerprints and those prints did not tie to Hamilton or Smith:

| | |
|---|---|
| [Defense Counsel:] | Did you collect that bottle? |
| [Connie Park:] | Yes, we did. Our latent lab examiner did. |
| [Defense Counsel:] | And any prints on the bottle? |
| [Connie Park:] | Yes. |
| [Defense Counsel:] | Okay. Did it tie back to my client? |
| [Connie Park:] | No. |
| [Defense Counsel] | Did it tie up to Mr. Smith, Shawn Smith? |
| [Connie Park:] | No. |
| [Defense Counsel] | Okay. Any physical evidence that came back to my client or to Shawn Smith? |
| [Connie Park:] | No, not in this investigation. |

42

18 RR 40–41. Counsel's closing argument reiterated the absence of fingerprints or DNA linking Hamilton to Huynh's murder. 21 RR 45.

Evidence is not suppressed when the State presents it at trial. *See*, *e.g.*, *Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir. 2002); *see also Powell v. Quarterman*, 536 F.3d 325, 335 (5th Cir. 2008) ("The Supreme Court has never expressly held that evidence that is turned over to the defense during trial has been 'suppressed' within the meaning of *Brady*."). Here, the fact that the fingerprints did not tie to Hamilton or Smith was known to the jury and therefore was not suppressed. Hamilton may be making a tortured distinction between the fact that the prints did not tie to him and specific knowledge of Benningfield's eliminations. Or he may perhaps be arguing that when Park said that he did not tie to the bottle, she merely meant that the prints were not usable or were not compared to him and therefore he was not aware he was affirmatively eliminated. But these distinctions slice *Brady* very fine. Even assuming Hamilton did not know Benningfield had compared Hamilton and Smith to the prints on the bottle prior to trial, the fact that Hamilton and Smith were not *included* as donors of fingerprints is the important thing, not the specifics of any *exclusion*. *Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2003) (defense counsel cross-examined witness with similar facts as she would had with the undisclosed evidence, so the evidence is not material). And when

43

Park said that Hamilton and Smith did not tie to the bottle, the clear import was that they were not a match to the prints—Park did not say that no comparisons were done or that the prints were unusable. Certainly, this is the commonsense interpretation of Park's testimony that the CCA adopted. *Ex parte Hamilton*, 2020 WL 6588560, at *2 ("the jury heard the 'essence' of the habeas evidence—that the prints on the bottle were not [Hamilton]'s or Smith's"). Hamilton therefore fails both the first and the third prongs of *Brady*.

Trying to show materiality, Hamilton asserts that if he had known of his pretrial elimination, his "entire defense strategy would have changed." Am. Pet., ECF No. 50 at 8, 23 n.15, 41, 65. Granted, Muldrow asserted that she would have hired her own fingerprint expert and altered her cross-examination of Park if she had known Hamilton had been eliminated, 6 SHRR–02 44, 51, but it remains unknown what different testimony an expert would have provided or what was left unasked of Park. Muldrow elicited the relevant information from Park, and an expert would have just confirmed what Park willingly admitted. The idea that an expert repeating the information would have yielded a reasonable probability of different result is speculative at best.

Moreover, Muldrow's assertions are suspect since the trial was not over when Park finished testifying. If Hamilton had wanted to call a fingerprint expert, nothing stopped him from doing so after Park revealed the purportedly

44

suppressed fact that he was not tied to the bottle. He also could have re-examined Park when his surprise wore off; in fact, Park was recalled three days later. 19 RR 6. And if Hamilton needed more time to adjust his strategy or prepare, he could have raised an objection and requested a continuance.[27] But he made no objection. 6 SHRR–02 120.

Hamilton argues that his facts are analogous to those in *Floyd v. Vannoy*, 894 F.3d 143 (5th Cir. 2018), where the Fifth Circuit granted habeas relief on a *Brady* claim. Am. Pet., ECF No. 50 at 65–66, 69–73. But *Floyd* is easily distinguishable. To begin, it is important to note that the Fifth Circuit majority found Floyd *demonstrated his actual innocence* such that he was permitted to present time-barred claims. *Id*. at 159–60. Floyd had confessed to two similar murders, was tried for both, but was convicted of only one. *Id*. at 149–52. The Fifth Circuit majority found that Floyd's own statements (a confession and a threat made to another person) were the only evidence supporting his conviction. And the Fifth Circuit majority entertained the possibility that the

---

[27]     Under state law, "when previously withheld evidence is disclosed at trial, the defendant's failure to request a continuance waives any *Brady* violation." *Gutierrez v. State*, 85 S.W.3d 446, 452 (Tex. App.—Austin 2002, pet. ref'd) (citations omitted); *see also Wilson v. State*, 7 S.W.3d 136, 146 (Tex. Crim. App. 1999); *Valdez v. State*, AP–77,042, 2018 WL 3046403, at *11 (Tex. Crim. App. Jun. 20, 2018) (not designated for publication) ("A defendant's failure to request a continuance when *Brady* evidence is disclosed at trial arguably waives his complaint that the State has violated *Brady* and suggests that the tardy disclosure of the evidence was not prejudicial to him."). The CCA did not explicitly find waiver here, but Hamilton's failure to object to the purported *Brady* violation shows that he likely was not surprised and/or that the allegedly withheld information was not important.

confession had been improperly obtained or even beaten out of Floyd, who had an IQ of 59. *Id*. at 157–59. In fact, the case against Floyd was so weak that the State refused to expressly oppose Floyd's innocence claim in the Fifth Circuit and tried to plea bargain the case away during federal habeas review. *Id*. at 154. Floyd's *Brady* claim involved the nondisclosure of fingerprint comparison results from the scene of the murders and a statement from a friend of the victim. *Id*. at 166. Evidence disclosed to the defense prior to trial had indicated that the fingerprints taken from both scenes had not been tested, when, in fact, they had been tested and excluded the victims and Floyd. *Id*. at 162. The Fifth Circuit majority emphasized that Floyd had not been convicted of the other murder despite his confession, and the majority believed that the instant evidence might have led to the same result. *Id*. at 167. The majority also noted that a detective had presented incorrect testimony at trial that reinforced the validity of Floyd's confession, when the correct testimony would have undermined it. *Id*. at 164–66.

Thus, the only real similarity between *Floyd* and Hamilton's case is that they both involve fingerprints. Hamilton has not been found actually innocent, and the Director rejects any such conclusion. Floyd's *Brady* claim involved two compelling nondisclosures, whereas Hamilton's only involves one purported nondisclosure. Floyd's *Brady* claim involved the crime of conviction, whereas

Hamilton's case centers on an extraneous offense presented in the punishment phase of a capital case with robust additional evidence in support of the death penalty. But most importantly, in the instant case *the police admitted that Hamilton was not tied to the prints on the bottle*. In *Floyd*, "[a]lthough the fingerprint-comparison results existed at the time of the joint bench trial, the results were not presented." *Id*. at 156. This distinction undermines Hamilton's whole comparison.[28]

Hamilton concedes that the trial prosecutors were likely not aware of the fact that the prints on the bottle matched Knight. Am. Pet., ECF No. 50 at 78. In any event, because the jury already knew that the prints did not tie back to Hamilton or Smith, the CCA reasonably held that the jury's evaluation would not have been swayed by additional testimony showing who the prints actually

---

[28]   *Floyd* found that "the State's assertions the evidence was not withheld because Floyd could have conducted his own analysis are in direct contrast to clearly-established *Brady* law rejecting the defense's ability to conduct their own analysis as justification for prosecutorial non-disclosure." *Floyd*, 894 F.3d at 163. The Fifth Circuit based its decision in this respect on *Banks*. *Banks*, 540 U.S. at 696 (holding "a rule thus declaring 'prosecutor may hide, defendant must seek', is not tenable in a system constitutionally bound to accord defendants due process"). Accordingly, the Director makes no due diligence argument with respect to the bottle prints. But the Director qualifies that this holding from *Floyd* would not apply to any DNA claims, since Hamilton has not demonstrated that the State did relevant DNA testing at the trial level. *Williams v. Scott*, 35 F.3d 159, 163 (5th Cir. 1994) (no *Brady* violation if the defendant, using due diligence, could have obtained the information). If there was no prosecutorial "hiding" of DNA testing results conducted before trial, then the reasonable diligence requirement should still apply.

And the Director nevertheless notes that Hamilton's failure to request testing still suggests that before trial either (1) he did not consider the testing results important, (2) he knew the results already (because someone with the State told counsel), or (3) he was concerned that DNA and fingerprint testing might incriminate him (for instance, if his DNA was found in the scrapings).

belonged to. *Ex parte Hamilton*, 2020 WL 6588560, at \*2. The Supreme Court has previously held that "the cumulative effect of [ ] withheld evidence" may be "insufficient to undermine confidence in the jury's verdict." *Turner v. United States*, 137 S. Ct. 1885, 1894–95 (2017) (citing *Smith v. Cain*, 565 U.S. 73, 75–76 (2012) & *Kyles*, 514 U.S. at 434) (internal quotation omitted); *see also Agurs*, 427 U.S. at 109 n.16 & 114 (declining to find a *Brady* claim in part because lower court found evidence cumulative); *Murphy*, 901 F.3d at 598 (immaterial evidence "was of marginal value to the defense and was cumulative with already presented [ ] evidence."); *Rocha v. Thaler*, 619 F.3d 387, 396 (5th Cir. 2010) ("Undisclosed evidence that is merely cumulative of other evidence is not material[.]").

Further, the CCA observed that "[n]o one identified the bottle in question as having been handled by the shooter. And the witness who testified in the habeas hearing that the shooter handled a bottle just before the shooting equivocated about that assertion." *Ex parte Hamilton*, 2020 WL 6588560, at \*2. Huynh's convenience store was a high traffic location where people would loiter and drink. 17 RR 202–03; 8 SHRR–02 352 (alcohol containers found), 513 (no loitering sign). There is no way of telling when Knight's prints were left on the bottle or how long the bottle had been outside the store. Thus, the CCA correctly recognized it was critically important for Hamilton to show that the

bottle was touched by Huynh's killer if he wanted to demonstrate materiality. Without that connection, the bottle is just unremarkable trash, and it does not matter whose prints are on it.

Hamilton argues that Johnson clearly stated that the killer handled the bottle, Am. Pet., ECF No. 50 at 67, but the totality of the record shows Johnson was confused and inconsistent on this point. Hamilton's instant contentions stemmed originally from a portion of the incident report noting that Johnson said that she saw the killer handle the bottle. 4 Supp.SHCR–02 917; 8 SHRR–02 348 (pg. 2.011: "[i]t was not mentioned in the statement but [Johnson] also saw the same man sit down an empty 40 once [sic] beer bottle on the rail"). Yet, this is a hearsay statement by the reporting officer. *Id*. In her sworn statement Johnson did not mention the killer handling the bottle. 6 SHRR–02 17; 8 SHRR–02 244–45. She also seemed to deny it in another hearsay statement. 4 Supp.SHCR–02 918; 8 SHRR–02 362 (pg. 2.025: "Johnson stated the suspect did not pick up the glass bottle but stood over it when he urinated").

Johnson's trial testimony did not specify that the killer touched a 40-oz Schlitz beer bottle. 17 RR 275–99. Rather, Johnson merely referred to "a bottle" and said that the killer urinated over it. *Id*. at 277 ("He had a bottle sitting on the side of the store on the bench. He was urinating over the bottle onto the wall."). At the evidentiary hearing, Hamilton failed to show Johnson the

49

recovered bottle and ask Johnson to confirm that it was the same bottle that she saw the shooter touch, although she did state that she saw the killer drinking a "40-ounce." 5 SHRR–02 5–29. Again, at the hearing, Johnson mostly testified that she saw Huynh's killer set down a beer bottle, 5 SHRR–02 9, 11–12, 17, 27–29, although she inconsistently said that she knew the shooter did not touch the bottle. *Id.* at 13. Johnson also first stated that she had told police about the shooter setting down the bottle, *id.* at 11–13, 16–19, 27–28, but then qualified, "Well I don't know if I told the police, but I think when they brung me to court to testify. . . I told the Court." *Id.* at 28. This does not appear to be reflected in the relevant trial testimony. 17 RR 277.

Johnson's hearing testimony is, simply put, a mess. Hoffmaster could not independently remember how Johnson described the alcohol container, and multiple containers were recovered. 4 Supp.SHCR–02 931–33. Thus, the CCA was entirely correct when it noted that no one identified the bottle in question, and Johnson equivocated about the shooter handling a bottle.[29] The CCA's determination that Johnson was not credible on this point is supported by the record and is "virtually unreviewable" by this Court. *Ford v. Davis*, 910 F.3d 232, 234–35 (5th Cir. 2018) (citing *Pippin v. Dretke*, 434 F.3d 782, 792 (5th Cir.

---

[29]    Hamilton complains that the prosecution's closing argument misled the jury by observing that prints were not found at either crime scene. Am. Pet., ECF No. 50 at 32, 72. However, the prosecution was emphasizing the fact that Hamilton used a shirt to wipe his fingerprints off the cash register. 17 RR 247; 21 RR 22.

2005)); 28 U.S.C. § 2254(e)(1). Similarly, the CCA's determination that Hamilton failed to conclusively show that the bottle was handled by the shooter is a factual resolution entitled to a presumption of correctness in this forum. 28 U.S.C. § 2254(e)(1).

Here, two eyewitnesses identified Hamilton as Huynh's murderer. 17 RR 227–28, 251, 282, 288; 18 RR 21–24. Jailhouse informant testimony linked Hamilton to Huynh's murder. 17 RR 187–90, 195–97. Huynh's murder was similar to Matalkah's. 21 RR 21–23 (prosecutor's closing summary). Moreover, the State presented evidence that Hamilton had prior convictions, dealt drugs, possessed weapons, was racist and violent in prison, and engaged in domestic abuse. *See Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (evidence not material partly in light of overwhelming other evidence); *see also Smith*, 565 U.S. at 76 (evidence "may not be material if the State's other evidence is strong enough to sustain confidence in the verdict"). This is not a situation where the State had a weak case, either with respect to guilt-innocence,[30] the extraneous offense, or the State's other punishment evidence.[31] Thus, in light of the

---

[30]    Under Texas law, the facts of the crime alone can be enough to make the future dangerousness finding necessary for the death penalty. *Guevara v. State*, 97 S.W.3d 579, 581 (Tex. Crim. App. 2003).

[31]    *Cf. Wearry*, 577 U.S. at 392 ("[t]he State's trial evidence resembles a house of cards"); *Smith*, 565 U.S. at 76 ("testimony was the only evidence linking [the petitioner] to the crime," and, therefore, the undisclosed statements contradicting this testimony were "plainly material"); *Agurs*, 427 U.S. at 113 ("[I]f the verdict is already of questionable validity,

dubious value of the allegedly withheld information and the State's robust case against Hamilton, there is no reasonable probability that had additional evidence been disclosed to the defense, the result of the proceeding would have been different, i.e., Hamilton would have received a life sentence in lieu of the death penalty.

Finally, although the CCA did not explicitly rule on the suppression prong[32], it is worth noting that if Hamilton was actually surprised by Park's testimony, 6 SHRR–02 48, 50, 114, then the defense's reaction is puzzling. It is extremely odd that they did not request a continuance or mistrial or otherwise put that surprise on the record. Muldrow acknowledged that after Park testified to the lack of fingerprints and physical evidence linking Hamilton to the murder, she did not object that the State had violated any of the trial court's orders or rulings.[33] 6 SHRR–02 120; *see also* Am. Pet., ECF No. 50 at 15–16. Along the same lines, Muldrow acknowledged that she cannot

___

additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.").

[32]    Hamilton asserts that "the CCA accepted that prongs one and two of the *Brady* claim were proven." Am. Pet., ECF No. 50 at 64. This is not reflected in the opinion. Indeed, given the rejection of *all* the trial court's findings and conclusions, it appears the converse is true— the CCA found that the first and second prongs were *not* proven.

[33]    Hamilton does not appear to make a claim that the disclosure that he was not tied to the fingerprints was merely late or tardy. However, even if he did, the question is whether "the evidence is received in time for its effective use at trial." *Powell*, 536 F.3d at 335–36; *Little v. State*, 991 S.W.2d 864, 867–68 (Tex. Crim. App. 1999). Given that the jury was aware that the fingerprint evidence did not tie to Hamilton and Smith, it is clear that the evidence was, in fact, used effectively.

recall all the details of her conversations related to the case and that some aspects of her memory had faded due to the passage of time and the number of cases she has handled. 6 SHRR–02 59–60, 75. Despite having the burden of proof, Hamilton failed to call co-counsel or the prosecution[34] to confirm Muldrow's assertion that she was unaware of the eliminations prior to trial despite the State's open file. 2 RR 7. Muldrow also did not know where the defense file was and therefore her hearing testimony lacked documentation. 6 SHRR–02 58, 60, 142.

In sum, Hamilton has not shown that, in the light of all the evidence, it is reasonably probable that the punishment outcome would have been different had the purportedly suppressed evidence been disclosed.[35] The CCA was therefore not objectively unreasonable when it denied relief Hamilton's *Brady* claim. *Morales v. Thaler*, 714 F.3d 295, 303 n.5 (5th Cir. 2013) (§ 2254(d)(2)

---

[34]     Hamilton asserts that the State should have called the prosecution, Am. Pet., ECF No. 50 at 42, but he had the burden of proof. *Ex parte Hamilton*, 2020 WL 6588560, at *2. This Court should be reticent to impugn the ethical reputations of attorneys who have not had the opportunity to defend themselves.

[35]     The incident report put the defense on notice that DNA swabs were collected from the evidence. 8 SHRR–02 347. Prior to trial, the defense could have requested that DNA testing but did not. 6 SHRR–02 128. Hamilton states that Park "falsely testified that no DNA samples were obtained." Am. Pet., ECF No. 50 at 24. He makes a similar statement about the prosecution's closing argument. *Id*. at 32. To the extent that Hamilton refers to the exchange on 18 RR 55–56, the defense's question and Park's answer appear to refer to the collection of DNA samples from the killer's urine and not to DNA on the bottle or in fingernail scrapings. *See also* 18 RR 95 (defense asking different witness about DNA in urine). The same goes for the prosecution's closing argument. 21 RR 45 (defense closing mentioning urine), 85–86 (prosecution closing mentioning DNA in urine).

requires that a state court's findings be objectively unreasonable, not just disagreed with by the federal habeas court).

### 3. The State did not violate *Napue*.

The rule under *Napue* and *Giglio*[36] is that "'a conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict.'" *Bagley*, 473 U.S. at 679–80 & n.9 (quoting *Agurs*, 427 U.S. at 103). Here, the record fully supports the CCA's decision that no false testimony was presented because the jury heard the essence of the habeas evidence. *Ex parte Hamilton*, 2020 WL 6588560, at *2. Indeed, the habeas evidence merely shows the additional fact that, based on comparisons made long after trial, the prints match another individual—not that Park's testimony was false, perjured, or misleading. *Id*. Park truthfully and accurately testified that the prints did not tie to Hamilton or Smith. 18 RR 40–41. Therefore, "the State's trial evidence about the fingerprints was consistent with the fingerprint evidence developed at the habeas stage." *Ex parte Hamilton*, 2020 WL 6588560, at *2. This lack of false testimony dooms Hamilton's claim.

Under the *Napue/Giglio* standard, Hamilton is also required to prove that the prosecution knew that false testimony was presented. Because

---

[36]     *Giglio v. United States*, 405 U.S. 150 (1972).

Hamilton has not demonstrated any testimony is false, he necessarily also cannot show that the prosecution knew any testimony was false.[37] And if he believes that he has conclusively proved his innocence of Huynh's murder and therefore any evidence to the contrary must be false or misleading, Hamilton's premise is flawed. The CCA disagreed that it was shown that the killer actually handled the bottle, so Knight's prints on it are meaningless. Hamilton thinks that it is telling that Knight took the Fifth[38] rather than answer questions, but Hamilton has no other compelling evidence that Knight committed the murder. Am. Pet., ECF No. 50 at 8, 76, Hamilton observes that Knight had a criminal history, Am. Pet., ECF No. 50 at 33, 76, 78, 81, but so does Hamilton, including killing Matalkah during a similar robbery. Hamilton subjectively suggests that Knight better fits the shooter's description, Am. Pet., ECF No. 50 at 22 n.14, but he largely ignores that the eyewitnesses identified Hamilton. Hamilton's petition does not show that the witnesses have retracted those identifications. Indeed, Hamilton does not seem to argue anyone identified Knight as the

---

[37]     To the extent that Hamilton argues that the testimony was incomplete because it did not show that the prints matched Knight, his claim fails because he does not contend that the prosecutors knew that the prints matched Knight. Am. Pet., ECF No. 50 at 78. Also, Knight's 2017 AFIS identification does not mean that a 2001 AFIS search would have yielded the same result. 2 SHRR–02 112–13; 4 SHRR–02 81, 92–93. And the Barringer memorandum just reflects what was before the jury—that the prints did not tie back to Hamilton. Am. Pet., ECF No. 50 at 34–35; 8 SHRR–02 365; 18 RR 40–41.

[38]     Knight could have had any number of wholly unrelated reasons for asserting the Fifth Amendment. For instance, Hamilton says that Knight was twenty when the murder occurred. Am. Pet., ECF No. 50 at 22 n.14. If so, that suggests that he was drinking underage and possibly in violation of the terms of his community supervision. 8 SHRR–02 380.

shooter, testified that Knight was the shooter, or provided any forensic evidence linking Knight to the crime outside the bottle.[39] Knight's prints do not undermine the State's evidence in support of Hamilton's commission of the Huynh murder, specifically the two identifications, Montoyer's testimony, and the similarities in the murders.

For his false testimony claim, Hamilton faced a less demanding standard in state court and did not need to show that the prosecution knew about any purported falsity. *Ex parte Hamilton*, 2020 WL 6588560, at *2; *Ex parte Chabot*, 300 S.W.3d 768, 771 (Tex. Crim. App. 2009) (recognizing a due process deprivation through the State's *unknowing* presentation of false evidence). However, Hamilton must prove knowledge here in federal court. "There is a long line of unbroken precedent from . . . the U.S. Supreme Court holding that false trial testimony does not implicate a defendant's due process rights if the State was unaware of the falsity at the time the testimony was given." *Pierre v. Vannoy*, 891 F.3d 224, 230 (5th Cir. 2018) (Ho, J., concurring), *as revised* (June 7, 2018), *cert. denied*, 139 S. Ct. 379 (2018). The Supreme Court has "never held" that the unknowing use of false testimony violates the Due Process Clause and it is "unlikely ever to do so." *Cash v. Maxwell*, 565 U.S. 1138 (2012) (Scalia, J., dissenting from denial of certiorari). "All we have held

---

[39]     Hamilton asserts that his DNA was not found on the bottle, Am. Pet., ECF No. 50 at 23–24, 32–33, 39 but the HFSC analyst found insufficient data for that conclusion.

is that 'a conviction obtained through use of false evidence, *known to be such by representatives of the State*, must fall under the Fourteenth Amendment.'" *Id.* (quoting *Napue*, 360 U.S. at 269) (emphasis in original).

Lastly, Hamilton's evidence was not material under *Napue/Giglio* for the same reasons that it was not material under *Brady*. As shown above, the CCA found that the jury heard the essence of the habeas evidence and that Hamilton failed to demonstrate that the shooter had actually handled the bottle in the first place. Hamilton's guilt of Huynh's murder was supported by two eyewitness identifications, Montoyer's testimony, and similarities in the crimes. And the State presented ample evidence of Hamilton's noncompliant and racist behavior in prison, his drug-dealing, his weapons possession, and his abuse of his child's mother. Consequently, even if Hamilton could demonstrate falsity and knowledge, his claim would still fail because of a lack of materiality. There simply is no reasonable likelihood that the purported falsity could have affected the jury's verdict. *Agurs*, 427 U.S. at 103. The CCA therefore reasonably denied relief on this claim. *Hines*, 141 S. Ct. at 1149 (to obtain relief the petitioner needs to show that the state court "managed to blunder so badly that every fairminded jurist would disagree" with its conclusion); *White v. Woodall*, 572 U.S. 415, 427 (2014) (the "critical point" in applying § 2254(d)(1) is whether "it is so obvious that a clearly established rule

applies to a given set of facts that there could be no 'fairminded disagreement' on the question") (citing *Richter*, 562 U.S. at 103–04).

### 4. The State did not violate *Johnson*.

Hamilton also argues that he is entitled to a new sentencing trial because, while he concedes that the prosecution likely did not know about Knight, his conviction is based on materially inaccurate testimony suggesting that he killed Huynh. Am. Pet., ECF No. 50 at 78–82. In *Johnson*, the Supreme Court addressed whether Johnson's death sentence could stand despite being predicated on the existence a prior assault conviction that was vacated after his trial. 486 U.S. at 585–86. During Johnson's sentencing, the jury found three aggravating factors, including that Johnson had been previously convicted of a violent felony, an assault in New York. *Id*. at 581 n.1. The only evidence presented to prove the assault was a copy of Johnson's prison commitment. *Id*. at 581. No witnesses were presented to testify regarding the underlying facts of the assault. *Id*. at 585. In closing, the prosecutor "repeatedly urged the jury to give [the prior conviction] weight." *Id*. at 586. But after the trial a New York court reversed the assault conviction. *Id*. at 582.

The Supreme Court held that Johnson's death sentence could not stand because it was predicated on an aggravating circumstance that was "materially inaccurate." *Id*. at 589. In so holding, the Court stated that, "petitioner's death

sentence is now predicated, in part, on a New York judgment that is not valid now, and was not valid when it was entered in 1963." *Id.* at 585 n.6. However, the Supreme Court indicated that it may have reached a different conclusion if additional evidence (e.g., witness testimony) had been admitted. *Id.* at 585–86, 590 n.9.

*Johnson* simply does not apply here. Hamilton does not contend that an invalid conviction was entered against him. *Hernandez v. Johnson*, 213 F.3d 243, 252 (5th Cir. 2000) ("[t]he present case does not parallel the situation addressed in *Johnson* nor the vast majority of cases that have relied upon *Johnson* [. . .] Instead of a materially inaccurate criminal conviction, we confront purportedly materially inaccurate testimony."). Hamilton's discussion of this claim offers no case where the Supreme Court granted *Johnson* relief in a situation like his. Accordingly, the CCA could not have unreasonably applied clearly established federal law by denying relief. 28 U.S.C. § 2254(d); *see Woodall*, 572 U.S. at 427. But even expanding *Johnson* beyond its initial confines, Hamilton cannot show that any materially inaccurate testimony was used against him. As the *Johnson* Court clearly stated, Johnson's prior conviction was invalid when it was entered and was invalid at the time of trial. *Johnson*, 486 U.S. at 585 n.6. Here, the police correctly testified that the fingerprints on the bottle did not tie to Hamilton or Smith. 18 RR 40–41.

Nothing that happened after trial has rendered that testimony false. The testimony was accurate then, and it is accurate now. Hamilton himself concedes that there was no inaccurate testimony about Knight at his trial. Am. Pet., ECF No. 50 at 78.

Moreover, the Supreme Court in *Johnson* indicated that the result may have been different if additional evidence had supported the facts of the prior assault. Here, as shown above, two eyewitnesses identified Hamilton as Huynh's killer, an informant linked Hamilton to the crime, and there were prominent similarities between the murders. *See Hughes v. Quarterman*, 530 F.3d 336, 346 (5th Cir. 2008) (rejecting *Johnson* claim in part because other evidence connected petitioner to offense).

As with his prior claims, the main thrust of Hamilton's argument seems not to be that any trial testimony was actually inaccurate, but that he is actually innocent of killing Huynh and, if he had presented additional evidence at trial, then the jury would not have sentenced him to death. However, this is plainly not an argument under *Johnson*. *Spence*, 80 F.3d at 1000 (distinguishing *Johnson* because the petitioner's claim raised only a question "over what weight the jury should have accorded" an expert witness's testimony); *see also Buntion v. Lumpkin*, 982 F.3d 945, 950 (5th Cir. 2020) (rejecting argument that *Johnson* "'stands for the proposition that any

sentence based on a factual inaccuracy must be vacated" because "[t]he Supreme Court has *never* intimated that the factual correctness of the jury's prediction on the issue of future dangerousness . . . bears on the constitutionality' of a death sentence.") (quoting *Lincecum v. Collins*, 958 F.2d 1271, 1281 (5th Cir. 1992)). And, in any event, Hamilton does not come close to demonstrating his actual innocence. The CCA found the bottle was not material to the identity of Huynh's killer, but even if it was relevant, then Hamilton is merely offering evidence that conflicts with the State's other evidence that he killed Huynh. *Kelly v. Cockrell*, 72 F. App'x 67, 76 (5th Cir. 2003) (denying *Johnson* claim because, *inter alia*, evidence conflicted).

The unimportance of Hamilton's new evidence is reflected in the CCA's materiality decision, which likewise defeats his claim. The relevant fact that Hamilton was not tied to the bottle was before the jury, which thus heard the essence of Hamilton's theory. *Ex parte Hamilton*, 2020 WL 6588560, at *2. Likewise, Hamilton failed to show that the shooter handled the bottle. *Id.* Without locking in that critical evidentiary step, Hamilton's claims fall apart. Unless the killer touched the bottle, it was just trash next to a convenience store.

Hamilton contends that the CCA's decision is flawed because it failed to consider any evidence adduced posttrial. Am. Pet., ECF No. 50 at 80–82.

61

However, the CCA was not required to address every jot of evidence or argument that Hamilton raised. *Coleman v. Thompson*, 501 U.S. 722, 739 (1991) ("[W]e have no power to tell state courts how they must write their opinions."); *Ex parte Graves*, 70 S.W.3d 103, 120 n.3 (Tex. Crim. App. 2002) (Price, J., dissenting) ("we are not required to write an opinion explaining the reason or reasons we deny relief on applications of habeas corpus"). Indeed, "there are instances in which a state court may simply regard a claim as too insubstantial to merit discussion." *Johnson v. Williams*, 568 U.S. 289, 299–300 (2013). Nevertheless, the CCA clearly considered postconviction developments in its opinion, specifically noting Johnson's postconviction testimony and the fingerprint evidence matching another individual. The fact that the state court did not specifically respond to every jot of Hamilton's evidence is not surprising, nor does it undermine the state court's decision. State courts are tasked with reviewing scores of habeas applications and their "[o]pinion-writing practices" are influenced by considerations other than avoiding scrutiny in federal court. *Richter*, 562 U.S. at 99. And while Hamilton argues that the state court did not consider the totality of the evidence, Am. Pet., ECF No. 50 at 82, the CCA's opinion offers parentheticals referring both to the "totality of the record" and the "entire record." *Ex parte Hamilton*, 2020 WL 6588560, at *2–*3.

But even if Hamilton showed some trial testimony was false, any resulting error was harmless. *Velez v. State*, AP–76,051, 2012 WL 2130890, at *32 (Tex. Crim. App. Jun. 13, 2012) (not designated for publication) (for *Johnson* claims, "a reviewing court 'must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment.'"); *see also Clemons v. Mississippi*, 494 U.S. 738, 754 (1990) (harmless error analysis permissible for capital sentencing); *Hogue v. Johnson*, 131 F.3d 466, 498 n.60, 502 (5th Cir. 1997) ("[*Johnson*] does not preclude harmless error analysis"). A crucial problem in *Johnson* was that the lower court "refused to reweigh the remaining, untainted aggravating circumstances against the mitigating circumstances." *Romano v. Oklahoma*, 512 U.S. 1, 11 (1994). Here, the CCA did not explicitly conduct a harm analysis. *Ex parte Hamilton*, 2020 WL 6588560, at *2. However, unlike *Johnson*, it is not obvious the CCA refused. And the result of the analysis is clear—Hamilton shows no harm.

This lack of harm is reflected by Hamilton's reference to the prosecution's closing statement that "Even, ladies and gentlemen, without that second capital, he is a future danger; but, with it, he is an absolute menace."[40] Am.

---

[40]     If Hamilton is claiming that the prosecutor falsely claimed he committed the murder, closing arguments are not evidence and the prosecutor may make reasonable deductions or inferences from the evidence. *United States v. Mendoza*, 522 F.3d 482, 491 (5th Cir. 2008);

Pet., ECF No. 50 at 79 n.36 (quoting 21 RR 84). Hamilton believes this statement shows the State's reliance on Huynh's murder, but it more accurately shows the opposite. The State was clearly saying that it did not matter Hamilton killed Huynh because the evidence supports a death sentence regardless. 21 RR 84. This closing argument is borne out by the evidence—namely, the facts of Matalkah's murder, Hamilton's prior convictions, his drug-dealing, his weapons possession, his violence and noncompliance in prison, and his vicious domestic abuse.

Hamilton is correct that the CCA did not explicitly address his *Johnson* claim. Am. Pet., ECF No. 50 at 79. Accordingly, the Director would argue that *Richter* would apply, *see* Am. Pet., ECF No. 50 at 80–81 (agreeing that *Richter* may be applicable), and mandates that the Court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Richter*, 562 U.S. at 102. Given that Hamilton fails to show that: (1) *Johnson* should be extended to cases involving false testimony (as opposed to false convictions); (2) any false or otherwise inaccurate testimony was actually presented at trial; (3) any purportedly

---

*Clark v. Johnson*, 227 F.3d 273, 279 (5th Cir. 2000); *Moody v. State*, 827 S.W.2d 875, 894 (Tex. Crim. App. 1992).

inaccurate testimony was material; (4) the evidence does not simply just conflict; or (5) any error was not harmless, this Court must find that the CCA reasonably refused to grant Hamilton relief on this claim. *See id*.

### B.    The Director understands Hamilton to have abandoned his claims concerning the prosecution's dealings with Smith as well as any *Simmons* claim relating to Smith or the bottle.

While Hamilton reiterates many of his original petition's complaints about the prosecution's dealings with Smith in his factual summary, Am. Pet., ECF No. 50 at 29–31, 41, it appears that he has abandoned any claim for federal habeas relief based upon those complaints. *Compare* Pet., ECF No. 19 at 62–68 *with* Am. Pet., ECF No. 50 at 60–82. Likewise, he does not appear to reurge his claim for relief based on *Simmons v. South Carolina*, 512 U.S. 154 (1994). *Compare* Pet., ECF No. 19 at 68 *with* Am. Pet., ECF No. 50 at 60–82.

To the extent that these claims are re-raised, the Court should find them waived for lack of adequate briefing. *Trevino v. Johnson*, 168 F.3d 173, 181 n.3 (5th Cir. 1999) ("Because they are inadequately argued, we consider these issues waived."); *Batiste v. Davis*, CV H–15–1258, 2017 WL 4155461, at *28 n.28 (S.D. Tex. Sept. 19, 2017) (unpublished). Furthermore, to the extent that they are re-raised, the Director would rely on his earlier briefing in these topics, Ans., ECF No. 27 at 74–83, 86, and would request the opportunity to provide additional briefing if the Court finds that these claims are not

abandoned or waived. Nonetheless, the Director will briefly note that, during initial state habeas review, the trial court entered findings and conclusions germane to its denial of Hamilton's claim that the State violated *Brady* by withholding evidence from Smith. 4 SHCR–01 784–87, 801. And, as noted above, the CCA rejected Hamilton's prosecutorial misconduct claim during Hamilton's subsequent state habeas proceedings. The CCA held:

> Regarding the existence of a plea deal with co-defendant Smith, because the prosecution's statements to the trial court about its plea deal with Smith were not testimony, nor heard by the jury, [Hamilton] is not entitled to relief on a claim that the State presented false testimony based on the prosecution's statements. *See Ex parte Ghahremani*, 332 S.W.3d 470, 479 (Tex. Crim. App. 2011) (in determining whether particular piece of testimony has been demonstrated to be false, relevant question is whether the testimony, taken as a whole, gives the jury a false impression). Notwithstanding that, applicant nevertheless still fails to show by a preponderance of the evidence that the State misled the trial court or misrepresented any information. *See Ex parte Kimes*, 872 S.W.2d 700, 703 (Tex. Crim. App. 1993) (applicant has burden of proof in post-conviction habeas proceeding).

*Ex parte Hamilton*, 2020 WL 6588560, at *3. To the extent Hamilton is re-raising any of his claims about Smith, the CCA's decisions denying relief were reasonable, and his claims fail under AEDPA.

## II. Hamilton's Second Claim for Relief Is Procedurally Defaulted. Alternatively, Hamilton's Counsel Was Not Ineffective. (Claim 2)

In his amended petition's second claim for relief, Hamilton argues that he received IATC because: (1) "[t]rial counsel repeatedly failed to object to

inadmissible and prejudicial extraneous offense and bad act evidence"; (2) "[t]rial counsel was ineffective for failing to investigate, prepare for, and effectively cross-examine Joseph Montoyer—a 'jailhouse snitch' who testified that he overheard Hamilton admit to committing the extraneous capital murder"; (3) "[t]rial counsel was ineffective for failing to investigate, prepare for, and effectively cross-examine Wanda Johnson—a witness to the [Huynh extraneous] murder who observed the shooter had an afro"; and (4) "Hamilton's counsel failed to adequately investigate, prepare, and present mitigating evidence." Am. Pet., ECF No. 50 at 82–127; Pet., ECF No. 19 at 75–117. However, Hamilton's instant IATC claims are procedurally defaulted because he failed to properly present them to the state courts, and he fails to demonstrate that he can evade his default under *Martinez*[41] and *Trevino*.[42] Alternatively, Hamilton fails to show either deficiency or prejudice with respect to counsel's actions. Accordingly, Hamilton would not be entitled to relief under the deferential *Strickland* standard of review even if these claims were not defaulted. *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010) ("[s]urmounting *Strickland*'s high bar is never an easy task").

---

[41]   *Martinez v. Ryan*, 566 U.S. 1 (2012).

[42]   *Trevino v. Thaler*, 569 U.S. 413 (2013).

### A.     These claims are procedurally defaulted.

Hamilton did not raise the instant IATC claims in either his brief on direct appeal or his initial state habeas application. *See* Brief for Appellant at ii–iv (table of contents); 1 SHCR–01 3–4 (table of contents). Instead, he presented them in a subsequent state habeas application that the CCA denied as an abuse of the writ. 1 SHCR–02 52–120; *Ex parte Hamilton*, 2020 WL 6588560, at *3. Consequently, this claim (including all its subparts and the new evidence supporting it) is procedurally defaulted by virtue of the fact it was not properly presented to the state court. It is well-settled that federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman*, 501 U.S. at 729; *Harris v. Reed*, 489 U.S. 255, 262 (1989). Thus, federal review of a habeas claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural default.[43] *Coleman*, 501 U.S. at 729; *Harris*, 489 U.S. at 265; *Amos v. Scott*, 61 F.3d 333, 338 (5th Cir. 1995).

Concerning the case-at-bar, Texas Code of Criminal Procedure Article 11.071, Section 5, prohibits a successive state habeas corpus application except in limited circumstances. *Williams v. Thaler*, 602 F.3d 291, 306 (5th Cir. 2010),

68

*abrogated on other grounds by Banister v. Davis*, 140 S. Ct. 1698 (2020) (recognizing Section 5 bars consideration on the merits of new claims contained in a subsequent state habeas corpus application unless either: (1) the new claims could not have been presented in a previous application because the legal or factual basis for the new claims were unavailable at the time the previous application was filed; (2) by a preponderance of the evidence, but for a violation of the United States Constitution, no rational juror could have found the applicant guilty beyond a reasonable doubt; or (3) by clear and convincing evidence, but for a violation of the United States Constitution, no rational juror would have answered in the state's favor one or more of the capital sentencing special issues). Thus, the state court's dismissal of claims as an abuse of the writ precludes federal habeas relief as a matter of law. *Aguilar v. Dretke*, 428 F.3d 526, 533 (5th Cir. 2005) ("This court has consistently held that Texas' abuse-of-writ rule is ordinarily an 'adequate and independent' procedural ground on which to base a procedural default ruling."); *Matchett v. Dretke*, 380 F.3d 844, 848 (5th Cir. 2004); *Busby v. Dretke*, 359 F.3d 708, 724 (5th Cir. 2004); *Barrientes v. Johnson*, 221 F.3d 741, 758–59 (5th Cir. 2000); *Fuller v. Johnson*, 158 F.3d 903, 906 (5th Cir. 1998).

---

[43]    A state court expressly and unambiguously bases its denial of relief on a state procedural default even if it alternatively reaches the merits of a defendant's claim. *Fisher v. Texas*, 169 F.3d 295, 300 (5th Cir. 1999).

A petitioner may overcome the state procedural bar only "by demonstrating (1) cause for the procedural default and actual prejudice as a result of the alleged violation of federal law or (2) that failure to consider his claims will result in a fundamental miscarriage of justice." *Pitts v. Anderson*, 122 F.3d 275, 279 (5th Cir. 1997). The Supreme Court expanded the notion of cause to include ineffective state habeas counsel in *Martinez* and found *Martinez* applicable to Texas cases in *Trevino*. And a fundamental miscarriage of justice occurs when the petitioner is "'actually innocent' of the offense underlying his conviction or 'actually innocent' of the death penalty." *Roberts v. Thaler*, 681 F.3d 597, 605 (5th Cir. 2012).

Hamilton acknowledges his procedural default. Am. Pet., ECF No. 50 at 83. Nevertheless, Hamilton argues that the Court can review his claims de novo because he can demonstrate cause and prejudice for his default under *Martinez* and *Trevino*. But *Martinez* and *Trevino* do not help Hamilton. Hamilton's state habeas counsel was not ineffective. And Hamilton's underlying claims are not meritorious or substantial, as shown below. Thus, he is not entitled to evade the procedural default of these claims.

Indeed, Hamilton fails to demonstrate that he meets *Martinez*'s difficult requirements. In *Martinez*, the Supreme Court held that when a State requires a petitioner to raise an IATC claim in an initial-review collateral proceeding,

the petitioner may establish cause to excuse a default of that claim if either: (1) no counsel was appointed; or (2) counsel in that proceeding was ineffective under the standards of *Strickland*. *Martinez*, 566 U.S. at 17. Here, Hamilton had state habeas counsel; therefore, Hamilton must demonstrate that his attorney was actually ineffective to qualify for *Martinez* relief. *Id*. at 14, 17. An appellate attorney's effectiveness is measured by the same standard applied to trial counsel: whether counsel's performance was objectively reasonable and whether any deficient performance prejudiced the proceeding. *Sharp v. Puckett*, 930 F.2d 450, 452–53 (5th Cir. 1991). State habeas counsel, if required by the facts, also has an obligation under *Strickland* to perform "some minimum investigation prior to bringing the initial state habeas petition." *Trevino v. Davis*, 829 F.3d 328, 347–49 (5th Cir. 2016). However, counsel is not ineffective merely because he fails to raise issues that the defendant, his client, requests him to raise. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Nor is counsel ineffective for failing to raise every possible point on appeal. *Id*. at 288. Rather, appellate counsel is obliged to raise and brief only those issues that he believes have the best chance of success. *See Engle v. Issac*, 456 U.S. 107, 134 (1982) ("[T]he constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim."). Only "solid, meritorious

arguments based on directly controlling precedent should be discovered and brought to the court's attention." *United States v. Williamson*, 183 F.3d 458, 462–63 (5th Cir. 1999). In the instant case, state habeas counsel effectively investigated and litigated Hamilton's case under these standards. Thus, Hamilton asserts a very different type of grievance against his counsel than the complaint levied by Martinez[44]— Hamilton only claims that state habeas counsel failed to present certain claims and evidence in conjunction with Hamilton's state habeas application.

Here, the record reflects that Patrick McCann, Hamilton's state habeas counsel, filed a seventy-six-page initial state writ, including several claims raised in the instant federal habeas petition. 1 SHCR–01 2–78. This application was accompanied by hundreds of pages of documents. 1–2 SHCR–01 79–416. Hamilton attached at least some of McCann's billing records to his federal habeas application. Without conceding the validity or completeness of these records, the Director observes that these bills demonstrate that

---

[44]     Martinez was convicted in Arizona state court of sexual conduct with a minor. *Martinez*, 566 U.S. at 4–8. His conviction was affirmed on direct appeal. *Id.* During the pendency of his appeal, Martinez's appellate counsel initiated collateral review in state court by filing a notice of post-conviction relief. *Id.* That counsel then filed a statement that she could find no colorable claim for post-conviction relief. *Id.* The state court gave Martinez the option of filing a pro se petition, but Martinez alleged that his counsel failed to inform him that he needed to do so. *Id.* After the time to file a petition expired, the trial court dismissed the collateral action. *Id.* Later, represented by new counsel, Martinez filed a new notice of postconviction relief in state court and alleged that Martinez's trial counsel had been unconstitutionally ineffective. *Id.* But Martinez's petition was dismissed since he did not present the claim in the first proceeding. *Id.* In subsequent federal habeas proceedings, the district court denied Martinez's claims as procedurally barred. *Id.*

McCann's investigator met with Hamilton, filed open records requests to obtain governmental documents, visited the Matalkah and Huynh crime scenes, ran background checks on involved officers, did background research on Smith, pulled court records, ran searches to try to find Montoyer (presumably referred to as "Joe Montoya"), ran background checks on Wanda Johnson, Brooke Rogers, and Charles Douglas, and attempted to meet with those individuals. Am. Pet., ECF No. 50 at Exhibit 14; Pet., ECF No. 19 at Exhibit 14. According to these records, McCann himself apparently spent 194 hours on the writ (as well as 14.5 hours of travel time), reviewing records and mitigation materials, doing legal research, consulting with another attorney, conducting juror interviews, meeting with a "psych expert" and an investigator, interviewing an attorney, responding to client correspondence, visiting his client, looking for and visiting with witnesses, and visiting the crime scene. *Id*. This is clearly not deficient performance.

Regardless, prejudice cannot be shown in the absence of a reasonable probability that, but for state habeas counsel omitting a particular ground of error, the case would have been reversed on appeal. *Smith*, 528 U.S. at 285. As shown below, Hamilton's instant claim is wholly without merit. Because Hamilton's underlying claim is wholly without merit, there is no way that Hamilton can make the "substantial" showing required by *Martinez* that he

was prejudiced by state habeas counsel's alleged deficiencies. 566 U.S. at 14 (requiring a showing "that the underlying [IATC] claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit"); *Canales v. Stephens*, 765 F.3d 551, 568 (5th Cir. 2014). Accordingly, Hamilton cannot overcome the procedural bar to review of his claims even if state habeas counsel was somehow deficient. *See Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013) (agreeing with the district court that "habeas counsel was not ineffective in failing to raise [a] claim at the first state proceeding" because "there was no merit to [the petitioner's] claim"); *Beatty v. Stephens*, 759 F.3d 455, 466 (5th Cir. 2014).

Along the same lines, Hamilton's claim fails because—even assuming he has successfully shown cause under *Martinez*—he has not shown the accompanying actual prejudice. *Ramey v. Davis*, 942 F.3d 241, 255–56 (5th Cir. 2019); *Hernandez v. Stephens*, 537 F. App'x 531, 542 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1760 (2014); *see, e.g.*, *Martinez*, 566 U.S. at 18 (remanding to address prejudice). "Proving 'actual prejudice' requires a prisoner to 'establish not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Ramey*, 942

F.3d 255–56 (quoting *Hernandez*, 537 F. App'x at 542) (emphasis in original).

Hamilton simply cannot make this showing.

### B.    Hamilton's claims are insubstantial and meritless.

The familiar two-prong standard by which an IATC claim is weighed is set forth in *Strickland*. That is, to establish that counsel performed ineffectively, Hamilton must show both that his attorneys' performance was deficient, and the deficient performance prejudiced his defense. 466 U.S. at 687. Furthermore, because a convicted defendant must satisfy both prongs of the *Strickland* test, a failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong. *Id.* at 697.

To establish that counsel's performance was constitutionally deficient, a convicted defendant must show that trial counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687. In so doing, a convicted defendant must overcome a strong presumption that trial counsel's conduct fell within a wide range of reasonable professional assistance, and every effort must be made to eliminate the "distorting effect of hindsight." *Id.* at 689.

Nevertheless, "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Strickland*, 466 U.S. at 692. To establish that he has sustained

prejudice, Hamilton "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. at 694. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Id*. That requires a "substantial," not just "conceivable," likelihood of a different result. *Richter*, 562 U.S. at 112.

1.   **Hamilton's claim that trial counsel failed to object to unnoticed extraneous offenses and bad acts is largely conclusory and entirely meritless.**

As part of his IATC claim, Hamilton argues that his attorney failed to object to unnoticed extraneous offenses and bad acts. Am. Pet., ECF No. 50 at 84–94; Pet., ECF No. 19 at 76–85. Specifically, he contends that counsel should have objected to testimony that: (1) Hamilton threatened to hurt Rogers if she told anyone about the Matalkah murder; (2) Hamilton had other girlfriends besides Rogers and had children with those girlfriends while dating Rogers; (3) Hamilton attempted to have sex with Rogers while she was dating another man; (4) Hamilton violently assaulted Rogers and then disappeared with their child; (5) Hamilton argued with and cursed Rogers; (6) Hamilton shot a gun at Rogers; (7) Hamilton assaulted Rogers while she was visiting Hamilton's cousin; (8) Hamilton joked that another inmate was homosexual; and (9) Hamilton was a jailhouse bully who picked on Caucasians and was involved in several fights. Am. Pet., ECF No. 50 at 84–94; Pet., ECF No. 19 at 77–81.

However, Hamilton's claim should be denied as conclusory since he provides no citation to the record that shows that the incidents in question were unnoticed. Instead, he only refers to a document in the state habeas record—the prosecution's list of extraneous offenses and bad acts that they might introduce at the punishment phase. Am. Pet., ECF No. 50 at 84 (citing 3 SHCR–01 555–56). But this letter clearly states that prosecutor will update the defense with any further information. *Id.*; *see*, *e.g.*, 8 SHRR–02 390–91. Hamilton supplies no affidavit from trial counsel indicating that they were surprised by any unnoticed extraneous offense or bad act. It is therefore unclear that there was any valid basis for objecting.

Hamilton asserts that "Respondent has not pointed to any evidence showing that additional notice of these bad acts was given, *because it was not*." Reply, ECF No. 34 at 69 (emphasis in original). However, on federal habeas review, the petitioner has the burden of proof—not the Director. *Lockett v. Anderson*, 230 F.3d 695, 707 (5th Cir. 2000). The Fifth Circuit has consistently held that a petitioner's conclusory, self-serving allegations will not merit habeas relief. *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000); *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990); *Ross v. Estelle*, 694 F.2d 1008, 1011 (5th Cir. 1983). "Absent evidence in the record, a court cannot consider a

habeas petitioner's bald assertions on a critical issue in his pro se[45] petition, unsupported and unsupportable by anything else contained in the record, to be of probative evidentiary value." *Ross*, 694 F.2d at 1011–12 (citing *Woodard v. Beto*, 447 F.2d 103, 104 (5th Cir. 1971)). The Fifth Circuit has likewise noted that "[Petitioner]'s failure to provide 'competent summary judgment evidence'—i.e., exhibits or affidavits—is fatal to his claim." *Gregory v. Thaler*, 601 F.3d 347, 353 (5th Cir. 2010). Accordingly, *Hamilton* must affirmatively prove that no notice was given[46] and, moreover, that his counsel had no strategic reason for not objecting. *Dunn v. Reeves*, 141 S. Ct. 2405, 2412 (2021) ("if the attorneys had been given the chance to testify, they might have pointed to information justifying the strategic decision to devote their time and efforts elsewhere").

That said, the prosecution's list indicated that the State intended to present evidence concerning Hamilton being a poor provider and neglectful father, which could possibly be viewed as including his behavior towards his child's mother, Brooke Rogers. 3 SHCR–01 555–56. It also referred to Hamilton's violent and noncompliant behavior in jail. *Id*. This included the

---

[45]    Hamilton is not pro se. However, one presumes that a represented inmate is held to the same (if not higher) standard. [footnote added]

[46]    If the defense file cannot be located, *see* 6 SHRR–02 58, 60, 142, then it seems that Hamilton lacks the ability to show that there is no additional notice contained therein.

assault on inmate Jason Gurley. *Compare* 17 RR 139 *with* 3 SHCR–01 556. And it included testimony about Hamilton trying to manufacture a false alibi. 3 SHCR–01 555 ("Witnesses at the Harris County Jail would testify that Ronald Hamilton shortly after being jailed on the Capital Murder case for which he now stands charged, tried to set up an alibi with members of his family."). A follow-up letter included an assault on Rogers. 8 SHRR–02 391.

Hamilton asserts that the State's notice did not comply with Texas Code of Criminal Procedure Article 37.07, Section 3(g), but it is debatable that the incidents enumerated above went unnoticed in any meaningful way[47], and it is unlikely that the trial court would have upheld an objection on this basis. *Luna v. State*, 301 S.W.3d 322, 326 (Tex. App.—Waco 2009, no pet.) (failure to provide notice is nonconstitutional error and "[t]o assess nonconstitutional errors, [a court on appeal will] examine whether the purpose of the statute or rule violated was thwarted by the error"). The available notice was sufficient to avoid unfair surprise and to enable Hamilton to answer the extraneous offense evidence.[48] *Id.*

---

[47]   Hamilton also does not show that Rogers, Gurley, and Montoyer were not on the State's witness list, which may have also alerted him to their testimony. 1 CR 65 (court order for witness list).

[48]   It is worth noting that Hamilton's IATC allegation is premised on an interpretation of state law, but such state-law questions are generally "beyond the scope of federal habeas review." *Gutierrez v. Stephens*, No. 1:09–CV–22, 2013 WL 12092544, at *31 (S.D. Tex. Oct. 3, 2013) (citing *Charles v. Thaler*, 629 F.3d 494, 500–01 (5th Cir. 2011)).

In any event, the State's remaining punishment case showed that Hamilton committed a second murder, had prior convictions, made his living selling drugs, and was belligerent while incarcerated. While the allegedly unnoticed extraneous acts do support a finding that Hamilton constituted a future danger, the successful exclusion of these facts would not have created a reasonable probability that the verdict would have been different.

## 2.   Counsel effectively cross-examined Montoyer.

Hamilton also claims that his attorney failed to adequately cross-examine Montoyer. Am. Pet., ECF No. 50 at 94–99; Pet., ECF No. 19 at 85–90. Specifically, he claims that defense counsel should have pointed out additional prior convictions, as well as Montoyer's various aliases, and Muldrow should have pointed out purported discrepancies between Montoyer's original statement to police and his testimony. *Id.* Yet, in *Henderson v. Norris*, the Eighth Circuit noted that an ineffectiveness claim based on an allegedly deficient cross-examination "is not the type of error, if indeed it [is] error at all, that the Sixth Amendment functions to correct." 118 F.3d 1283, 1287 (8th Cir. 1997). The court explained

> The cross-examination of a witness is a delicate task; what works for one lawyer may not be successful for another. Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel. We have recently observed that there are a few, if any, cross-examinations that could not be improved upon. If that were the standard of

> constitutional effectiveness, few would be the counsel whose performance would past [sic] muster.

*Id.* (quotations and citations omitted). The decision whether, and how much, to cross-examine a witness is a strategic decision best left to counsel's discretion and is not amenable to second-guessing. *Ex parte McFarland*, 163 S.W.3d 743, 756 (Tex. Crim. App. 2005) ("[C]ross-examination is an art, not a science, and it cannot be adequately judged in hindsight."); *see also Thang Lai v. Cain*, CIV. A. 08–3984, 2009 WL 324059, at *11 (E.D. La. Feb. 6, 2009); *Rockwell v. Davis*, CIV. A. 4:14–CV–1055–O, 2016 WL 4398378, at *20 (N.D. Tex. Aug. 18, 2016) (citing *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002)). Since decisions regarding the cross-examination of witnesses are strategic, they usually "will not support an ineffective assistance claim." *United States v. Bernard*, 762 F.3d 467, 472 (5th Cir. 2014) (citation omitted). Indeed, "[s]peculating about the effect of tinkering with the cross-examination questions is exactly the sort of hindsight that *Strickland* warns against." *Castillo v. Stephens*, 640 F. App'x 283, 292 (5th Cir. 2016).

But even if the Court wished to evaluate counsel's cross-examination, this is clearly not deficient performance. *See, e.g.*, *Nelson v. Davis*, 952 F.3d 651, 668 (5th Cir. 2020) ("the fact that [petitioner] has identified in hindsight another unprobed weakness in [the witness]'s testimony does not render his trial counsel's cross-examination unreasonable"); *Castillo*, 640 F. App'x at 292

(cross-examinations were not deficient where attorneys elicited evidence and statements favorable to defendant, such as stressing motivations of various witnesses to lie and lack of physical evidence linking defendant to crime). The Director has exhaustively set forth Montoyer's testimony below. *See* Argument, Section III, *infra*. Counsel raised at least some of Montoyer's aliases and convictions[49] during her two examinations. *Id*. She also addressed some of the discrepancies between his police statement and trial testimony. *Id*. Additional impeachment would have been cumulative. *Bernard*, 762 F.3d at 473 (no relief when additional details not elicited on cross-examination were "unsubstantiated or cumulative of other inconsistencies brought out at trial"); *see Soliz v. Davis*, CIV. A. 3:14–CV–4556–K, 2017 WL 3888817, at *13 (N.D. Tex. Sept. 6, 2017) (rejecting IATC claim alleging a failure to adequately cross-examine a witness where counsel elicited useful information from the witness.

Furthermore, since the same type of evidence that Hamilton now claims defense counsel should have explored was, in fact, developed at trial and would not have undermined the facts of the crime or the State's other aggravating evidence, Hamilton has also failed to demonstrate any prejudice. *Russell v.*

---

[49]     Hamilton refers to Montoyer's convictions from after trial, Am. Pet., ECF No. 50 at 97 n.39, but convictions that did not yet exist have no bearing on an evaluation of counsel's performance. Counsel are not required to be clairvoyant with respect to future developments in the law. *United States v. Fobbs*, No. 2:03–CR–20067, 2006 WL 8426592, at *1 n.5 (W.D. Tex. 2006) (collecting cases). It goes without saying, then, that counsel are not required to— nor could they possibly—predict future factual developments.

*Collins*, 944 F.2d 202, 206 (5th Cir. 1991) (defendant failed to show that further impeachment by defense counsel would have altered outcome of trial). Indeed, even without Montoyer, the State still would have been able to show that Hamilton was identified by two eyewitnesses as Huynh's murderer and that the facts of Huynh murder were remarkably similar to that of Matalkah's (i.e., convenience store robberies in the same geographic area, close in time, both utilizing firearms and a getaway driver, and involving attempts to steal a cash register). Montoyer's testimony may have been relevant and inculpatory, but it was not necessary to show Hamilton's guilt in Huynh's murder, and further impeachment of Montoyer would not have led to a reasonable probability of different result. Thus, this Court should hold that Hamilton has proved neither deficiency nor prejudice with respect to this allegation.

### 3. Counsel effectively cross-examined Johnson.

Hamilton also argues that counsel ineffectively cross-examined Wanda Johnson. Am. Pet., ECF No. 50 at 99–103; Pet., ECF No. 19 at 90–93. Specifically, he argues that: (1) counsel should have impeached Johnson with her written statement to police that the Huynh murderer had an afro and was about seventeen years old; and (2) counsel should have presented evidence that Johnson had seen the shooter holding the 40 oz. bottle before going into the store. *Id*. As shown immediately above, it is dubious that inadequate cross-

examination is a type of claim upon which habeas relief can be granted. Nevertheless, the record shows that counsel's cross-examination was not deficient.

With respect to Hamilton's claim that counsel should have more effectively cross-examined Johnson concerning her statement to police that the Huynh shooter had an afro and was about seventeen-years old, the record reflects that, on cross-examination and in front of the jury, defense counsel specifically questioned whether Johnson had told Officer Park that the shooter was seventeen and had an afro, and she denied it. 17 RR 291–92. Counsel also attempted to exclude Johnson's identification outside of the presence of the jury using the same information. *Id*. at 270. Johnson said that she had told the officer that the assailant was in his late teens. *Id*. Later, counsel asked Officer Park about the issue, and Officer Park confirmed—while referencing her notes—that Johnson had said that Hamilton had "a little thicker hair" or an afro. 18 RR 56–57. Hamilton believes that counsel should have confronted Johnson with her witness statement, but presenting the written statement would have been cumulative impeachment in light of Officer Park's testimony. *See Rockwell*, 2016 WL 4398378, at *20 ("[C]ounsel did not fail to cross-examine or impeach [the witness]; [petitioner] simply claims counsel should have done more. Thus, this claim is one of degrees. Such claims risk

incorporating the distorting effects of hindsight and are accordingly less susceptible to judicial second-guessing.") (citations and quotations omitted).

Concerning the bottle, the Director has addressed this matter exhaustively above. *See* Argument, Section I, *supra*. Hamilton complains that counsel did not adequately show through cross-examination that Huynh's shooter handled the bottle. Am. Pet., ECF No. 50 at 101. But Johnson stated on direct examination that Huynh's killer "had a bottle sitting on the side of the store on the bench. He was urinating over the bottle onto the wall." 17 RR 277. And counsel then elicited from police that the prints on the bottle did not tie back to Hamilton or Smith. 18 RR 40–41. The fact that the prints did not tie back was before the jury because counsel put it there. *Id*.

Hamilton nevertheless argues that counsel should have explicitly ascertained from Johnson whether Johnson saw the shooter touch the bottle because of a portion of the police report which states "[i]t was not mentioned in the statement but [Johnson] also saw the same man sit down an empty 40 once [sic] beer bottle on the rail." 4 Supp.SHCR–02 917; 8 SHRR–02 348 (pg. 2.011). The problem with this argument is that, even assuming that Johnson would have said that the shooter handled the bottle or that counsel could have impeached her with this statement, in yet another report (which the State likely would have relied upon), Johnson explains that she did not see the

shooter pick up the bottle, but rather that he merely urinated over it. 4 Supp.SHCR–02 918; 8 SHRR–02 362 (pg. 2.025: "Johnson stated the suspect did not pick up the glass bottle but stood over it when he urinated"). Similarly, in her sworn statement Johnson did not mention the killer handling the bottle. 6 SHRR–02 17; 8 SHRR–02 244–45. The State therefore could have easily undermined the value of whatever counsel obtained utilizing this cross-examination tactic. Indeed, having access to all the evidence adduced since trial and at the subsequent state habeas hearing, the CCA still found that Johnson "equivocated" about the shooter handling the bottle.[50] *Ex parte Hamilton*, 2020 WL 6588560, at *2. The jury's interpretation would have likely been the same.

Further, even if Johnson had been impeached and the bottle shown to have been picked up, it would not change the fact that Hamilton was still identified by two eyewitnesses (including Johnson), and the facts of the offense were remarkably similar to Matalkah's murder—again, convenience store robberies in the same geographic area, close in time, using firearms, employing a getaway driver, with attempts to steal a cash register. Montoyer also testified to Hamilton's jailhouse admissions. 17 RR 187–88. The CCA found no materiality with respect to Hamilton's bottle claims, and that determination

---

[50]   This fact finding is entitled to deference by this Court. 28 U.S.C. § 2254(e)(1).

should strongly influence this Court's IATC prejudice evaluation. *Ex parte Hamilton*, 2020 WL 6588560, at \*2. Accordingly, Hamilton fails to prove that he is entitled to relief with respect to his claim that counsel ineffectively cross-examined Johnson.

### 4. Counsel effectively investigated, prepared, and presented mitigating evidence.

#### a. Hamilton has not shown any deficiency.

Hamilton also asserts that trial counsel failed to effectively investigate, prepare, and present mitigating evidence. Am. Pet., ECF No. 50 at 103–23; Pet., ECF No. 19 at 94–111. Hamilton argues that counsel performed a tardy and inadequate investigation that failed to uncover individuals who could have testified favorably for him (or failed to prepare those that did testify). *Id*. These individuals include James Anthony Brown, Penelope Ann Leon, Sheena Gaines, Elsie Tippins, and Tywon Hamilton. ECF No. 50-1 at Exhibit 7 (witness affidavits); Exhibit 8 (affidavits of federal mitigation investigator Jade Ortego). He further argues that counsel should have spent more effort explaining the effects of fry on Hamilton through an expert like Dr. Wilkie A. Wilson. *Id*. at Exhibit 13. Finally, he contends that defense witness Halpin, an educational diagnostician and consultant, did not have access to all the records that she needed and was therefore unprepared to testify. As previously noted, this claim is unexhausted and procedurally defaulted. However, even if this

claim were not unexhausted and procedurally defaulted, it is still meritless under de novo review.

To render effective assistance, the Sixth Amendment requires counsel "to make a reasonable investigation of defendant's case or to make a reasonable decision that a particular investigation is unnecessary." *Ransom v. Johnson*, 126 F.3d 716, 723 (5th Cir. 1997) (citing *Strickland*, 466 U.S. at 691). When assessing effectiveness at the sentencing stage of a capital trial, counsel's "investigations into mitigating evidence should comprise efforts to discover all reasonably available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003). "[C]ounsel should consider presenting . . . [the defendant's] medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." *Id*. That is, "[g]enerally accepted standards of competence require that counsel conduct an investigation regarding the accused's background and character." *Id*. Yet, *Strickland* does not "require defense counsel to present mitigating evidence at sentencing in every case." *Miniel v. Cockrell*, 339 F.3d 331, 344 (5th Cir. 2003).

With respect to counsel's duty to investigate, the Supreme Court has observed:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable;

and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690–91. When a petitioner argues that his counsel failed to adequately investigate mitigation evidence, the proper inquiry is "not whether counsel should have presented a mitigation case . . . [but] whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background was itself reasonable." *Wiggins*, 539 U.S. at 523.

The reasonableness of an attorney's investigation must be determined by considering not only the evidence already known to counsel, but also whether such evidence would lead a reasonable attorney to investigate further. *Id.* at 527. The reasonableness of an investigation depends in large part on the information supplied by the defendant. *Strickland*, 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic decisions made by the defendant and on information supplied by the defendant. In particular, what

investigation decisions are reasonable depends critically on such information."); *see also Johnson v. Cockrell*, 306 F.3d 249, 252–53 (5th Cir. 2002) (evidence of any history of abuse or brain injury never disclosed despite specific questions on these topics).

With respect to any allegation that counsel should have called other family members, friends, or experts that did not actually testify at trial, "[c]omplaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what a witness would have testified are largely speculative." *See Sayre v. Anderson*, 238 F.3d 631, 635–36 (5th Cir. 2001) (quoting *Lockhart v. McCotter*, 782 F.2d 1275, 1282 (5th Cir. 1986)); *see also Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) ("[T]o prevail on an [IATC] claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense"). Furthermore, the presentation of witness testimony is essentially strategy and, thus, within trial counsel's domain. *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985). A petitioner must overcome a strong presumption that his counsel's decision in not calling a particular witness was a strategic one. *Murray v. Maggio, Jr.*, 736 F.2d 279, 282 (5th Cir. 1984).

To begin, it is worth noting that mitigation investigator Jade Ortego's affidavits are rife with hearsay and could not be considered even if this claim were not procedurally defaulted. ECF No. 50-1 at Exhibit 8. As for the affidavits of Hamilton's friends, family, and Dr. Wilson, the affiants do state that they would have testified to the affidavits' contents if they had been asked. *Id.* at Exhibits 7, 13. However, Hamilton offers no affidavit from his trial attorneys explaining their strategic motivations and investigations regarding these witnesses. Without providing any explanation of counsel's thinking and motivations—their "perspective at the time"—Hamilton plainly fails to meet his burden to show deficient performance. *See Burt v. Titlow*, 571 U.S. 12, 23 (2013) ("It should go without saying that the absence of evidence cannot overcome" *Strickland*'s presumption of attorney competence.); *see also Reeves*, 141 S. Ct. at 2412. Judicial scrutiny of counsel's performance must be "highly deferential," indulging in a "strong presumption" that "trial counsel rendered adequate assistance and that the challenged conduct was the product of a reasoned trial strategy." *West v. Johnson*, 92 F.3d 1385, 1400 (5th Cir. 1996) (citing *Wilkerson v. Collins*, 950 F.2d 1054 (5th Cir. 1993). In the absence of information concerning trial counsel's strategic reasoning, the presumption of adequate assistance must prevail. *See Titlow*, 571 U.S. at 23. Indeed, without

any information from counsel about their thinking, strategy, and the extent of their investigations, Hamilton's claim of IATC is basically conclusory.

Moreover, the information offered in Hamilton's affidavits is merely cumulative to the evidence that was already presented. At trial, there was abundant family and personal history presented through Hamilton's mother and father, his cousin, his friend Billy Norris, and Halpin. There was also ample testimony about fry and its deleterious effects presented through these individuals. *See* Statement of Facts, *supra*. And Halpin testified at length about Hamilton's academic and intellectual issues. *Id*. Counsel's decision not to present cumulative and redundant testimony does not constitute ineffective assistance. *Pinholster*, 563 U.S. at 200; *Sheppard v. Davis*, 967 F.3d 458, 468–69 (5th Cir. 2020); *Murray*, 736 F.2d at 282. "The defense of a criminal case is not an undertaking in which everything not prohibited is required. Nor does it contemplate the employment of wholly unlimited time and resources." *Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992). "Additional evidence on these points would have offered an insignificant benefit, if any at all." *Wong v. Belmontes*, 558 U.S. 15, 23 (2009) (per curiam); *Lovett v. State of Florida*, 627 F.2d 706, 708 (5th Cir. 1980) (counsel is "not required to pursue every path until it bears fruit or until all conceivable hope withers"). In *Van Hook*, the Supreme Court concluded that "the minor additional details" of Van Hook's

traumatic childhood, which the interviews with additional family members would have revealed, did not prejudice Van Hook because counsel had already presented extensive evidence of Van Hook's traumatic childhood at trial. *Bobby v. Van Hook*, 558 U.S. 4, 11–12 (2009) ("there comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties"). "[Petitioner] has not shown any deficiency related to [his] proffer of cumulative evidence." *Carty v. Thaler*, 583 F.3d 244, 264 (5th Cir. 2009).

Furthermore, there does not appear to be any affidavit from Halpin in which she states that she was unprepared. *See, e.g.*, *Segundo v. Davis*, 831 F.3d 345, 352 (5th Cir. 2016) ("none of the experts retained by trial counsel indicated that they were missing information needed to form an accurate conclusion that Segundo is not intellectually disabled"). And Hamilton's exhibits show that they provided Halpin with at least some records. ECF No. 50-1 at Exhibit 5 (faxes). Hamilton asserts that Halpin never received 142 pages of school records, *see* Am. Pet., ECF No. 50 at 114–15 (citing ECF No. 50-1 at Exhibit 8), but this is a conclusory statement of the federal habeas investigator. Moreover, assuming that these documents were not provided, the defense team may have had a strategic reason for withholding them. *See Coble v. Quarterman*, 496 F.3d 430, 441–42 (5th Cir. 2007) ("At most, Coble is challenging the strategy

employed by trial counsel, arguing that witnesses should have been better prepared and that more witnesses should have been proffered. Coble's challenge is measurably distinct from the failure to investigate social history in *Wiggins*."). For instance, it is entirely possible that they contained damaging information that would have undermined Halpin's testimony.

Also, concerning Dr. Wilkie, Hamilton's counsel would obviously have to be circumspect about calling an expert to testify about his mental state. Had counsel done so, the State would have undoubtedly countered with their own expert, and that expert would likely have had a dim view of a double murderer like Hamilton. *See Kansas v. Cheever*, 571 U.S. 87, 94 (2013) ("When a defendant presents evidence through a psychological expert who has examined him, the government likewise is permitted to use the only effective means of challenging that evidence: testimony from an expert who has also examined him."); *Lagrone v. State*, 942 S.W.2d 602, 611 (Tex. Crim. App. 1997) (allowing trial courts to "order criminal defendants to submit to a state-sponsored psychiatric exam on future dangerousness when the defense introduces, *or plans to introduce*, its own future dangerousness expert testimony") (emphasis in original). Counsel thus may have decided it was a safer course to present testimony about Hamilton's fry usage and its effects through the lay witnesses and avoid damaging rebuttal. *See Pinholster*, 563 U.S. at 196 (explaining that

a court reviewing a *Strickland* claim is "required not simply to give the attorneys the benefit of the doubt, but to affirmatively entertain the range of possible reasons [a defendant]'s counsel may have had for proceeding as they did") (cleaned up).  Moreover, overemphasizing Hamilton's drug use could have been seen by the jury as an attempt blame drugs for Hamilton's crime and undermined the defense's strategy of showing that Hamilton took responsibility for his actions by pleading guilty. *See Strickland*, 466 U.S. at 699 (rejecting IATC claim where the Court found trial counsels' strategy "to rely as fully as possible on respondent's acceptance of responsibility for his crimes" was reasonable); *Boyle v. Johnson*, 93 F.3d 180, 187–88 (5th Cir. 1996) ("As to evidence of drug and alcohol abuse, counsel stated "it would have been aggravating."").

Hamilton also asserts that he suffers from brain damage. Am. Pet, ECF No. 50 at 119. But Hamilton concedes that his trial team was aware of it. *Id.* One must therefore presume that counsel had a strategic reason for not employing this potential evidence. *See Pinholster*, 563 U.S. at 196. Indeed, brain damage has a double-edged nature that can counsel against its use. *Druery v. Thaler*, 647 F.3d 535, 541–42 (5th Cir. 2011); *Martinez v. Dretke*, 404 F.3d 878, 899–90 (5th Cir. 2005).

Hamilton questions the timing of the defense team mitigation investigation and contends that it did not comport with ABA Guidelines. Am. Pet, ECF No. 50 at 107; Pet., ECF No. 19 at 97–98. But while it is true that Supreme Court decisions refer approvingly to the ABA Guidelines, the guidelines were not adopted as law. *Wiggins*, 539 U.S. at 524. As the Court explained in *Strickland*:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in American Bar Association standards and the like [] are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

466 U.S. at 468–89 (citations omitted).

The Supreme Court has soundly rejected the notion that the ABA's guidelines are an "inexorable command with which all capital defense counsel must fully comply" to be constitutionally effective. *Van Hook*, 558 U.S. at 8 (internal quotation marks omitted). The Court emphasized that the same was true of all state and private organization rules, noting that they are "free to impose whatever specific rules they see fit to ensure that criminal defendants are well represented," but "the Federal Constitution imposes one general

requirement: that counsel make objectively reasonable choices." *Id*. at 9 (internal quotation marks omitted).

Moreover, while not conceding either the completeness or the accuracy of the documents Hamilton provides with his federal habeas petition[51], the Director observes that Hamilton's Exhibit 5 shows that counsel retained an investigator (Gerald Bierbaum) who: met with Hamilton; acquired or read governmental records concerning Hamilton, his family, and potential witnesses; met with Hamilton's great aunt, uncles, Billy Norris, and Darious Graves; located educational records; interviewed neighbors; and met experts. ECF No. 50-1 at Exhibit 5. The defense team arranged for Hamilton to be examined for neuropsychological defects, acquired some of his medical records, and retained an expert to provide a report. *Id*. The defense also retained and met with educational diagnostician Halpin. *Id*. A detailed chronology of

---

[51]    While the Director believes that the current record is sufficient to rebut Hamilton's arguments and support the denial of relief, to the extent that the Court wishes to entertain granting relief or permitting factual development (either with respect to Hamilton's default or the merits), the Director requests that the Court first order Hamilton to divulge both state habeas counsel and trial counsel's files (to the extent available) to the Director for evaluation. Hamilton has called into question the competence of both state habeas and trial counsel and has selectively submitted statements and file materials to support his accusation. Hamilton cannot use privilege as a sword and a shield, and his IATC claims constitute a waiver of his attorney-client privilege with respect to his accusations. *Willy v. Admin. Review Bd.*, 423 F.3d 483, 497 (5th Cir. 2005) ("when a party entitled to claim the attorney-client privilege uses confidential information against his adversary (the sword), he implicitly waives its use protectively (the shield) under that privilege."); *United States v. Ballard*, 779 F.2d 287, 292 (5th Cir. 1986); *In re Medina*, 475 S.W.3d 291, 302 (Tex. Crim. App. 2015). The Director should be permitted to review counsel's relevant file materials to make any rebuttal arguments applicable.

Hamilton's life was produced. *Id.* Another investigator (Lisa Milstein) conducted a lengthy interview with Ronald Hamilton, Sr. *Id.*

"All of [Hamilton's] arguments—that trial counsel did not begin the investigation soon enough, that they did not try hard enough to gather records or get [various witnesses] to testify, that they did not find enough witnesses— come down to a matter of degrees." *Balentine v. Lumpkin*, No. 18–70035, 2021 WL 3376528, at *9 (5th Cir. Aug. 3, 2021), *pet. rehearing filed*. And "[w]e must be particularly wary of arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second guessing." *Skinner v. Quarterman*, 576 F.3d 214, 220 (5th Cir. 2009) (quoting *Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000)); *Ward v. Stephens*, 777 F.3d 250, 265 (5th Cir. 2015). "Reliance on 'the harsh light of hindsight' to cast doubt on a trial that took place . . . years ago is precisely what *Strickland* and AEDPA seek to prevent." *Richter*, 562 U.S. at 107; *Bell*, 535 U.S. at 702; *see also Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). When unpresented evidence is not "shocking and starkly different than that presented at trial," the Fifth Circuit has previously held that an ineffectiveness claim is not viable. *Blanton v. Quarterman*, 543 F.3d 230, 239–40 n.1 (5th Cir. 2008); *Newbury v. Stephens*, 756 F.3d 850, 873 (5th Cir. 2014) (where counsel

"presented six witnesses to testify about [petitioner's] family, medical, and educational history" and because the jury "heard about [petitioner's] traumatic childhood" which included neglect and abuse, counsel were not ineffective for not presenting evidence that may have provided more details but "is of the same genre as that presented to the jury at trial"); *Trottie v. Stephens*, 720 F.3d 231, 248 (5th Cir. 2013) ("[A]lthough the jury may not have had all of the facts that [petitioner] now wishes it had, [petitioner]'s counsel did offer meaningful information regarding [petitioner]'s childhood and how it may have impacted [petitioner]'s decisions on the day of the incident."); *see also Coble*, 496 F.3d at 441 (counsel not ineffective because counsel produced significant witnesses who testified about petitioner's background); *Martinez v. Dretke*, 99 F. App'x. 538, 543 (5th Cir. 2004) (counsel not ineffective because "[t]hey conducted investigations and located numerous witnesses to help their client avoid the death penalty"). Hamilton is plainly raising an argument of degrees. The record clearly shows that the trial witnesses related the important facts concerning Hamilton's personal history and background. *See Pinholster*, 563 U.S. at 200 (finding no reasonable probability that the additional evidence presented in state habeas proceeding would have changed jury's verdict because the "'new' evidence largely duplicated the mitigation evidence at trial"). Moreover, "[c]ounsel was entitled to formulate a strategy that was

reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Richter*, 562 U.S. at 107. Counsel were not deficient with respect to their investigation and presentation of mitigating evidence, and relief on this basis should be denied.

### b.    Hamilton has not shown prejudice.

The Supreme Court has explained that the fact patterns of its IATC cases do not necessarily set the bar for a finding of prejudice. *Andrus v. Texas*, 140 S. Ct. 1875, 1887 n.6 (2020). Nevertheless, it is informative that Hamilton's allegedly mitigating evidence does not compare to the mitigating evidence the Court has found to be prejudicially omitted in other cases. *See*, *e.g.*, *Wiggins*, 539 U.S. at 516–17, 525–26, 534–35 ("Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother. He suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care."); *Rompilla v. Beard*, 545 U.S. 374, 378, 390–95 (2005) (evidence established that Rompilla was reared in a slum, quit school at sixteen, had a series of incarcerations, his mother drank during pregnancy, his father had a "vicious temper," Rompilla and his siblings "lived in terror," he and a brother were locked "in a small wire mesh dog pen that was filthy and excrement filled," their home had no indoor plumbing, and they slept in an attic with no heat);

*Williams*, 529 U.S. at 395 (counsel "failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records.").

*Andrus* held that evaluating prejudice requires reweighing the aggravating and mitigating evidence. 140 S. Ct. at 1886. In assessing the relative weight of the new mitigating evidence, a reviewing court compares the new evidence with that from the trial. *Sheppard*, 967 F.3d at 469. "[O]verwhelming aggravating factors" can outweigh unpresented mitigating evidence. *Busby v. Davis*, 925 F.3d 699, 726 (5th Cir. 2019); *Clark v. Thaler*, 673 F.3d 410, 424 (5th Cir. 2012); *Sonnier v. Quarterman*, 476 F.3d 349, 360 (5th Cir. 2007); *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002). For instance, the "brutal and senseless nature of the crime," *Smith v. Quarterman*, 471 F.3d 565, 576 (5th Cir. 2006), or the "cruel manner in which [petitioner] killed," *Miniel*, 339 F.3d at 347, may weigh heavily against a finding of *Strickland* prejudice. *Strickland*, 466 U.S. at 700; *Knight v. Quarterman*, 186 F. App'x 518, 535 (5th Cir. 2006). Here, Hamilton's amended petition fails to show a reasonable probability that the result would have been any different if his additional, allegedly omitted evidence had been before the jury. *See, e.g.*, *Parr v. Quarterman*, 472 F.3d 245, 256–58 (5th Cir. 2006); *Ransom*, 126 F.3d

at 724. Hamilton also has not shown that "[t]he likelihood of a different result [is] substantial, not just conceivable." *Richter*, 562 U.S. at 112.

Again, the evidence Hamilton now offers is largely cumulative. *Sheppard*, 967 F.3d at 468 ("[Petitioner] has not shown that, but for her counsel's failure to present cumulative mitigating evidence, 'the result of the proceeding would have been different.'") (citing *Andrus*, 140 S. Ct. at 1881). It would not have caused the jury to view Hamilton any differently than they already did. The defense offered Hamilton's family and personal history through testimonies from Hamilton's mother and father (18 RR 119–244), his cousin Darious Graves (19 RR 8–49), and his friend Billy Norris (16 RR 89–115). Hamilton's parents, who were previously married but subsequently divorced, 18 RR 121, 128–29, had a tumultuous relationship, *id*. at 130–31, had criminal histories, *id*. at 140–41, 190, 204, 240, abused drugs and alcohol, *id*. at 123–25, 127–28, 135–36, 190, 204, 240, and neglected Hamilton due to their own issues. *Id*. at 135, 145, 203. Hamilton was partially raised by his grandmother in poor conditions, *id*. at 130, 132–33, 143, and began selling drugs at a young age. *Id*. at 148. There was also testimony about fry and its deleterious effects on Hamilton. 18 RR 136, 204; 19 RR 18–19, 25–27. Educational diagnostician Deedee Halpin testified about Hamilton's academic and intellectual issues. 19 RR 50–94. While Hamilton had an IQ of 92, he likely

also had a learning disability, and his academic performance was poor. *Id.* at 53–57, 60–62.

On the other side of the ledger, the State's case showed that Hamilton had committed two capital murders, had previous convictions, was a vicious domestic abuser, earned his living as a drug dealer, and remained violent even after he was incarcerated. *See* Statement of Facts, *supra*. Hamilton's additional evidence would not have made any appreciable difference in this case—there is simply no reasonable probability of a different result. *Strickland*, 466 U.S. at 695; *Wiggins*, 539 U.S. at 534; *Balentine*, 2021 WL 3376528, at *9–*10 (finding a lack of prejudice where purportedly mitigating new mental-health expert testimony was double-edged and the aggravating evidence overwhelmed the proffered mitigating evidence); *see also Neal*, 286 F.3d at 241 ("Stated to the point: Is this additional mitigating evidence so compelling that there is a reasonable probability at least one juror could reasonably have determined that, because of Neal's reduced moral culpability, death was not an appropriate sentence?") (footnote omitted). Thus, even if this Court finds deficient performance by trial counsel, Hamilton is not entitled to relief on any of his IATC claims due to a failure to show prejudice. *Strickland*, 466 U.S. at 700 (noting that the unpresented evidence would have "barely altered the sentencing profile"); *see also Ex parte Martinez*, 195 S.W.3d 713,

731 (Tex. Crim. App. 2006) ("since the jury was privy to some of the severe abuse Applicant suffered during his childhood, there is not a reasonable probability that the unadmitted alleged mitigating evidence would have tipped the scale in Applicant's favor").

Finally, Hamilton argues that the errors in this case can be cumulated to demonstrate prejudice. This claim is more thoroughly addressed in a response to Hamilton's related, free-standing claim. *See* Argument, Section XIII, *infra*. But, to briefly summarize the Director's later briefing, the claim is unexhausted and defaulted, Hamilton has failed to demonstrate any constitutional errors, individual errors not of constitutional dimension cannot be cumulated to form an error worthy of relief, and the Supreme Court has never recognized a claim of cumulative error. Therefore, this claim must be denied.

## C. Hamilton's request for an evidentiary hearing should be denied.

In conjunction with this claim, Hamilton asks the Court to hold an evidentiary hearing. Am. Pet., ECF No. 50 at 126–27; Pet., ECF No. 19 at 115–16. But since an evidentiary hearing is either prohibited under 28 U.S.C.

§ 2254(e)(2) or is otherwise unnecessary, the Court should deny Hamilton's motion.[52]

First, § 2254(e)(2) "continues to have force" with respect to claims that were not adjudicated on the merits in state court proceedings. *Pinholster*, 563 U.S. at 185–86; *see also McCamey v. Epps*, 658 F.3d 491, 497 (5th Cir. 2011) (noting that § 2254(e)(2) "remains an important tool" where habeas petitioners raise claims not adjudicated on the merits by the state court). Pursuant to § 2254(e)(2), where the applicant has failed to develop the factual basis for a claim in state court, a federal court cannot hold a hearing on the claim unless the applicant shows the legal or factual basis for the claim was previously unavailable *and* the applicant demonstrates that but for constitutional error no reasonable fact-finder would have found the applicant guilty of the underlying offense. (*Michael*) *Williams*, 529 U.S. at 432–37.

Hamilton cannot satisfy this standard with regard to his defaulted allegations. Hamilton is at fault for not raising these claims in state court[53] because he had the opportunity to raise them in his initial habeas application

---

[52]     Hamilton has also filed a separate motion for an evidentiary hearing. ECF No. 52. The Director is responding to that motion contemporaneously with this amended answer.

[53]     Under AEDPA, the proper forum for the making of all factual determinations in habeas cases is the state courts ("where it belongs"), and it is the burden of the federal habeas petitioner "to raise and litigate as fully as possible his potential federal claims in state court." *Hernandez v. Johnson*, 108 F.3d 554, 558 & n.4 (5th Cir. 1997).

and did not.[54] *Id.* at 432 (holding that "a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel"). A hearing on the merits of his IATC claims is therefore foreclosed because Hamilton has not demonstrated his claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable and that he is actually innocent of his crime. In fact, Hamilton could never satisfy these requirements because he pleaded guilty to the underlying offense and his claims pertain to punishment only. *Thompson v. Davis*, 916 F.3d 444, 458 (2019) (court did not have discretion to grant hearing because the alleged errors were only in punishment proceeding).

Second, even if a petitioner has satisfied the requirements of § 2254(e)(2), he is still not necessarily entitled to an evidentiary hearing. "[O]vercoming the narrow restrictions of § 2254(e)(2) does not guarantee a petitioner an evidentiary hearing; it merely opens the door for one[.]" *Murphy v. Johnson*, 205 F.3d 809, 815 (5th Cir. 2000). Federal law leaves "[t]he decision whether to conduct an evidentiary hearing . . . to the sound discretion of the district court[.]" *Barrientes*, 221 F.3d at 770. "[W]here a district court has before it sufficient facts to make an informed decision regarding the merits of

---

[54]    The Supreme Court recently granted certiorari review in *Shinn v. Ramirez*, No. 20–1009, to determine the relationship between *Martinez/Trevino* and § 2254(e)(2).

a claim, a district court does not abuse its discretion in refusing to grant an evidentiary hearing (even where no factual findings are explicitly made by any state court)." *Murphy*, 205 F.3d at 816; *see also McDonald v. Johnson*, 139 F.3d 1056, 1060 (5th Cir. 1998) ("The district court had sufficient facts before it to make an informed decision on the merits . . . and, accordingly, did not abuse its discretion in refusing to hold an evidentiary hearing."); *Young v. Herring*, 938 F.2d 543, 560 n.12 (5th Cir. 1991) ("[A] petitioner need not receive an evidentiary hearing if it would not develop material facts relevant to the constitutionality of his conviction.").

Furthermore, a petitioner is not entitled to an evidentiary hearing "if his claims are merely 'conclusory allegations unsupported by specifics' or 'contentions that in the face of the record are wholly incredible.'" *Young*, 938 F.2d at 560 (quoting *Blackledge v. Allison*, 431 U.S. 63, 74 (1977)). In deciding whether to grant a hearing, under Rule 8 of the Rules Governing Section 2254 Cases, "'the judge must review the answer [and] any transcripts and records of state-court proceedings . . . to determine whether an evidentiary hearing is warranted.'" *Hall v. Quarterman*, 534 F.3d 365, 368 (5th Cir. 2008) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

Therefore, before granting Hamilton's request for a hearing, the Court must consider whether further factual development could "enable [Hamilton]

to prove the petition's factual allegations, which, if true, would entitle [Hamilton] to federal habeas relief." *Landrigan*, 550 U.S. at 474. Furthermore, "if the record refutes [Hamilton's] factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id*. Hamilton's claims are unexhausted and procedurally defaulted, prohibiting relief even if he were to uncover more favorable facts.

Hamilton's amended petition argues that the Court should hold a hearing on whether he can evade the procedural bar of hiss IATC[55] claims under *Martinez* and *Trevino*.[56] Am. Pet., ECF No. 50 at 126. Hamilton then cites *Barrientes* and contends that he is entitled to evidentiary development if he demonstrates cause and prejudice to overcome procedural default under *Martinez. Id*. at 126. But "the Fifth Circuit has held that an evidentiary hearing is not required before finding that a claim does not fall within the [*Martinez*] exception." *Ochoa v. Davis*, 3:09–CV–2277–K, 2017 WL 2666150, at *3 (N.D. Tex. Jun. 20, 2017) (citing *Segundo v. Davis*, 831 F.3d 345, 351 (5th Cir. 2016)). "*Martinez* and *Trevino* protect Texas habeas petitioners from completely forfeiting an IATC claim; neither entitles petitioners to

---

[55]    The Director's amended answer has argued that *Martinez* and *Trevino* are not applicable to conflict-of-interest claims like Hamilton's Claim 4. This is a threshold legal question that the Court should resolve first if it were inclined to hold a hearing.

[56]    The Supreme Court recently granted certiorari review in *Shinn v. Ramirez*, No. 20–1009, to determine the relationship between *Martinez/Trevino* and § 2254(e)(2).

an evidentiary hearing in federal court in order to develop such a claim." *Segundo*, 831 F.3d at 351. Furthermore, while *Barrientes* provided for evidentiary development on the merits if cause and prejudice was shown, Barrientes's counsel appeared diligent in pursing his claims but were frustrated in their efforts by the State. *Barrientes*, 221 F.3d at 766–69, 771. Here, unlike in *Barrientes*, Hamilton has effectively conceded that state habeas counsel was not diligent by virtue of making a *Martinez* allegation; thus, an evidentiary hearing on the *merits* of Hamilton's punishment-phase IATC claims (as opposed to the effectiveness of state habeas counsel for the purpose of determining whether his IATC claims satisfy *Martinez*) is impermissible under the plain language of § 2254(e)(2).

Furthermore, a hearing on defaulted constitutional claims is warranted only where there is "'a viable constitutional claim, not a meritless one, and not simply a search for evidence that is supplemental to evidence already presented.'" *Segundo*, 831 F.3d at 351 (quoting *Ayestas v. Stephens*, 817 F.3d 888, 896 (5th Cir. 2016)). And "*Martinez* and *Trevino* protect Texas habeas petitioners from completely forfeiting an IATC claim; neither entitles petitioners to an evidentiary hearing in federal court in order to develop such a claim." *Id*. For the reasons discussed herein, there is not a factual dispute which, if resolved in Hamilton's favor, would entitle him to relief.

Consequently, he is not entitled to a hearing on these claims. *See*, *e.g.*, *Garcia v. Davis*, 704 F. App'x 316, 327 (5th Cir. 2017) ("Because an evidentiary hearing would not have affected Garcia's failure to establish prejudice by counsel's error, the district court did not abuse its discretion in denying an evidentiary hearing on the claim.").

Accordingly, an evidentiary hearing is either barred by 28 U.S.C. § 2254(e)(2) or simply unnecessary for the resolution of this procedurally defaulted claim. Hamilton's request should be denied.

## III. The State Court Reasonably Denied Hamilton's Claim That One of His Attorneys Had a Conflict of Interest Stemming from the Attorney's Prior Interactions with Joseph Montoyer. (Claim 3)

In his amended petition's third ground for relief, Hamilton argues that one of his trial attorneys suffered from a conflict of interest. Am. Pet., ECF No. 50 at 127–50; Pet., ECF No. 19 at 43–57. Specifically, Hamilton alleges that lead counsel Muldrow had a conflict of interest because she fleetingly represented State's witness Joseph Montoyer at a minutes-long plea colloquy. *Id*. But the state habeas court correctly procedurally barred this claim because it could have been raised on direct appeal. 4 SHCR–01 787–92, 801–02; *Ex parte Hamilton*, 2015 WL 3899185, at *1. Accordingly, this claim cannot now be considered on federal habeas review. *See Coleman*, 501 U.S. at 729; *Rhoades v. Davis*, 914 F.3d 357, 372 (5th Cir. 2019) ("The state court is free to reach the

merits in the alternative . . . without interfering with the procedural bar."). Alternatively, the state court also correctly found that this claim was meritless even if it was not procedurally barred, and AEDPA deference applies to the alternative merits adjudication. *Ex parte Hamilton*, 2015 WL 3899185, at *1; *Busby*, 359 F.3d at 721 n.14. *Id.* To overcome AEDPA's relitigation bar, Hamilton must show that this decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Because Hamilton has failed to meet his burden of proof to show that the state court's decision was unreasonable, this Court must deny relief even if it does not procedurally bar this claim.

### A.   Background

The state habeas court issued extensive findings concerning this claim. 4 SHCR–01 787–92. These findings are a reasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d)(2). The state court findings and trial record reflect that Montoyer was a State's witness during Hamilton's punishment hearing. Montoyer was serving time for forgery and was previously jailed with Hamilton. 4 SHCR–01 788; 17 RR 181, 183–85. Montoyer said that Hamilton was a bully and assaulted other inmates. 4 SHCR–01 788; 17 RR 185. Montoyer also heard

Hamilton tell friends that he shot a man on Yellowstone and took a cash register. 4 SHCR–01 788; 17 RR 186. Hamilton further mentioned robbing a Chinese person at a store on Holman Street. 4 SHCR–01 788; 17 RR 187–88. Montoyer stated that Hamilton told him that Hamilton's sister and his aunt were going to assert that Hamilton was in Dallas during Matalkah's murder. 4 SHCR–01 788; 17 RR 189–90. On cross-examination by Muldrow, Montoyer admitted his taped police statement omitted Hamilton's robbery of a Chinese person on Holman Street. 4 SHCR–01 788; 17 RR 194–95. Defense counsel also reiterated Montoyer's two-year sentence for forgery. 4 SHCR–01 788; 17 RR 195.

Subsequently, co-counsel Frances Northcutt informed the trial court that the defense team had discovered that Muldrow stood in for Montoyer's attorney when Montoyer made his forgery plea. 4 SHCR–01 788–89; 19 RR 104–05, 111, 119. Northcutt moved the trial court to strike Montoyer's testimony and/or grant a mistrial because Muldrow was not able to effectively cross-examine Montoyer. 4 SHCR–01 788–89; 19 RR 104–05, 119. Muldrow explained the situation to the trial court as follows:

> [Muldrow]:      What happened, Your Honor, was during the week I worked in the 337th District Court, I believe it was the first week of April, the last week of March, I was called by Mr. Williams and while I was there in court he had contacted I believe the court reporter Melissa.

> [The Court]:      Gina?
>
> [Muldrow]:      Whatever. You know better than I do. But, at any rate, he told me that he would be unavailable and he had learned that I was attorney of the week and needed me to stand in for him for a plea.
>
> I had forgotten that day, got a call the next day, kind of lightly chastised by Mr. Williams because he thought that I would have handled that plea for him and he was in a federal hearing of some sort is how he put it. And I assured him that I would work it out.
>
> As it turned out I believe I worked it out better than the original deal. I think I ended up getting him the minimum of two years to do. And that's all I knew about it.
>
> I didn't know until last week that this individual Joe Montoyer was, in fact, the same person who had given a statement that inculpated our client even further in the Yellowstone case until last week when I went back to see my client and he pointed at me. And that's when Miss Davidson informed me that I, indeed, had represented him and gotten him a better offer.

19 RR 106–08. Muldrow stated that the extent of her involvement with Montoyer was standing in for his plea, and there was no discussion of Hamilton's case. 4 SHCR–01 789; 19 RR 109.

According to the record, Montoyer was indicted for forgery of a commercial instrument on December 17, 2001, in cause number 891658. 4 SHCR–01 790–91; DX 45–46. Attorney Connie Williams represented Montoyer in cause number 891658. 4 SHCR–01 790–91; DX 45–46. On January 7, 2002, Montoyer's bond was set at $60,000. 4 SHCR–01 790–91; DX 45–46. On February 24, 2002, Montoyer provided a statement to police regarding Hamilton. 4 SHCR–01 790–91; 19 RR 119–20. On March 7, 2002, a bond

agreement of $20,000 was reached, *see id.*, with Montoyer subsequently forfeiting his bond on March 26, 2002. 4 SHCR–01 790–91; 19 RR 124, 130. On April 19, 2002, Montoyer pleaded guilty to forgery and was sentenced to two years imprisonment pursuant to a plea agreement. 4 SHCR–01 790–91; 17 RR 181; 19 RR 127; DX 45–46. Attorney Williams was reflected as Montoyer's lawyer on the docket sheets and plea papers—not Muldrow. 4 SHCR–01 789; 19 RR 108–09, 118–19. The trial court observed that the court's computer did not associate Muldrow with Montoyer's case. 4 SHCR–01 789; 19 RR 109, 115.

Prosecutor Colleen Barnett noted that the State learned of Montoyer when a deputy sheriff called to inform her that a Harris County Jail inmate wanted to provide information about Hamilton. 19 RR 111–12. Prosecutor Barnett contacted the HPD and two officers took Montoyer's statement. *Id.* at 112. Prosecutor Barnett also arranged with Montoyer's attorney (Williams) for Montoyer's bond to be lowered after Montoyer gave his statement. *Id.* at 112–13, 116. Barnett testified that she had no further contact with Montoyer's attorney regarding Montoyer's case, and she had no other dealings with Montoyer's case other than to get Montoyer's bond lowered. *Id.* at 112–13. There were no deals regarding Montoyer's sentence, and Barnett did not participate in any plea negotiations regarding Montoyer's case. *Id.* When Hamilton's case got closer to trial, Barnett discovered that Montoyer was

already sentenced. *Id.* at 113. Barnett also stated that she had told Muldrow of Montoyer's bond being lowered. *Id.* at 113–14. Muldrow disputed this. *Id.* at 113–15.

The defense argued to the trial court that Muldrow was unable to effectively cross-examine Montoyer because of the purported conflict of interest even though her involvement with Montoyer was minimal. 4 SHCR–01 788–89; 19 RR 115. The trial court denied the defense's motions to strike Montoyer's testimony and declare a mistrial. 4 SHCR–01 790; 19 RR 119. The trial court also took notice that Muldrow was not listed in the clerk's file, including on the docket sheet and judgment. *Id.*

Montoyer was then recalled, and Muldrow questioned him outside the presence of the jury. Montoyer testified that Williams represented him in his forgery case. 4 SHCR–01 790; 19 RR 121–26. Muldrow filled in for Williams at Montoyer's plea when Williams was unavailable. *Id.* Their interaction was limited to one day. *Id.* Williams arranged Montoyer's plea agreement and completed the paperwork. *Id.* Montoyer's bond was reduced after he gave his statement concerning Hamilton. *Id.* Montoyer's contact with Muldrow lasted only five to ten minutes. *Id.* On cross-examination by the State, Montoyer testified that the court initially denied his bond reduction motion. 4 SHCR–01 790; 19 RR 123–24. Williams later conveyed to him that prosecutor Barnett

would assist in getting Montoyer's bond reduced and Montoyer subsequently made the reduced bond. 4 SHCR–01 790; 19 RR 123–24. Montoyer made no other deals with the State. 4 SHCR–01 790; 19 RR 124–25.

The jury was then brought in, and Muldrow examined Montoyer. Montoyer admitted that he also used the name Yousef Mohamed and was serving a two-year sentence for forgery. 4 SHCR–01 790; 19 RR 127–29. Montoyer was arrested for forgery on January 1, 2002. *Id.* No bond was set. *Id.* On January 10, 2002, bond was set at $60,000. *Id.* Williams represented Montoyer. Montoyer gave his statement on February 24, 2002. *Id.* Montoyer's initial motion to reduce his bond was denied, but the bond was later reduced as a result of the information he gave about Hamilton. *Id.* Montoyer was released on bond in March 2002 but was rearrested later that month. *Id.* Montoyer had prior felony convictions for possession of marijuana in 1984 and forgery in 1994. *Id.* During the State's cross-examination, Montoyer testified that he forfeited his bond on March 26, 2002, and reentered custody with no bond status. 19 RR 130–31. Except for the initial lowering of his bond, there were no other deals between Montoyer and the State. *Id.*

### B.  This claim is procedurally barred because Hamilton did not raise it on direct appeal.

This claim is procedurally barred because Hamilton failed to present it to the state court in a procedurally correct manner. Here, the CCA found that

116

Hamilton could have raised this claim on direct appeal but did not. 4 SHCR–01 801. "Texas law requires that a petitioner must raise a [record-based] claim on direct appeal before it can be raised on state habeas, and this rule is an adequate state ground capable of barring federal habeas review." *Scheanette v. Quarterman*, 482 F.3d 815, 827 (5th Cir. 2007) (quotation and footnote omitted); *Dorsey v. Quarterman*, 494 F.3d 527, 532 (5th Cir. 2007) ("The [CCA] has held that record based claims not raised on direct appeal will not be considered in habeas proceedings. . . . This procedural rule [is] firmly established . . . [and] sets forth an adequate state ground capable of barring federal habeas review.") (citations omitted); *Busby*, 359 F.3d at 718–19.

Hamilton's default could be excused on a showing of cause and prejudice or of fundamental miscarriage of justice, but he does not argue that either exception applies. *See generally* Am. Pet., ECF No. 50 at 148–50. Rather, Hamilton argues that this bar in not adequate in his case because he is raising a conflict-of-interest claim similar to an IATC claim, and Texas procedure usually reserves such claims for state habeas review. *Id*. But in *Buntion*, the Fifth Circuit held that it would not second-guess the state court's application of a procedural default. 982 F.3d at 951–52. The Court observed that "'a basic tenet of federal habeas review is that a federal court does not have license to question a state court's finding of procedural default [that is] based upon an

adequate and independent state ground.'" *Id.* (quoting *Smith v. Johnson*, 216 F.3d 521, 523 (5th Cir. 2000) (per curiam)). At bottom, Hamilton's contention is that the CCA got the procedural default wrong. Under *Buntion* and *Smith*, this argument is foreclosed. Indeed, this Court should be unwilling to second-guess Texas' high court's interpretation of its own law, an undertaking for which it is ill-suited. *See, e.g., Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (federal habeas review does not lie for errors of or in applying state law); *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("We reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions").

In any event, it appears that the CCA properly applied this bar to Hamilton's situation. The issue of counsel's representation of Montoyer was addressed extensively at trial, with testimony and explication from the trial court, trial counsel, the prosecution, and Montoyer. The record was thus fully developed and sufficient for a conflict-of-interest claim to be raised on direct appeal.[57] Accordingly, the Court should find that this claim is procedurally barred from federal habeas review.

---

[57]     Hamilton argues that he raised "substantial evidence" relating to this claim on initial state habeas. Am. Pet., ECF No. 50 at 149. But obviously the state court disagreed, and it appears that Muldrow's state habeas affidavit added little to what was already adduced at trial.  The line-drawing decision as to whether this new evidence was sufficient to avoid the bar is appropriately made by the state court, not a federal habeas court.
        And while Hamilton cites to cases in which Texas courts have resolved conflict-of-interest claims in state habeas, so too have Texas courts resolved such claims on direct appeal

### C.    Alternatively, the state court reasonably held that Hamilton's conflict-of-interest claim is meritless.

#### 1.    No actual conflict existed.

Criminal defendants are entitled, under the Sixth Amendment, to the assistance of counsel who is not "burdened by an actual conflict of interest." *Strickland*, 466 U.S. at 692. To prevail on a conflict-of-interest claim, a petitioner must "show that his trial attorney was acting under the influence of an actual conflict of interest that adversely affected his performance at trial." *United States v. Infante*, 404 F.3d 376, 392 (5th Cir. 2005) (citing *Cuyler v. Sullivan*, 446 U.S. 335 (1980); *Strickland*, 466 U.S. at 668; *Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000)). Under *Cuyler*, the petitioner "need not show prejudice in the sense that the outcome of the proceeding would have been different if it were not for his attorney's conflict of interest." *Id.* (citing *Perillo*, 205 F.3d at 781–82).

"'Conflicts may arise when an attorney simultaneously represents clients with differing interests (multiple representation), or when an attorney representing a defendant has previously represented co-defendants or trial

---

where the trial record provided a basis on which to raise the claim. *See, e.g., Johnson v. State*, 583 S.W.3d 300, 311–18 (Tex. App.—Fort Worth 2019, pet. ref'd); *Gaston v. State*, 136 S.W.3d 315, 318–22 (Tex. App.—Houston [1st Dist.] 2004, pet. struck). To be sure, in *Johnson*, the state court recognized that the record did not reflect whether the witness could have been impeached with prior offenses. *Johnson*, 583 S.W.3d at 318. Nonetheless, the court adjudicated the claim, noting that the appellant failed to develop the record by way of a motion for new trial. *Id.*

witnesses (successive representation).'" *Moss v. United States*, 323 F.3d 445, 459 (6th Cir. 2003) (quoting *United States v. Shepard*, 675 F.2d 977, 979 (8th Cir. 1982)). "In the case of successive representation, a non-hypothetical conflict exists only 'when defense counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client.'" *Wilkins v. Stephens*, 560 F. App'x 299, 309 (5th Cir. 2014) (quoting *Perillo*, 205 F.3d at 781). "It is more difficult for a defendant to show that counsel actively represented conflicting interests in cases of successive rather than simultaneous representation." *Moss*, 323 F.3d at 459.

The question of whether an actual conflict exists is highly fact-sensitive. *Perillo*, 205 F.3d at 782, 798–99. "Whether a conflict of interest exists depends on a number of factors, including, but not limited to, whether the attorney has confidential information that is helpful to one client but harmful to another; whether and how closely the subject matter of the multiple representations is related; how close in time the multiple representations are related; and whether the prior representation has been unambiguously terminated." *Infante*, 404 F.3d at 392 (5th Cir. 2005) (citing *Perillo*, 205 F.3d at 798–99). Merely "the possibility of a conflict is insufficient to impugn a criminal conviction." *Cuyler*, 446 U.S. at 350.

Here Muldrow's representation of Montoyer occurred during her representation of Hamilton.[58] However, Muldrow's representation lasted only minutes and was terminated months before Hamilton's trial and the cross-examination of Montoyer that forms the crux of Hamilton's complaints. *See* 4 SHCR–01 791. Consequently, it may be that Hamilton's case is most accurately considered a case of successive representation than multiple representation. But regardless whether it is multiple representation or successive representation, Hamilton is not entitled to relief. Hamilton has asserted that cross-examining a former client inherently leads to divided loyalties. Reply, ECF No. 34 at 24 (citing *Perillo*, 205 F.3d at 801–02). But *Perillo* did not apply AEDPA (which applies here), and this situation nonetheless does not inevitably lead to a conflict of interest. *Perillo*, 205 F.3d at 793; *see*, *e.g.*, *Boswell v. Davis*, 4:16–CV–729–A, 2017 WL 5635822, at *4 (N.D. Tex. Nov. 22, 2017). *Perillo* itself acknowledged as much, even in the cross-examination context. *Perillo*, 205 F.3d at 782 (comparing cross-examination cases and noting that "[e]ven a brief review of the precedent reveals that any categorical treatment of when an actual conflict exists is difficult"). Rather, *Perillo* mandates examining the specific facts of the case. *Perillo*, 205 F.3d at 782, 798–99.

---

[58]   Muldrow was appointed to Hamilton's case on February 1, 2002. 1 CR 5. Montoyer pleaded guilty on April 19, 2002. 4 SHCR–01 790–91. Muldrow cross-examined Montoyer in Hamilton's case in November 2002. *Id.*

Examining the specific facts of Hamilton's case, Muldrow's representation of Montoyer during Montoyer's plea proceedings was not closely related to her representation of Hamilton. Indeed, Muldrow initially did not even remember Montoyer due to the fleeting nature of their contact—she had to be told that she had previously represented him. 19 RR 106–08. Muldrow's representation of Montoyer was limited to standing in for Montoyer's attorney at Montoyer's plea colloquy—Montoyer's attorney Williams was the one who worked out Montoyer's plea agreement. *United States v. Olivares*, 786 F.2d 659, 663 (5th Cir. 1986) (where defense counsel's involvement in prior representation was transient or insubstantial, the court is less likely to find actual conflict); 19 RR 119, 121–23, 125–26. The plea colloquy apparently only lasted five to ten minutes. 19 RR 126. And Muldrow was not associated with Montoyer's case in the court records. *Id*. at 109, 119 (the Court: "I got the docket sheet. I got the judgment. I have got the plea papers. It is Connie Williams. Connie Williams. Connie Williams.). And while Montoyer did receive some benefit for his statement concerning Hamilton in the form of a bond reduction, *id*. at 124–25, the underlying forgery charge was wholly unrelated to Hamilton's murders and the benefit was secured by another attorney.

Hamilton also fails to demonstrate that Muldrow obtained confidential information during her representation of Montoyer that would have been

useful to Hamilton. This is significant because "the fear in successive representation cases is that the lawyer will fail to cross-examine the former client rigorously for fear of revealing or misusing privileged information." *Moss*, 323 F.3d at 460; *see also Boswell*, 2017 WL 5635822, at *4 ("There is no indication that counsel bore any residual loyalty to Warren or that counsel was forced to forfeit a defense strategy in petitioner's case based upon the representation. In fact, the record reflects that counsel did attempt to impeach Warren's credibility on cross-examination."). Muldrow stated during the trial court proceedings that there was no discussion of Hamilton's capital-murder case. 19 RR 109 ("The Court: Any discussion with him about this case at all? Ms. Muldrow: None."). Hamilton parses Muldrow's language and asserts that Muldrow never said that she did not receive confidential information. Reply, ECF No. 34 at 27–28. But Muldrow clearly stated that she did not discuss the Hamilton case (which would obviously include confidential information), and Hamilton does not seem to suggest that he has proof that Muldrow had other unrelated confidential information that was somehow useful to Hamilton's case. Indeed, it is difficult to see what information Muldrow could have gleaned from Montoyer in the couple minutes the representation lasted. 19 RR 122–23. The most Hamilton can do is suggest that perhaps Muldrow received confidential information from another source and that she had a "duty to keep

confidential her former client's criminal history and not even attempt to embarrass him with it at trial." Reply, ECF No. 34 at 27–28. Of course, this ignores the fact that Muldrow did use Montoyer's criminal history against him. 4 SHCR–01 790; 19 RR 127–29. Hamilton also must show that the actual reason that a tactic was not pursued was the alleged conflict. *Lee v. Cain*, 519 F. App'x 869, 880 (5th Cir. 2013) (citing *Perillo*, 205 F.3d at 807). Hamilton's speculation does not meet this requirement.

Finally, even though counsel's representation of Montoyer and Hamilton were close in time, her representation of Montoyer lasted minutes and was unambiguously terminated after Montoyer's guilty plea and before Hamilton's trial. It is also worth noting that Hamilton was also represented by Northcutt, who was unencumbered by any allegation of conflict. *Cf.*, *United States v. Rosnow*, 981 F.2d 970, 972 (8th Cir. 1992) (finding in case of suspended lawyer, "[i]f co-counsel provides petitioners with effective assistance at all critical stages of the proceedings, petitioners' Sixth Amendment rights have been protected."); *Hall v. Thaler*, 504 F. App'x 269, 277–78 (5th Cir. 2012) (no presumed prejudice in case of sleeping lawyer due to presence of co-counsel). The facts in this case simply do not support that counsel labored under an actual conflict of interest, and the state court's decision that there was no

conflict (which even cited Circuit precedent) was entirely reasonable. 4 SHCR–01 792, 801–02; *see Boswell*, 2017 WL 5635822, at *4.

> ### 2. Even assuming arguendo that an actual conflict existed, Hamilton was not prejudiced and/or the conflict did not adversely impact counsel's representation of Hamilton.

>> #### a. Application of presumed prejudice is barred by AEDPA and nonretroactivity.

While counsel represented Hamilton and Montoyer at the same time, that was during Montoyer's plea colloquy. Hamilton's petition complains about counsel's performance at Hamilton's trial, when counsel's representation of Montoyer was long terminated. Thus, Hamilton's case is likely most accurately characterized as one of successive representation. The Fifth Circuit has previously observed that "the Supreme Court [has] noted that it has never extended *Cuyler* to cases of successive, as opposed to concurrent, representation, and the Court expressed concern about whether *Cuyler* or *Strickland* provides the proper standard for resolving conflict-of-interest claims involving successive representation." *Infante*, 404 F.3d at 391 n.12 (citing *Mickens v. Taylor*, 535 U.S. 162, 174–76 (2002)). "The *Cuyler* presumption of prejudice has never been applied by the Supreme Court to conflicts of interest stemming from successive representation." *Johnson v. Cain*, CV 14–2676, 2019 WL 4921933, at *20 (E.D. La. Sept. 9, 2019), report

and recommendation adopted, CV 14–2676, 2019 WL 4918121 (E.D. La. Oct. 4, 2019); *United States v. Salinas*, C.A. C–09–122, 2010 WL 2606519, at *6 (S.D. Tex. Jun. 24, 2010), aff'd, 428 F. App'x 328 (5th Cir. 2011). Therefore, this Court is precluded by AEDPA and principles of nonretroactivity from presuming prejudice even if it finds an actual conflict.[59] *Teague*, 489 U.S. at 309–10; *Langley v. Prince*, 926 F.3d 145, 159–60 (5th Cir. 2019) (discussing *Woodall*, 572 U.S. at 426). Rather, this Court should only apply *Strickland* prejudice, which requires that Hamilton show there was a reasonable probability that, but for counsel's conflict, the result of the proceeding would have been different. 466 U.S. at 694. Hamilton fails to make this showing. In addition to Montoyer's testimony, the State had two eyewitnesses linking Hamilton to the Huynh killing. Also, the State presented ample other evidence of Hamilton's domestic abuse, violence in prison, prior convictions, and drug-dealing. There is no reasonable probability that the result of the punishment phase would have been different if counsel had cross-examined Montoyer the way that Hamilton proposes.

---

[59]     The Fifth Circuit found that it was bound to apply previous precedent requiring application of the adverse effect standard in *Infante*. 404 F.3d at 391 n.12. However, *Infante* was a direct appeal. Hamilton proceeds in federal habeas, where review is constrained by *Teague*.

>    **b.    Even if presumed prejudice applied, there was
>           no adverse effect stemming from the purported
>           conflict.**

However, even if *Cuyler*'s presumption of prejudice applied, it makes no difference. The state court found no adverse effect, 4 SHCR–01 792, and this determination was reasonable under the plain facts in the record. If counsel is burdened with an actual conflict of interest, prejudice is presumed only where the petitioner shows both that counsel acted under the influence of the conflict and that counsel's actions adversely affected the representation. *United States v. Culverhouse*, 507 F.3d 888, 892 (5th Cir. 2007), *abrogated on other grounds by Evans v. Davis*, 875 F.3d 210, 217 n.5 (5th Cir. 2017). To prove adverse effect, a petitioner need not show that the conflict changed the outcome of the trial. *Nealy v. Cabana*, 782 F.2d 1362, 1365 (5th Cir. 1986). An "adverse effect" is established with evidence that presents a "plausible defense strategy or tactic that could have been pursued, but was not because of the actual conflict impairing counsel's performance." *Perillo*, 205 F.3d at 781 (quotation and citation omitted). Again, a primary fear "is that the lawyer will fail to cross-examine the former client rigorously for fear of revealing or misusing privileged information." *Moss*, 323 F.3d at 459.

Here, Hamilton has alleged that he was prejudiced by Muldrow's purported conflict because: (1) Muldrow was distracted during her initial

examination of Montoyer; (2) Muldrow failed to bring out all of Montoyer's prior convictions; (3) Muldrow failed to adequately examine Montoyer about his aliases; (4) Muldrow failed to adequately show inconsistencies between Montoyer's statement and his trial testimony; and (5) Muldrow failed to object to Montoyer's testimony about Hamilton's extraneous bad acts. Am. Pet., ECF No. 50 at 136–39; Pet., ECF No. 19 at 48–51. However, none of these factual assertions were presented in Hamilton's state habeas application in conjunction with this claim. 1 SHCR–01 24–28. Consequently, any new claims predicated on them are unexhausted and procedurally defaulted. Hamilton asserts that "Respondent fails to recognize, however, that all of these facts were before the state habeas court." Am. Pet., ECF No. 50 at 140; Reply, ECF No. 34 at 29. However, this is insufficient for exhaustion purposes. *Riley v. Cockrell*, 339 F.3d 308, 318 (5th Cir. 2008) ("It is not enough that the facts applicable to the federal claims were all before the State court, or that the petitioner made a similar state-law based claim. The federal claim must be the 'substantial equivalent' of the claim brought before the State court.").

Along the same lines, to the extent Hamilton asserts that his new federal habeas evidence just supports the claim raised in state court, evidence that was never before the state court that resolved a claim on the merits is unequivocally barred by *Pinholster*. For example, ECF No. 34-1 at Exhibit 7

and ECF No. 50-1 at Exhibit 3—referenced in Hamilton's amended petition—do not appear to have been before the state court. Hamilton's repeated assertion that he is permitted to present evidence that supplements rather than fundamentally alters the claim presented to the state court, *see* Am. Pet., ECF No. 50 at 140–42 & Reply, ECF No. 34 at 29–30, 31, 33, has been firmly rejected by the Fifth Circuit in light of *Pinholster*. *Clark*, 673 F.3d at 416–17; *Lewis v. Thaler*, 701 F.3d 783, 789–91 (5th Cir. 2012).

In any event, as shown below, the record reflects that between her two cross-examinations, Muldrow aggressively questioned Montoyer about his current incarceration, his use of a fake name, the details of his prior statement to police, his possible motivations for testifying, his bond forfeiture, and his prior convictions. Accordingly, Hamilton fails to demonstrate that he is entitled to relief even under these new factual theories.

Specifically concerning Hamilton's allegation that Muldrow was too distracted by her potential conflict to examine Montoyer properly, this assertion is based on Muldrow's state habeas affidavit. Am. Pet., ECF No. 50 at 136–37 (1 SHCR–01 98). However, Muldrow' affidavit is speculative and does not support a claim of a conflict of interest. *Id*. According to Muldrow, she did not recall Montoyer's name and only learned that she had represented him on a plea at the request of Montoyer's attorney just as she was about to conduct

her cross-examination. *Id*. Muldrow states that it is "possible" that the announcement of her former representation of Montoyer "could have had some effect" on her cross-examination. *Id*. But a conflict of interest may not be hypothetical or potential. *Perillo*, 205 F.3d at 802. Hamilton asserts that this only applies to the existence of the conflict and not actual effect, *see* Reply, ECF No. 34 at 30, but the Fifth Circuit has acknowledged that "in *Mickens*, the Supreme Court announced that 'the *Sullivan* standard is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect. An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance.'" *Infante*, 404 F.3d at 391–92 (quoting *Mickens*, 535 U.S. at 172 n.5). Further, Muldrow's affidavit fails to account for the fact that the trial court allowed her to examine Montoyer a second time, when one presumes that her surprise had worn off. 19 RR 126.

Regarding Hamilton's assertion that counsel failed to point out all Montoyer's convictions and aliases, Hamilton's contentions are based on copies of Montoyer's criminal history provided along with Hamilton's federal habeas petition. Am. Pet., ECF No. 50 at 137 (citing Exhibit 3). Again, Hamilton does not show that these documents were ever presented to the state habeas court in conjunction with the merits denial of this claim, and therefore they are

barred by *Pinholster*. Am. Pet., ECF No. 50-1 at Exhibit 3 (documents dated June 16, 2016); *Ex parte Hamilton*, 2015 WL 3899185 (decision rendered June 24, 2015). But even if these documents could be considered, Muldrow adequately cross-examined Montoyer about his criminal history and use of another name. 19 RR 126–29. Muldrow may not have questioned Montoyer about every conviction and alias that Hamilton now claims are associated with him, but additional impeachment in this fashion would have been cumulative. *See Sheppard*, 967 F.3d at 468–69; *Carty*, 583 F.3d at 264 ("[Petitioner] has not shown any deficiency related to her proffer of cumulative evidence."); *United States v. Harris*, 408 F.3d 186, 191 (5th Cir. 2005) ("This Court has previously refused to allow the omission of cumulative testimony to amount to ineffective assistance of counsel."). If declining to offer cumulative testimony is not deficient conduct in the first place[60], then it does not matter whether prejudice is presumed under the *Cuyler* standard. *Cf. Beets v. Scott*, 65 F.3d 1258, 1277 (5th Cir. 1995).

Hamilton also claims that Muldrow failed to question Montoyer about a purported discrepancy between his trial testimony and his statement to police. Am. Pet., ECF No. 50 at 138; Pet., ECF No. 19 at 50. Specifically, he asserts

---

[60]    The question is not whether cumulative evidence is admissible, as contended by Hamilton, *see* Am. Pet., ECF No. 50 at 141–42 & Reply, ECF No. 34 at 32; rather, the question is whether counsel should have presented evidence that is cumulative in nature.

that Montoyer told the jury that he learned about Hamilton's involvement in Matalkah's murder when he overheard Hamilton as Montoyer was cutting hair, whereas Montoyer told the police that Hamilton told him about Matalkah's murder while Montoyer was helping Hamilton at the law library. *Compare* 17 RR 184–86 *with* Am. Pet., ECF No. 50-1 at Exhibit 4. However, Hamilton has not shown that Montoyer's statement was presented to the state habeas court in conjunction with this claim and it is therefore barred by *Pinholster*. Montoyer's statement is also unauthenticated and is consequently of dubious probative value. But even if the statement was valid and could be considered, it shows that Montoyer was responding to the detective's question "now why is he confiding in you this?" Am. Pet., ECF No. 50-1 at Exhibit 4. In his statement, Montoyer was not saying that Hamilton confided in him in the law library, rather he confided in him because Montoyer did legal work and used the law library (although Montoyer does not mention overhearing Hamilton while cutting hair in his statement). *Id*. And while counsel did not bring out the purported difference between the two stories that Montoyer told, she was nevertheless aware of the statement and did impeach Montoyer with it. 17 RR 190–95. Between that and pointing out Montoyer's prior convictions and aliases, counsel sufficiently damaged Montoyer's credibility even if she did

not highlight any additional discrepancies between Montoyer's statement and his trial testimony.

With respect to counsel's purported failure to object to unnoticed extraneous offenses and bad acts, *see* Am. Pet., ECF No. 50 at 142–43 & Pet., ECF No. 19 at 50–51, the Director has previously explained that Hamilton has not shown these acts were, in fact, unnoticed. *See* Argument, Section II(B)(1), *supra*. To briefly restate, in support of this claim, Hamilton refers to a document in the state habeas record where the prosecution provides a list of extraneous offenses and bad acts that they might introduce at the punishment phase. 3 SHCR–01 555–56. But this letter states that prosecutor will update counsel with any further information. *Id*. Possibly this information was sent later—Hamilton supplies no affidavit from the defense team indicating that they were surprised by any extraneous offense. Hamilton asserts that the Director would have him prove a negative and that he has examined all the documentation in his trial file without finding adequate notice. Am. Pet., ECF No. 50 at 142–43; Reply, ECF No. 34 at 33–34 & n.8. However, Hamilton has the burden of proving his entitlement to federal habeas relief. His examination of counsel's records does not foreclose that the records are incomplete or missing or the possibility that information was verbally transmitted to counsel. If Hamilton wished to pursue this argument, he needed to offer affidavits in

133

the state habeas proceedings from counsel attesting that they did not have actual knowledge of the bad acts in question (and possibly complimentary affidavits from prosecutors describing their complete efforts to provide notice). While this may indeed be proving a negative, securing affidavits during state habeas review is not uncommon or especially arduous. In any event, Hamilton's attempt to manufacture a false alibi is noticed in the letter, as are various jail assaults. 3 SHCR–01 555–56. Defense counsel therefore had no valid basis for objecting.

Hamilton's initial petition's reply brief also attaches Exhibit 7, which is a "Public Information Act Request for Attorney Muldrow's cases." Reply, ECF No. 34-1 (Exhibit 6).[61] Hamilton offers this exhibit to explain why Muldrow did not initially remember previously her interaction with Montoyer—that is, she was too busy. *Id*. at 27 n.7. But this evidence does not show a tactic that was taken *because* of the conflict[62]; instead; it shows a possible deficiency that resulted from a heavy caseload. Moreover, as noted, Hamilton's conflict-of-interest claim concerning Montoyer was alternatively resolved on the merits by the state court. Thus, new evidentiary support of this claim is barred by *Pinholster*, 563 U.S. at 181–82.

---

[61]     Hamilton's reply refers to this as Exhibit 6, although it is actually labeled Exhibit 7.

[62]     *Infante*, 404 F.3d at 393 (there must be "some plausible alternative defense strategy that could have been pursued, but was not, because of the actual conflict.").

The CCA considered and rejected Hamilton's instant claim on the merits. *Ex parte Hamilton*, 2015 WL 3899185; 4 SHCR–01 787–92, 801–02. Therefore, this Court cannot grant habeas corpus relief unless it determines that the state courts' determinations to deny relief conflict with clearly established federal law as determined by the Supreme Court or that they were "based on an unreasonable determination of the facts in light of the evidence." 28 U.S.C. § 2254(d). As discussed above, Hamilton fails to meet his heavy burden to show that the state court's decision was unreasonable, and his claim should be denied with prejudice.

### D. Hamilton's related *Brady* claims are unexhausted and procedurally defaulted, as well as meritless.

In conjunction with this claim, Hamilton makes a *Brady*-like argument that the prosecution failed to disclose (1) the entirety of Montoyer's criminal history and (2) its involvement in his bond reduction. Am. Pet., ECF No. 50 at 129–30; Pet., ECF No. 19 at 49, 51. But, to the extent that Hamilton is actually raising *Brady* claims, these *Brady* claims are unexhausted and procedurally defaulted since Hamilton did not raise them in his direct appeal brief or his state habeas application. However, even if these claims were not unexhausted and procedurally defaulted, they are still meritless. To establish a *Brady* violation, Hamilton must prove: (1) the evidence in question was favorable to him, either because it is exculpatory or because it is impeaching; (2) the

evidence was suppressed by the State, either willfully or inadvertently; and (3) the evidence was material, i.e., prejudice ensued from its nondisclosure. *Banks*, 540 U.S. at 691; *Strickler*, 527 U.S. at 281–82.

With respect to Montoyer's criminal history, Hamilton provides no direct evidence that this history was unknown to the defense team—in fact, he seems to suggest that it was known. Am. Pet., ECF No. 50 at 141. He also cites no evidence showing that the prosecution knew of this history and then failed to disclose it. Thus, even though this allegation is not raised as an independent ground for relief in Hamilton's federal habeas application, it would be subject to dismissal as conclusory if it were. *Miller*, 200 F.3d at 282. Furthermore, the basis for Hamilton's assertions concerning Montoyer's criminal history and aliases appear to be publicly accessible documents, *see* Am. Pet., ECF No. 50-1 at Exhibit 3, that counsel could have obtained through the use of due diligence. *See Williams*, 35 F.3d at 163 (no *Brady* violation if the defendant, using due diligence, could have obtained the information).

As for Hamilton's claim the prosecution failed to disclose Montoyer's bond reduction (Am. Pet., ECF No. 50 at 128–29; Pet., ECF No. 19 at 45 n.10), prosecutor Barnett clearly stated during trial that that information was disclosed to Muldrow. 19 RR 113. And even if Hamilton was correct and Barnett lied, the issue was still eventually raised before the jury, thereby

negating any *Brady* claim. *Id*. at 128–29; *see* Argument, Section I(A)(2), *supra*. Consequently, to the extent that the Court wants to consider these unexhausted allegations, they are meritless even under de novo review. *Miller*, 200 F.3d at 281 n.4 ("Review is de novo when there has been no clear adjudication on the merits.").

## IV.   Hamilton's Claim That Attorney Muldrow Had a Conflict of Interest Because She Was Purportedly Law Partners with Smith's Lawyer Is Unexhausted and Procedurally Defaulted. Alternatively, This Claim Is Without Merit. (Claim 4)

In his amended petition's fourth ground for relief, Hamilton argues that trial counsel Muldrow had an additional conflict of interest because her purported law partner, Alvin Nunnery, represented Smith. Am. Pet., ECF No. 50 at 150–63; Pet., ECF No. 19 at 57–61. However, this claim was first raised in a subsequent application that was dismissed as an abuse of the writ. *Ex parte Hamilton*, 2020 WL 6588560, at *3; 1 SHCR–02 39–52. Consequently, this claim is procedurally defaulted and cannot be considered on federal habeas review.[63] In the alternative, even if this claim is not procedurally defaulted, it is meritless under de novo review. Specifically, this claim was conclusory, as Hamilton has not proved that Muldrow and Nunnery were actually law partners. But even assuming that Muldrow and Nunnery were truly law partners, Hamilton has also not identified any plausible alternative defense

---

[63]   The Director does not waive this procedural bar. Pet., ECF No. 19 at 60.

strategy that could have been pursued, but was not, because of the alleged conflict. Finally, Hamilton had conflict-free co-counsel. Accordingly, Hamilton is not entitled to federal habeas relief on this claim.

### A.      This claim is procedurally defaulted.

This claim was never raised to the state court during either Hamilton's direct appeal or initial state habeas application. *See generally* Brief for Appellant; 1 SHCR–01 2–78 (state habeas application). Rather, as noted above, it was presented in a subsequent application that the CCA dismissed as an abuse of the writ. *Ex parte Hamilton*, 2020 WL 6588560, at *3; 1 SHCR–02 39– 52. Thus, this claim is procedurally defaulted. *Aguilar*, 428 F.3d at 533.

To the extent that Hamilton argues that he can circumvent the procedural default of this claim under *Martinez* and *Trevino*, Hamilton fails to demonstrate that he meets *Martinez*'s requirements. Hamilton does not raise an IATC claim; instead, he raises a conflict-of-interest claim. Hamilton fails to demonstrate that the Supreme Court has extended *Martinez* to encompass conflict-of-interest claims. In fact, the Supreme Court has emphasized *Martinez*'s limited reach and rebuffed efforts to extend *Martinez* beyond IATC claims. *Davila v. Davis*, 137 S. Ct. 2058, 2068–70 (2017) (declining to extend the *Martinez* exception to ineffective-assistance-of-appellate-counsel claims). Hamilton fails to offer any precedent from any court that swells the *Martinez*

equitable exception to cover conflict-of-interest claims. He also offers no compelling reason to make such an extension in the instant case.

But even if *Martinez* was applicable to conflict-of-interest claims, Hamilton would not benefit. Hamilton had state habeas counsel; therefore, Hamilton must demonstrate that his attorney was actually ineffective to qualify for *Martinez* relief. *Martinez*, 566 U.S. at 14, 17. As shown above, state habeas counsel was not deficient, and no prejudice exists because Hamilton's underlying claim is wholly meritless. *See* Argument, Section II(A), *supra*. Likewise, Hamilton's claim fails because—even assuming he has successfully shown cause under *Martinez*—he has not shown the accompanying actual prejudice. *Id.*

In his reply brief, Hamilton has asserted that McCann also had a conflict of interest because of his professional relationship with Muldrow and Nunnery. Reply, ECF No. 34 at 40–44; *see also* Am. Pet., ECF No. 50 at 161. In support of his assertion, Hamilton offers: (1) documents that reflect that McCann shared office space with Nunnery and Muldrow while representing Hamilton, *see* ECF No. 34-1 at Exhibit 3 & ECF No. 50-1 at Exhibit 25; (2) documents purportedly showing that McCann withdrew as capital murderer Howard Guidry's state habeas counsel because Muldrow and Nunnery were trial counsel and McCann realized that he suffered from conflict of interest, *see* ECF

No. 34-1 at Exhibit 3 & ECF No. 50-1 at Exhibit 25; and (3) a letter that
Hamilton sent McCann referring to the purported Guidry conflict and asking
McCann to withdraw, *see* ECF No. 34 at Exhibit 6 & ECF No. 50-1 at Exhibit
26. However, this evidence is insufficient to prove any conflict.[64] As shown
below in the Director's discussion of the underlying merits of this claim, the
fact that attorneys share office space does not necessarily create a conflict, and
Hamilton does not seem to suggest that Muldrow and McCann are law
partners. But even assuming that McCann was somehow professionally tied to
Muldrow, "[i]n order to establish a violation of the Sixth Amendment, a
defendant who raised no objection at trial must demonstrate that an actual
conflict of interest adversely affected his lawyer's performance." *Cuyler*, 446
U.S. at 349–50. Hamilton has not made this demonstration. Moreover, as
explained above, McCann effectively represented Hamilton during his state
habeas proceedings. Finally, Hamilton's underlying conflict-of-interest claim
is wholly without merit. Consequently, Hamilton should not be permitted to

---

[64]     It is worth noting that the Guidry documents and Hamilton's letter only show that
McCann withdrew due to an unspecified conflict, which Hamilton merely assumes is because
of his relationship with Muldrow and Nunnery. ECF No. 34-1 at Exhibits 3 & 6. Hamilton's
conclusory assertion, without more, is insufficient proof of either that this conflict existed in
Guidry's case or that it existed in his own. It is further worth noting that Hamilton's letter
to McCann is not accompanied by a response from McCann or any additional details
concerning Hamilton's complaint. *Id*. (Exhibit 6). Hamilton refers to a reply letter but does
not seem to attach it. Reply, ECF No. 34 at 43 n.10; ECF No. 34-1 (Exhibit 6). And if McCann
was willing to withdraw from Guidry's case because of this purported conflict, it would be odd
that he was not willing to do so in Hamilton's case.

evade his procedural default on this basis or on the grounds of ineffective assistance of state habeas counsel or state habeas counsel's purported conflict of interest.

Besides, as previously noted, *Martinez*, by its own terms, only applies to petitioners who allege ineffective assistance of state habeas counsel as cause to excuse their procedural default of an IATC claim—not petitioners who allege a conflict of interest to excuse the procedural default of their conflict-of-interest claim. As noted, the Supreme Court in *Davila* as refused to extend the narrow *Martinez* holding beyond its original confines. Hamilton's precedent for the proposition that his state habeas counsel's purported conflict could constitute cause is not from this circuit. Reply, ECF No. 34 at 44 (citing *Manning v. Foster*, 224 F.3d 1129, 1134 (9th Cir. 2000); *Jamison v. Lockhart*, 975 F.2d 1377, 1380 (8th Cir. 1992)). The Fifth Circuit had previously found a conflict of interest unavailable to excuse a procedural default, although admittedly before *Martinez/Trevino*. *Williams*, 602 F.3d at 308–09. Until the Supreme Court or the Fifth Circuit recognizes conflict of interest as cause to circumvent a procedural default, this Court should not do so on its own. Thus, Hamilton cannot overcome the procedural bar to review of his claims.

### B.    This claim is meritless.

Even if this claim were not procedurally defaulted, Hamilton has failed

to demonstrate any entitlement to relief. The Supreme Court has held that:

> . . . Assuming without deciding that two law partners are
> considered as one attorney, it is settled that "[r]equiring or
> permitting a single attorney to represent co-defendants, often
> referred to as joint representation, is not per se violative of
> constitutional guarantees of effective assistance of counsel."
> *Holloway v. Arkansas*, 435 U.S. 475, 482 (1978). We have never
> held that the possibility of prejudice that "inheres in almost every
> instance of multiple representation" justifies the adoption of an
> inflexible rule that would presume prejudice in all such cases. *See*
> [*Cuyler*, 446 U.S. at 348]. Instead, we presume prejudice "only if
> the defendant demonstrates that counsel 'actively represented
> conflicting interests' and that 'an actual conflict of interest
> adversely affected his lawyer's performance.'" *Strickland*, 466 U.S.
> at 692 (citation omitted). *See also Cuyler*, 446 U.S. at 348, 350.

*Burger v. Kemp*, 483 U.S. 776, 783 (1987); *see also United States v. Dong Dang*

*Huynh*, CRIM.A.H–05–351–2, 2009 WL 3784393, at *3 (S.D. Tex. Nov. 10,

2009); *United States v. Wade*, CIV.A. H–10–3973, 2011 WL 2604826, at *4 (S.D.

Tex. Jun. 30, 2011). Hamilton has not demonstrated that the Supreme Court

has decided what was assumed in *Burger*, i.e., that law partners are considered

as one attorney for the purposes of a conflict analysis. Thus, the adoption of

this new rule would be barred by *Teague*.

In any event, Hamilton has not shown that the Muldrow and Nunnery are actually law partners. Hamilton cites to a Google search[65] and an exhibit with appointment forms showing the attorneys have the same address, but the two may just share office space. ECF No. 50-1 at Exhibits 6 & 27; ECF No. 19-1 at Exhibit 6; 1 SHCR–02 149–52. Similarly, Ortego's affidavit only shows that a receptionist answered the phone "law office of Muldrow and Nunnery." ECF No. 50-1 at Exhibit 28; 1 SHCR–02 144. This affidavit is hearsay, but even assuming that the contents are admissible, it again only shows that Muldrow and Nunnery share office space and resources. Hamilton notes that the prosecutor transmitted items to Nunnery through Muldrow (3 SHCR–01 554), but the fact that the prosecutor gave one attorney materials to give to another hardly makes the two attorneys partners. The Brian Stolarz affidavit likewise seems to only reflect the shared use of resources and office space (including a sign which was later taken down), a hearsay assertion that Nunnery casually called Muldrow his partner, Nunnery handing over documents for the absent Muldrow, and an assumption that Nunnery may have provided confidential information about another case to Muldrow. ECF No. 50-1 at Exhibit 30; 1 SHCR–02 153–56. Finally, Hamilton cites to a blog post with brief mentions

---

[65]   It is unclear that this evidence was presented to the state court. 1 SHCR–02 126 (index of exhibits). Evidence in support of defaulted claims that was not presented to the state court is barred by § 2254(e)(2).

that Muldrow and Nunnery are partners, but the source for this assertion is unclear. ECF No. 50-1 at Exhibit 29; 1 SHCR–01 43 n.9.

Hamilton has not provided any official documentation of Muldrow and Nunnery's partnership, and Muldrow and Nunnery's state bar information reflects that, while they share an address, Muldrow[66] and Nunnery[67] are solo practitioners. Hamilton has cited no affidavit or testimony from the two that states that the two attorneys were partners. Indeed, the precedent supplied in Hamilton's initial petition's reply brief appears to support the Director's position, as it states that "practitioners who share office space and occasionally consult with one another are not regarded as constituting a single firm for conflict purposes." Reply, ECF No. 34 at 39 (citing *United States v. Varca*, 896 F.2d 900, 903 (5th Cir. 1990)); *see also Duncan v. Morton*, 256 F.3d 189, 198 (3d Cir. 2001); *United States v. Gatti*, CRIM03–CR–500333, 2010 WL 1049586, at *6 (W.D. La. Feb. 9, 2010) ("The evidence established that attorneys Gold and Flowers merely shared office space and not the representation of clients."), report and recommendation adopted, CRIM. 03–CR–50033(3), 2010 WL

---

[66]   State Bar of Texas, Find a Lawyer Results, https://www.texasbar.com/AM/Template.cfm?Section=Find_A_Lawyer&template=/Customsource/MemberDirectory/MemberDirectoryDetail.cfm&ContactID=173746 (last accessed August 12, 2021).

[67]   State Bar of Texas, Find a Lawyer Results, https://www.texasbar.com/AM/Template.cfm?Section=Find_A_Lawyer&template=/Customsource/MemberDirectory/MemberDirectoryDetail.cfm&ContactID=181255 (last accessed August 12, 2021).

1039973 (W.D. La. Mar. 18, 2010), aff'd, 434 F. App'x 364 (5th Cir. 2011). To the extent that Hamilton claims that Nunnery and Muldrow are unethically creating the impression that they are partners, *see* 1 SHCR–02 46, 48 & Am. Pet., ECF No. 50 at 156, an analysis under *Cuyler* is not designed "to enforce the Canons of Legal Ethics, but to apply needed prophylaxis in situations where *Strickland* itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel." *Mickens*, 535 U.S. at 176; *see also Dong Dang Huynh*, 2009 WL 3784393, at *3 ("[e]thics rules are not dispositive of a conflict of interest analysis under the Sixth Amendment").

In any event, even if this Court makes the *Burger* assumption that law partners can be considered as one attorney for conflict purposes, there must be a showing that the joint representation created an "actual conflict," that is, "a conflict *that affect[s] counsel's performance*—as opposed to a mere theoretical division of loyalties." *Mickens*, 535 U.S. at 171 (emphasis in original). The burden is on Hamilton to show that an actual conflict was caused by the alleged joint representation such that "there was some plausible alternative defense strategy that could have been pursued, but was not, because of the actual conflict." *Infante*, 404 F.3d at 393.

Hamilton does not plausibly identify any specific action that was or was not taken due to this purported conflict. Hamilton pleaded guilty, so Smith's

testimony concerning Matalkah's murder was not necessary to support the verdict. Moreover, any challenge to a conviction that was obtained by a guilty plea is limited to the issues of voluntariness, the defendant's understanding of the charges against him, and his understanding of the consequences of the plea. *Hill v. Lockhart*, 474 U.S. 52, 56–57 (1985); *Diaz v. Martin*, 718 F.2d 1372, 1376–77 (5th Cir. 1983). All non-jurisdictional defects in the proceedings are waived, except those claims of ineffective assistance of counsel relating to the knowing and voluntary nature of the plea. *United States v. Glinsey*, 209 F.3d 386, 392 (5th Cir. 2000). Hamilton asserts that the alleged conflict impacted counsel's advice to him, but he offers no compelling evidence of this and fails to plausibly show how the alleged conflict changed her advice. His assertions are mostly conclusory. *Miller*, 200 F.3d at 282. Certainly, Hamilton makes no showing that the conflict affected counsel's advice in a way that compromised the knowing and voluntary nature of his plea, i.e., whether he knew the nature of the charges against him and the maximum penalty. *Diaz*, 718 F.2d at 1376–77; *Spinelli v. Collins*, 992 F.2d 559, 561 (5th Cir. 1993); *Hobbs v. Blackburn*, 752 F.2d 1079, 1081–82 (5th Cir. 1985). The fact that Hamilton's plea was knowing and voluntary is amply demonstrated below. *See* Argument, Section VI, *infra*. Accordingly, Hamilton's guilt-innocence conflict-of-interest claim is waived. *United States v. Palacios*, 928 F.3d 450, 457 (5th Cir. 2019) (citing

*United States v. Tijerina*, No. 00–41365, 35 F. App'x 390 (5th Cir. 2002) (per curiam) (unpublished)).

Hamilton points to Smith pleading his Fifth Amendment rights to avoid testifying during punishment, but the record reflects Smith and Nunnery seemed amendable to Smith testifying. 19 RR 100. The problem was that Smith would not testify until his plea deal was finalized, and the prosecution was unwilling to finalize the agreement at the time of trial. *Id*. Smith taking the Fifth is thus not attributable to the purported conflict, but instead the result of the lack of a formalized plea deal. In fact, Hamilton complains extensively about the prosecution's conduct in this respect. Am. Pet., ECF No. 50 at 29–31; Pet., ECF No. 19 at 62–65. Any issue here, then, is not attributable to the purported conflict. *Perillo*, 205 F.3d at 781. Another attorney representing Smith would not have handled this situation any differently. There is no adverse effect.

Hamilton has also failed to adequately prove that Smith's testimony would have been favorable to him. Hamilton did make a proffer of Smith's testimony at trial and submitted an affidavit from Smith's attorney Nunnery on state habeas review. 4 SHCR–01 787 (Finding No. 46, citing 19 RR 98–103, 117–18); 1 SHCR–01 96. However, Hamilton has not provided an affidavit from

Smith himself. Hamilton has thus merely offered hearsay and what other people believe that Smith would have said.

Hamilton's allegations establish neither an actual conflict of interest nor the existence of a plausible defensive strategy that could have been, but was not, pursued as the result of Muldrow's purported partnership with Nunnery. It is also worth reiterating that Hamilton had the assistance of co-counsel Northcutt, who is not alleged to be a partner with Nunnery. *Cf.*, *Rosnow*, 981 F.2d at 972; *Hall*, 504 F. App'x at 277–78. Accordingly, Hamilton is not entitled to relief on this claim even under de novo review.

## V. Hamilton's Claim That His Attorneys Were Ineffective Because They Did Not Object to Purported Victim Impact Testimony Is Unexhausted and Procedurally Defaulted. Alternatively, the State Court Reasonably Denied Hamilton's Claim. (Claim 5)

In his amended petition's fifth ground for relief, Hamilton argues that his trial attorneys were ineffective for not objecting to victim impact evidence. Am. Pet., ECF No. 50 at 163–70; Pet., ECF No. 19 at 69–75. Hamilton raised this claim on direct appeal. *Hamilton v. State*, 2004 WL 3094382, at *5. But the state court held the appellate record was not adequate to respond to Hamilton's assertions, because it was possible that counsel had a legitimate strategic reason for not objecting to this testimony:

> [. . .]During the State's punishment case-in-chief, Ahmad Naimi, a co-worker of the victim, testified about the victim and his life. Relying on language from *Mosley v. State*, 983 S.W.2d 249, 263–64

(Tex. Crim. App. 1998), *cert. denied*, 526 U.S. 1070 (1999), [Hamilton] argues that counsel was ineffective for failing to object to Naimi's testimony on the ground "that mitigation was not yet an issue in the case." He reasons that he had the option of affirmatively waiving reliance on and submission of the mitigation issue at the end of the State's case, and thus Naimi's testimony was not relevant until evidence on mitigation had been introduced.

The record on direct appeal is generally inadequate to show that counsel's conduct fell below an objectively reasonable standard of performance. *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim App. 2002); *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). "If counsel's reasons for his conduct do not appear in the record and there is at least the possibility that the conduct could have been legitimate trial strategy, we will defer to counsel's decisions and deny relief on an ineffective assistance claim on direct appeal." *Ortiz v. State*, 93 S.W.3d 79, 88 (Tex. Crim. App. 2002), *cert. denied*, 538 U.S. 998 (2003).

Here, counsel's reasons do not appear in the record. It is at least possible that counsel had some strategic reason for not objecting to the evidence on the grounds now urged on appeal. Accordingly, we will defer to counsel's decision.

*Hamilton v. State*, 2004 WL 3094382, at *5.

Hamilton did not cure the deficiency in the record during either of his state habeas proceedings by re-raising this claim and then seeking an affidavit or testimony from trial counsel discussing this issue. *See generally* 1 SHCR–01 2–76; 1 SHCR–02 1–124. The state court's decision on direct appeal was reasonable, and Hamilton has not presented any clear and convincing evidence to rebut the presumption of correctness attached to the state court's finding

that counsel may have had a strategic reason for not objecting to this evidence. Accordingly, AEDPA precludes relief on this claim.

### A. Hamilton's claims that counsel should have objected under Rule 403 is unexhausted and procedurally defaulted.

On direct appeal, Hamilton argued that the purported victim impact evidence from Naimi was impermissible because he had not yet put on a mitigation case. Brief for Appellant at 69–75. Now, on federal habeas review, Hamilton argues that counsel should have objected because the victim impact evidence would not have been admissible under Texas Rule of Evidence 403. Am. Pet., ECF No. 50 at 163; Pet., ECF No. 19 at 71. Hamilton cannot offer new legal theories in support of his claims to the state court. *Anderson v. Harless*, 459 U.S. 4, 6–7 (1982); *Riley*, 339 F.3d at 318; *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001). Hamilton asserted in his initial petition's reply brief that he has actually raised the same claim, since he cites *Mosley* in his direct appeal brief, and *Mosley* discusses Rule 403. Reply, ECF No. 34 at 60–61. However, this does not seem to be the import of his claim on direct appeal; it does not appear that the direct appeal brief specifically mentions Rule 403; and the Supreme Court has frowned on the use of "daisy chain[s]" in the exhaustion context. *Howell v. Mississippi*, 543 U.S. 440, 443–44 (2005). The Court should deny this aspect of Hamilton's claim as unexhausted and procedurally defaulted.

**B.** **Both the exhausted version of this claim (raised on direct appeal) and its current incarnation are meritless.**

**1.** **The IATC standard under AEDPA**

The Director has set forth the general *Strickland* standard above. *See* Argument, Section II(B), *supra*. But, to the extent that Hamilton seeks a federal writ of habeas corpus based on the IATC claim raised in the state court, the standard is more arduous. Instead, "the test is whether the state court's decision—that [petitioner] did not make the *Strickland* showing—was contrary to, or an unreasonable application of, the standards, provided by the clearly established federal law (*Strickland*), for succeeding on his [IATC] claim." *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003); *see also Richter*, 562 U.S. at 101. Thus, a federal court's review of a state court's resolution of an IATC claim under AEDPA is "doubly deferential," *Pinholster*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111 (2009)), because the question is "whether the state courts application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S. at 101. Importantly, "[t]his is different from asking whether defense counsel's performance fell below *Strickland*'s standard," because the "state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.* Consequently, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102. Rather, to

obtain habeas relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 102–03.

As the Supreme Court recently reiterated, in conducting a federal habeas review, this Court "owe[s] deference to both [Hamilton's] counsel *and* the state court." *Reeves*, 141 S. Ct. at 2410 (emphasis in original). The Court may only grant relief if counsel "took an approach that no competent lawyer would have chosen." *Id*. (citing *Titlow*, 571 U.S. at 22–23). "Or, in more concrete terms, a federal court may grant relief only if *every* fairminded jurist would agree that *every* reasonable lawyer would have made a different decision. *Id*. at 2411 (cleaned up) (emphasis in original).

### 2.    Hamilton fails to show deficiency.

At punishment, Matalkah's coworker Naimi testified that Matalkah lived very simply and sent all his money back to Jordan to support his wife, four children, mother, and sisters. 16 RR 271–73. Hamilton argues that his attorneys rendered IATC by not objecting to this purported victim impact evidence. However, Hamilton raised this claim to the CCA on direct appeal, and the CCA found that the appellate record was insufficient to demonstrate that counsel did not have a strategic justification for not objecting. *Hamilton*

152

*v. State*, 2004 WL 3094382, at *5. The CCA's decision was plainly reasonable, and it even left the door open for Hamilton to re-argue the claim on state habeas review (although he chose not to). Without providing habeas affidavits or habeas testimony with counsel's thinking and motivations—their "perspective at the time"—Hamilton plainly fails to meet his burden to show deficient performance. The CCA's decision conforms with the Supreme Court's teachings. *Titlow*, 571 U.S. at 23; *Reeves*, 141 S. Ct. at 2412.

Further, counsel was not deficient because there was no valid basis for an objection on Hamilton's proposed bases. It is questionable that Naimi's statements qualify as victim impact testimony. Naimi was not a family member, and his testimony about Matalkah's life was brief—most of his testimony was directed to the circumstances of Matalkah's murder. Naimi's testimony about his relationship with Matalkah, Matalkah's family, and Matalkah's occupation would be more accurately construed as contextual. *Payne v. Tennessee*, 501 U.S. 808, 840–41 (1991) (Souter, J., concurring) (noting that, with respect to a hypothetical victim's family and occupation, "the usual standards of trial relevance afford factfinders enough information about surrounding circumstances to let them make sense of the narrowly material facts of the crime itself. No one claims that jurors in a capital case should be deprived of such common contextual evidence."); *Mosely v. Quarterman*, CIV.A.

3:03–CV–1577–N, 2008 WL 656887, at *13 (N.D. Tex. Mar. 6, 2008), *aff'd* 306 F. App'x 40, 45–48 (5th Cir. 2008).

Moreover, in *Payne*, the Supreme Court held that the Eighth Amendment does not bar testimony about the murder victim or the murder's impact. *Payne*, 501 U.S. at 827. The Court held that there exists a legitimate interest in countering the individualization of the defendant by reminding the jury that the victim was also an individual whose death represents a unique loss to society and to the victim's family. *Id*. at 825–28. As a result, the Court left it to the states to determine whether such testimony is relevant under their individual punishment schemes. *Id*. "Courts have always taken into consideration the harm done by the defendant in imposing sentence." *Id*. at 825. "The assessment of harm caused by the defendant as a result of the crime charged has understandably been an important concern of the criminal law, both in determining the elements of the offense and in determining the appropriate punishment." *Id*. at 819. As such, "a state may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant." *Id*. at 825. "Victim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question." *Id*. In Texas, "victim

impact[68] evidence and victim character[69] evidence are admissible, in the context of the mitigation special issue, to show the uniqueness of the victim, the harm caused by the defendant, and as rebuttal to the defendant's mitigating evidence." *Mosley*, 983 S.W.2d at 262.

In his brief on direct appeal, Hamilton contended that victim impact/character evidence is relevant only to the mitigation special issue. Brief of Appellant at 71–72. He reasoned that, because the defense had not yet presented mitigation evidence at the time of Naimi's testimony and could have waived reliance on the mitigation special issue, his purported victim impact evidence was not admissible. *Id*. But the CCA did not hold in *Mosley* that a defendant could waive reliance upon and submission of the mitigation issue, thereby rendering victim impact and character evidence irrelevant and inadmissible—the CCA subsequently found that part of the *Mosley* holding was merely dicta. *Tong v. State*, 25 S.W.3d 707, 711–13 (Tex. Crim. App. 2000).

---

68    Victim impact evidence is evidence "concerning the effect the victim's death will have on others, particularly the victim's family members." *Mosley*, 983 S.W.2d at 261. It is "designed to remind the jury that murder has foreseeable consequences to the community and the victim's survivors." *Salazar v. State*, 90 S.W.3d 330, 335 (Tex. Crim. App. 2002).

69    Victim character evidence is "evidence concerning good qualities possessed by the victim." *Mosley*, 983 S.W.2d at 261. Victim character evidence "is designed to give the jury 'a quick glimpse of the life that the petitioner chose to extinguish, to remind the jury that the person whose life was taken was a unique human being.'" *Salazar*, 90 S.W.3d at 335 (quoting *Payne*, 501 U.S. at 830–31 (O'Connor, J., concurring)).

Besides, Hamilton did not affirmatively waive submission of the mitigation issue.

Also, Hamilton's assertion in his direct appeal brief (p.72) that when the State admitted the victim impact/character evidence the defense had put on no witnesses or mitigation testimony is contradicted the record. Naimi testified after Hamilton's counsel elicited evidence from Billy Norris that Hamilton's whole family was on drugs; Hamilton had been raised in a dirty crack house; Hamilton's mother did drugs; Hamilton's mother and father bought crack; Hamilton's mother walked the streets; Hamilton's father had gone to prison for aggravated robbery; Hamilton confessed to Norris; and Norris told him to confess to the Lord and Hamilton did so. 16 RR 271–73 (Naimi testimony); 16 RR 90, 92–93, 95–97, 100, 102, 104 (Norris testimony). Hamilton's counsel also elicited evidence from Norris that Hamilton had been using fry at the time he murdered Matalkah. 16 RR 101–02. Hamilton's counsel elicited evidence from Brooke Rogers that Hamilton's mother walked the streets and was a prostitute; Hamilton's father did drugs; Hamilton's father had been in jail; the whole family did drugs; and Hamilton had lived in a crack house. *Id.* at 185–95. Contrary to Hamilton's assertions, the trial court admitted Naimi's evidence after Hamilton already had introduced mitigating evidence.

Concerning Hamilton's unexhausted federal habeas theory that counsel should have objected because Naimi's testimony was not admissible under Texas Rule of Evidence 403, it appears that counsel both filed a motion in limine to preclude the introduction of improper victim impact testimony and— the day after Naimi's testimony—objected to certain portions of that testimony as improperly comparing Hamilton's worth to Matalkah's. However, the trial court denied counsel's objection. 17 RR 8–16. And while the judge granted counsel's motion, the judge qualified that he did not believe that the State had prompted a worth comparison. *Id*. Hamilton briefing may suggest that counsel's objection was denied because it was untimely. Am. Pet., ECF No. 50 at 166 ("This objection was untimely and was overruled by the trial court"). But the record appears to show that the trial court actually ruled on the merits.[70] 17 RR 16. Counsel cannot be deficient when they actually made the objection requested and received a ruling.

Moreover, it was not error by the trial judge to allow this evidence. Trial judges may exercise:

> [. . .] their sound discretion in permitting some evidence about the victim's character and the impact on others' lives while limiting the amount and scope of such testimony. Considerations in determining whether testimony should be excluded under Rule 403 should include the nature of the testimony, the relationship between the witness and the victim, the amount of testimony to be

---

[70]     Even though counsel's objection was made the next day, the trial court could have easily issued an instruction to disregard if it believed the objection had merit.

introduced, and the availability of other testimony relating to victim impact and character. And, mitigating evidence introduced by the defendant may also be considered in evaluating whether the State may subsequently offer victim-related testimony.

*Mosley*, 983 S.W.2d at 262.

Here, the testimony in question was brief, factual, and from a coworker who was familiar with Matalkah and mostly explained how and why Matalkah came to work at the convenience store where Hamilton killed him (i.e., context for the crime). It also occurred after the defense had elicited mitigation testimony, and there was little subsequent victim impact testimony. Thus, as suggested by the record, *see* 17 RR 16, the trial judge would not have barred this testimony even if a timelier objection under Rule 403 had been made. *Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir. 1997) ("[F]ailure to assert a meritless objection cannot be grounds for a finding of deficient performance."). Indeed, Hamilton asserts that the testimony improperly compared his worth with Matalkah's, Am. Pet., ECF No. 50 at 166–67, but it is not readily apparent from Hamilton's briefing where he believes that Naimi made this comparison. It would appear Hamilton believes that it was simply implied.

Consequently, Hamilton does not show deficiency under either his exhausted theory (i.e., failure to object because no mitigation evidence had been presented) or his unexhausted one (i.e., failure to object under Rule 403).

### 3.   No prejudice accrued from counsel's alleged deficiencies.

Nevertheless, to whatever extent counsel's performance was deficient, Hamilton was not prejudiced. *Paredes v. Quarterman*, 574 F.3d 281, 291 & nn.12–13 (5th Cir. 2009) (citing *United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument . . . cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue."). Hamilton does not show that error by trial counsel with regard to this testimony created a reasonable probability of a different result. *See Mosely v. Quarterman*, 306 F. App'x 40, 46–47 (5th Cir. 2008) ("even assuming that victim impact evidence was improperly admitted, Mosley fails to explain how Mrs. Moore's testimony prejudiced his defense in light of the overwhelming evidence of guilt"); *Guevara v. Thaler*, CIV. A. No. 4:08–CV–1604, 2011 WL 4455261, at *20–*21, *23 (S.D. Tex. 2011) (unpublished) (rejecting claim that counsel were ineffective for failing to object to extraneous offense victim impact testimony because petitioner failed to show prejudice in light of the evidence of his violent criminal history, his having committed an "escalating crime spree" in the months before the murder, and evidence that he was "cruel"); *cf. United States v. Bernard*, 299 F.3d 467, 480–81 (5th Cir. 2002) ("Taken in context, this inadmissible portion of the victim impact testimony was short and

mild compared to the horror of the crimes and the pathos of the admissible impact on the parents.").

Since the CCA's rejection of the exhausted portion of Hamilton's claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, Hamilton is not entitled to relief. 28 U.S.C. § 2254(d); *Richter*, 562 U.S. at 99–102. Moreover, the unexhausted portion of Hamilton's claim should be found defaulted and, alternatively, meritless under de novo review.

## VI.   The State Court Reasonably Denied Hamilton's Claim That the Trial Court Improperly Admonished Him. (Claim 6)

In his amended petition's sixth claim for relief, Hamilton argues that the trial court improperly admonished him concerning the consequences of his guilty plea, depriving him of due process of law under *Boykin v. Alabama*, 395 U.S. 238 (1969). Am. Pet., ECF No. 50 at 170–84; Pet., ECF No. 19 at 33–43. Specifically, he asserts that the trial court failed to tell him the applicable range of punishment and failed to inform him that a guilty plea would waive his right against self-incrimination. *Id*. However, the state court reasonably rejected variations of this claim on both direct appeal[71] and state habeas

---

[71]   The Supreme Court denied certiorari review of this claim on direct appeal. *See Hamilton v. Texas*, 545 U.S. 1130 (No. 04–9658).

review.[72] *Hamilton v. State*, 2004 WL 3094382, at *1–*3; *Ex parte Hamilton*, 2015 WL 3899185, at *1; 4 SHCR–01 778–79, 799. The state court correctly held that Hamilton's guilty plea was constitutionally permissible since it was knowing and voluntary. *Id*. It also found that Hamilton was aware that he could be sentenced to death, and *Boykin* did not require that Hamilton be informed of his right against self-incrimination. *Id*. As shown below, these determinations are plainly reasonable. The Fifth Circuit has "repeatedly held" that *Boykin* does not require explicit articulation of the three rights mentioned therein (i.e., the privilege against self-incrimination, the right to trial by jury, and the right to confront one's accusers). *Neyland v. Blackburn*, 785 F.2d 1283, 1287 (5th Cir. 1986). Moreover, the record in the instant case—in contrast to the silent record in *Boykin*—plainly shows that Hamilton was aware of his potential death sentence and his right to be free from compulsory self-incrimination. Since the state court's decision was reasonable, AEDPA precludes relief being granted on this claim.

## A.    The state court reasonably denied relief on these claims.

Hamilton raised iterations of this claim on direct appeal and during state habeas review. On direct appeal, the CCA held that:

> [. . .] After [Hamilton] pled guilty to the charged offense of capital murder, the trial court proceeded to ask [Hamilton] questions

---

[72]    Hamilton's state habeas claim dealt only with the range of punishment, not the right against self-incrimination. 1 SHCR–01 11–13.

concerning the voluntariness of his plea. The trial court did not, however, on the record, inform or discuss with [Hamilton] the punishment range for a capital offense. [Hamilton] urges this Court to reconsider our opinion in *Aguirre-Mata v. State*, 125 S.W.3d 473 (Tex. Crim. App. 2003), and to adopt the reasoning of Judge Johnson's dissenting opinion in that case. He contends that our opinion in *Aguirre-Mata* is at odds with [*Boykin*], and that the complete failure of the trial court to admonish him of the applicable range of punishment is a due process violation that amounts to "structural error" requiring reversal without a showing of harm. We held in *Aguirre-Mata* that the trial court's failure to show on the record that a defendant entering a plea of guilty was admonished on the range of punishment for the offense was nonconstitutional error subject to the harm analysis under Rule of Appellate Procedure 44.2(b). 125 S.W.3d at 474. We noted that "*Boykin* did not specifically set out what due process requires to be 'spread on the record'" and that "*Boykin* clearly did not hold that due process requires the equivalent of the [Texas Code of Criminal Procedure] Article 26.13(a) admonishments or an admonishment on the range of punishment." *Id*. at 475. Rather, "admonishing a guilty-pleading defendant that the consequences of a guilty plea are the admission of the factual elements of the charged crime and a waiver of various constitutional rights without admonishing the defendant on the range of punishment literally satisfies this [*Boykin*] test." *Id*. at n.4. We decline to revisit our holding in *Aguirre-Mata*.

[Hamilton] does not argue that he had no knowledge of the possible penalties for capital murder or that his plea was actually involuntary. Rather, he complains only about the absence in the record of any admonishment on the range of punishment. [Hamilton] has failed to show that the absence of an admonishment on the range of punishment resulted in an involuntary plea or a violation of due process in this case.

*Hamilton v. State*, 2004 WL 3094382, at *1.

In conjunction with a related claim, the CCA further found:

> In this case, the record fails to support an inference that [Hamilton] did not know the punishment range for his offense. Although the trial court did not explicitly admonish [Hamilton] on the punishment range for his offense, throughout jury selection, the parties openly discussed the punishment range at length in [Hamilton]'s presence. At the beginning of voir dire, at which [Hamilton] was present, the trial court informed the panel that the State was seeking the death penalty, and during individual voir dire, the prosecutor and defense counsel asked each venire member multiple questions concerning the death penalty, life imprisonment, and related issues.

*Id*. at *2.

The CCA additionally held that "'there is no requirement that [the] appellant be informed of his right against self-incrimination at trial upon a plea of guilty.' [] *Boykin* does not hold that the failure to admonish a guilty-pleading defendant of the privilege against self-incrimination violates due process." *Id*. at *2–*3 (quoting *Williams v. State*, 674 S.W.2d 315, 320 (Tex. Crim. App. 1984)).

On state habeas review, Hamilton re-raised his claim concerning the trial court's admonishments. In response, the state habeas court entered the following findings of fact:

> 13.    The trial court informed the jury panel at the beginning of voir dire that the State sought the death penalty, and the defense and [the] State asked each venire member many questions concerning the death penalty and life imprisonment. [*Hamilton v. State*, 2004 WL 3094382, at *2].

14.     There were many instances during [Hamilton]'s trial where the range of punishment as well as the death penalty[] was mentioned in [Hamilton]'s presence, including but not limited to the following:

- trial counsel urged a motion requesting that [Hamilton]'s family and friends be allowed to testify regarding their feelings about a death sentence and the impact that an execution would have on them [1 CR 266; 19 RR 170];

- the State argued for the death penalty in opening arguments [16 RR 24–25];

- in trial counsel's opening statement, she stated that accountability did not always mean execution; that [Hamilton] "pled guilty because he understood his accountability;["] and, that [Hamilton] deserved a life sentence [16 RR 25–27]; and

- both the State and trial counsel argued their positions on a life sentence versus the death penalty at the end of punishment [21 RR 4–90].

15.     On direct appeal of the instant conviction, [Hamilton] urged two points of error alleging that the trial court failed to admonish him on the record of the applicable range of punishment in violation of [Hamilton]'s constitutional rights and [Tex. Code Crim. Proc. art. 26.13]. The [CCA] overruled [Hamilton]'s points of error, holding that the record supported the inference that [Hamilton] knew the relevant range of punishment for his offense because the parties openly discussed the punishment range in [Hamilton]'s presence during jury selection. [*Hamilton v. State*, 2004 WL 3094382, at *2].

16.     The Court finds, based on the record and the 2014 habeas affidavit of trial counsel Muldrow, that [Hamilton] voluntarily and knowingly entered his guilty plea in the primary case; that [Hamilton] was aware of the consequences of pleading guilty to the

primary offense; that trial counsel advised [Hamilton] that pleading guilty was the best legal strategy in [Hamilton]'s case; and, that trial counsel advised [Hamilton] that the prosecution still intended to seek the death penalty after [Hamilton] plead[ed] guilty. [4 SHCR–01 811 (Muldrow affidavit).]

17.   The Court finds unpersuasive and not credible the self-serving habeas affidavit of [Hamilton] in which [Hamilton] asserts that he did not understand that he could still be sentenced to death after pleading guilty to capital murder. [1 SHCR–01 84]

4 SHCR–01 778–79. The state court then concluded that "[Hamilton] voluntarily entered his guilty plea and was aware of the consequences of pleading guilty in the primary case, including that [Hamilton] was still subject to receiving the death penalty." *Id*. at 799.

**B.   The Fifth Circuit has repeatedly held that *Boykin* does not require explicit waiver of the three rights mentioned therein—only that a guilty plea be voluntarily and intelligently given.**

"A guilty plea operates as a waiver of important rights, and is valid only if done voluntarily, knowingly, and intelligently, 'with sufficient awareness of the relevant circumstances and likely consequences.'" *Bradshaw v. Stumpf*, 545 U.S. 175, 183 (2005) (quoting *Brady v. United States*, 397 U.S. 742, 748 (1970)). A knowing and voluntary plea waives the privilege against compulsory self-incrimination guaranteed by the Fifth Amendment, the right to trial by jury, and the right to confront one's accusers. *Boykin*, 395 U.S. at 243. *Boykin* mandates an affirmative showing on the record that a defendant's guilty plea

is intelligently and voluntarily made, and a reviewing court should "'scrutinize with guarded caution those situations . . . where the reviewing court cannot ascertain from the trial transcript that the stringent due process requirements imposed by [*Boykin*] . . . have been complied with scrupulously.'" *Walker v. Maggio*, 738 F.2d 714, 716 (5th Cir. 1984) (quoting *LeBlanc v. Henderson*, 478 F.2d 481, 483–84 (5th Cir. 1973)). But when a defendant pleads guilty to a substantive offense, the court is not required to recite a litany of all the constitutional rights that are waived. *Holloway v. Lynaugh*, 838 F.2d 792, 794 (5th Cir. 1988). In particular, *Boykin* does not mandate any strict rule of criminal procedure, and failure to advise a guilty-pleading defendant of his right to trial by jury, right of confrontation, and right against self-incrimination does not in itself render the plea involuntary. *See Burton v. Terrell*, 576 F.3d 268, 271–72 (5th Cir. 2009). "This Circuit has repeatedly held that a specific express articulation and waiver of the three rights mentioned in *Boykin* is not mandated, but that it is necessary for the record to show that the plea was voluntarily and intelligently given." *Neyland*, 785 F.2d at 1287 (citing *Brown v. Jernigan*, 622 F.2d 914, 915 (5th Cir.), *cert. denied*, 449 U.S. 958 (1980); *Van Poyck v. Wainwright*, 595 F.2d 1083, 1085–86 (5th Cir. 1979); *McChesney v. Henderson*, 482 F.2d 1101, 1106 (5th Cir. 1973), *cert. denied*, 414 U.S. 1146 (1974); *United States v. Frontero*, 452 F.2d 406, 415 (5th Cir. 1971);

*Barksdale v. Blackburn*, 670 F.2d 22 (5th Cir. 1982)); *see also James v. Cain*, 56 F.3d 662, 666 (5th Cir. 1995) ("A federal court will uphold a guilty plea challenged in a habeas corpus proceeding if the plea was knowing, voluntary and intelligent.").[73]

A plea should be upheld if it is shown by the record that a defendant understood the charge and its consequences when he pleaded guilty. *Hobbs v. Blackburn*, 752 F.2d 1079, 1081 (5th Cir. 1985). Consequences of a guilty plea include only that the defendant knows the maximum penalty and fine for the charged offense. *Id.* at 1081–82. If the defendant understood the maximum penalty that he might possibly receive, he was fully aware of the consequences of his plea. *Spinelli v. Collins*, 992 F.2d 559, 561 (5th Cir. 1993); *United States v. Howard*, 991 F.2d 195, 199–200 (5th Cir. 1993) (relief not warranted when defendant only showed that record reflected that defendant was not specifically advised of his right to jury trial); *Schaefer v. Davis*, A–16–CA–1273–SS, 2017

---

[73]    The Fifth Circuit has observed that (at the time of its statement) "were we to impose a rule of criminal procedure requiring express articulation and waiver of certain constitutional rights at the time of acceptance of guilty pleas, we would require more of the state courts than is required in the federal courts." *McChesney*, 482 F.2d at 1109. But even if the state courts independently interpret *Boykin* to require such articulation, failure to make the articulation is a matter for the state courts to correct. *Neyland*, 785 F.2d at 1289. A state court's failure to follow its own procedural rules is not a per se federal constitutional violation cognizable in federal habeas corpus. *Stewart v. Estelle*, 634 F.2d 998, 999 (5th Cir. 1981); *Van Poyck*, 595 F.2d at 1086. To constitute a cognizable federal due process violation, the state trial judge's incorrect admonishments must somehow affect the knowing and voluntary character of the plea.

WL 3822750, at *4–*6 (W.D. Tex. Jun. 21, 2017), report and recommendation adopted, A–16–CA–1273–SS, 2017 WL 3726433 (W.D. Tex. Aug. 25, 2017).

In assessing whether a defendant's plea is valid, courts should look at "all of the relevant circumstances surrounding it," including whether there is evidence of guilt. *Matthew v. Johnson*, 201 F.3d 353, 364–65 (5th Cir. 2000) (citing *Brady*, 397 U.S. at 749). Evidence of guilt is not required before validating a guilty plea, but it is indicative of whether the plea is knowing and voluntary. *Id*. at n.16. A defendant's experience with the criminal justice system is also a factor in determining whether that defendant knowingly and intelligently waived constitutional rights. *Parke v. Raley*, 506 U.S. 20, 37 (1992); *Marshall v. Lonberger*, 459 U.S. 422, 437 (1983).

### C.   Hamilton's guilty plea was knowing and voluntary and made with an awareness of the applicable range of punishment.

The record in the instant case—unlike that in *Boykin*—is not silent. In *Boykin*, the defendant was indicted for five robberies. 395 U.S. at 239. The trial court appointed counsel. *Id*. Three days later, at arraignment, the defendant pleaded guilty to all five indictments. *Id*. The appellate record was silent concerning the plea and did not show that the judge examined the defendant or that the defendant addressed the court. *Id*.

In contrast, the record in Hamilton's case reflects that after the indictment was read Hamilton entered a plea of guilty before the jury. 16 RR 9–10. The trial court then excused the jury and examined Hamilton and Hamilton's counsel. *Id*. at 10–17. The trial court confirmed that Hamilton was pleading guilty because he was guilty and for no other reason. *Id*. at 11. Hamilton had not been promised anything to plead guilty. *Id*. at 11–12. Hamilton had not been frightened or coerced. *Id*. at 12. Hamilton was pleading guilty of his own free will. *Id*. at 12. Hamilton understood he had the right to a jury trial. *Id*. at 12. Hamilton understood he had the right to confront and cross-examine witnesses. *Id*. at 12. Hamilton wished to give up his rights and plead guilty. *Id*. at 12. Hamilton had had enough time to speak with counsel about his case. *Id*. at 13. Counsel had answered his questions, and he was satisfied with his representation. *Id*. at 13. Hamilton had no questions. *Id*. at 13. Hamilton did not have any problems talking with counsel; and Hamilton understood the criminal proceedings. *Id*. at 14. The trial court asked Hamilton if he had any history of any mental disease or defect, and Hamilton's counsel explained that Hamilton was a "special ed" student, but counsel was unaware of any psychiatric illnesses. *Id*. at 13. Hamilton had never been declared incompetent or insane. *Id*. at 13–14. Hamilton had no problems talking with counsel, and he understood the proceedings. *Id*. at 14. Hamilton's attorneys

had adequate time to speak with Hamilton and believed him competent. *Id*. at 14.

Here, the relevant "question [ ] is whether [petitioner] was advised by someone, prior to pleading guilty, of [his] punishment range." *Burdick v. Quarterman*, 504 F.3d 545, 547–48 (5th Cir. 2007) ("Texas argues, the trial court need not advise the defendant of consequences of her guilty plea, as long as somebody does. We agree."); *see also Burton*, 576 F.3d at 271–72 ("This court has consistently held that the critical question is not whether the court informed the defendant of the maximum sentence, but whether the defendant knew, in fact, the maximum he faced."). As noted by the state habeas court, defense counsel submitted an affidavit that explained that she and co-counsel told Hamilton that he could receive the death penalty even after pleading guilty, but that they were hoping to get a life sentence from the jury instead:

> After review of the parts of the State's files made available to us, and our investigation of evidence under the Special Issues, we decided the best legal strategy was for Mr. Hamilton to enter a plea of guilty before the jury. Mr. Hamilton was told of our plan. He was also told that the [S]tate was still intending to ask for the death penalty, and thus we would have to proceed with trial before the jury in what later proved to be a vain attempt to get a life penalty jury verdict.

4 SHCR–01 811. The state court found this affidavit credible evidence that Hamilton's plea was knowing and voluntary and that Hamilton was aware that he could still be sentenced to death even after his plea. 4 SHCR–01 778–79.

The state court did not find Hamilton's affidavit to the contrary credible. *Id.* Again, "[a] trial court's credibility determinations made on the basis of conflicting evidence are entitled to a strong presumption of correctness and are virtually unreviewable by the federal courts." *Pippin*, 434 F.3d at 792 (internal quotation marks and citations omitted); *see also Burton*, 576 F.3d at 273.

Further, as noted by the CCA on direct appeal, during voir dire the trial court, defense counsel, and the prosecutor repeatedly mentioned that the range of punishment consisted of either life imprisonment or death.[74] *Hamilton v. State*, 2004 WL 3094382, at *2. It can be presumed that Hamilton had actual knowledge of the applicable range of punishment from these references. *Burdick*, 504 F.3d at 548 ("There is also evidence that during voir dire, which was conducted before Burdick's guilty plea, Burdick's defense attorney referred to the range of imprisonment and specifically referenced the maximum possible term."); *cf. United States v. Vonn*, 535 U.S. 55, 75 (2002) (defendants may be presumed to recall information provided to them prior to the plea proceeding); *Bousley v. United States*, 523 U.S. 614, 618 (1998) (fact that the defendant had been given a copy of the indictment prior to pleading guilty gave

---

[74]     Hamilton was appointed counsel on February 1, 2002, 1 CR 5, and indicted on April 18, 2002. 1 CR 11. The defense filed several pre-trial motions in October 2002—shortly before voir dire began—that discussed the possibility Hamilton would receive the death penalty or seeking to preclude the death penalty. 1 CR 78–84, 100–02, 112–14, 119–21, 168–70, 173–220. Voir dire took place October 14, 2002 (3 RR) to October 30, 2002 (15 RR). Hamilton pleaded guilty on November 6, 2002. 16 RR 10. The jury returned its guilty verdict on November 12, 2002, following the conclusion of the punishment phase of trial. 2 CR 328.

rise to the presumption the defendant was informed of the nature of the charge against him).

Moreover, in Texas cases where the defendant enters his plea before the jury and the jury assesses his punishment, the defendant may withdraw his plea at any time before the jury retires to consider punishment. *McWherter v. State*, 571 S.W.2d 312, 313 (Tex. Crim. App. 1978) ("A liberal practice prevails in this state concerning the withdrawal of a guilty plea."). Here, the trial record reflects references to the range of punishment being either life imprisonment or death before the jury retired, yet Hamilton offered no objection. During opening statements immediately following the plea, the prosecutor twice argued there was no mitigating evidence that warranted "a life sentence over the death penalty." 16 RR 18–19, 25. In addition, defense counsel argued that Hamilton pleaded guilty because he understood his accountability. *Id*. Defense counsel further argued that "accountability doesn't always mean execution" and that the mitigating evidence compelled a life sentence. *Id*. at 25–27. The charge to the jury also explained the applicable range of punishment: "The mandatory punishment for the offense of capital murder is death or confinement in the Texas Department of Criminal Justice, Institutional Division, for life." 2 CR 321; 21 RR 4.

During closing arguments, defense counsel argued that Hamilton pleaded guilty and was fully accountable for the capital murder. 21 RR 53–55, 66. Counsel further argued that there is a presumption that a capital murder defendant was subject to a life sentence; that the law does not demand the death penalty; that there was compelling mitigating evidence; and that they should hold out for a life sentence so that Hamilton is not "strapped to the gurney and they stop his beating heart." *Id.* at 54, 68–69. Thereafter, the prosecutor argued that the mitigating evidence did not warrant a life sentence, and that Hamilton should receive the death penalty. *Id.* at 82, 88–89. It can reasonably be inferred from these references to life imprisonment and the death penalty that Hamilton had knowledge of the applicable range of punishment at a time when he could have retracted his plea. *See Burdick*, 504 F.3d at 548.

In response, Hamilton contends that he lacked the intellectual and legal sophistication to know that he could retract his plea. Am. Pet., ECF No. 50 at 182–83; Reply, ECF No. 34 at 14–16. He maintains that he could not have been expected to "stand up and object." *Id*. However, Hamilton's plea colloquy demonstrates that both he and his counsel believed that they could meaningfully interact. If Hamilton had meant to plead guilty only in exchange for a life sentence, he clearly would have conveyed his surprise to his attorneys

173

when he saw that he was still on trial for his life. His attorneys could have then acted to retract the plea pursuant to Texas's liberal policy. *See McWherter*, 571 S.W.2d at 313. Or, at the very least, his attorneys could have alerted the trial court and made a record showing that Hamilton had made a grave mistake. This did not happen, and counsel's affidavit reflects no confusion on the part of her client. 4 SHCR–01 811. Hamilton's lack of protestation strongly suggests that the ensuing proceedings unfolded exactly the way that Hamilton expected.

**D.    The trial proceedings show that Hamilton was aware of his right against self-incrimination as well as his ability to waive it.**

As noted above, the Fifth Circuit has made it clear that there is no requirement that a defendant be expressly advised that a guilty plea waives his right against self-incrimination. *Neyland*, 785 F.2d at 1288. Moreover, the affidavit that Hamilton submitted during state habeas contains no complaint about mistakenly waiving his right against self-incrimination—rather, Hamilton only complains about receiving the death penalty despite his guilty plea. 1 SHCR–01 84. Nevertheless, the record in this case shows that Hamilton was aware of his right against self-incrimination and his ability to exercise it at a trial. At voir dire, the trial court repeatedly explained the right against self-incrimination in front of Hamilton. 3 RR 20–28; 12 RR 78–90; 14 RR 25–

32;[75] *Schaefer*, 2017 WL 3822750, at *5 ("Petitioner did know he was waiving his right to a jury trial and did know he was waiving his right to be free of self-incrimination, as these specific rights were discussed during jury voir dire and prior to the entry of the guilty pleas."). Defense counsel submitted a motion attempting to limit the State's cross-examination of Hamilton at punishment if he should testify, suggesting that his testimony at punishment would not constitute a full waiver of his right against self-incrimination. 2 CR 281–89. And the trial court's charge also acknowledged that Hamilton exercised his right against self-incrimination vis-à-vis punishment and ordered that Hamilton should not be penalized for it. 2 CR 326; 21 RR 4.

Further, Hamilton was no stranger to guilty pleas or the criminal justice system. Hamilton had multiple prior convictions before his indictment for Matalkah's murder—pleading guilty no less than four times. SX 48–51. Hamilton even signed a stipulation of evidence regarding his prior convictions that acknowledged that he wanted to "waive his right against self-incrimination." SX 47. This stipulation is dated only one day after his guilty plea. 16 RR 10. Hamilton has asserted that the Director has cited "no cases [that] allow information learned after a guilty plea to be used as proof of knowledge at time of the guilty plea." Am. Pet., ECF No. 50 at 183–84; Reply,

---

[75]     The Director's previous answer had also cited 11 RR 75–84, but Hamilton correctly notes that Hamilton was not present at that time. Am. Pet., ECF No. 50 at 183; 11 RR 6.

ECF No. 34 at 12, 15–16. However, the converse is also true—Hamilton offers no cases clearly and explicitly showing that evidence from the punishment phase has no place in ascertaining the defendant's knowledge at the time of a guilty plea. And Hamilton has the burden on federal habeas review. But even without this evidence, it seems clear that Hamilton had the relevant awareness, as discussed above.

This Court cannot grant habeas relief unless it determines that the state's determination conflicts with clearly established federal law as determined by the Supreme Court or "[is] based on an unreasonable determination of the facts in light of the evidence." 28 U.S.C. § 2254(d); *see Flores v. Davis*, No. H–15–1208, 2016 WL 8223054, at *17–18 (S.D. Tex. Dec. 19, 2016) (holding the state court's rejection of the petitioner's due process claim was not an unreasonable application of *Boykin* because "*Boykin* does not require, and has never been extended to require, that the trial court inform the defendant of the possible punishment range. Instead, . . . all that is required is that the defendant know, *from some source*, the potential penalties he faces when pleading guilty.") (emphasis added). . Here, the state court findings and determinations are not unreasonable or inconsistent with clearly-established federal law. *See id.* at *18 (holding the state court's rejection of *Boykin* claim was not based on an unreasonable determination of the facts where the record

showed the petitioner was present when the punishment range was discussed). Consequently, the Court should deny any federal habeas relief on this claim.

## VII. Hamilton's *Apprendi/Ring/Hurst* Claim Is Procedurally Barred and Meritless. (Claim 7)

In his amended petition's seventh claim for relief, Hamilton argues that he is entitled to relief under *Apprendi*, *Ring*, and *Hurst* because: (1) the first special issue purportedly allows the jury to make its decision based on a probability rather than a reasonable doubt; and (2) the second special issue is not required to be proven beyond a reasonable doubt. Am. Pet., ECF No. 50 at 185–96; Pet., ECF No. 19 at 118–29. The state court rejected this claim on state habeas review, finding that the claim was procedurally barred for lack of contemporaneous objection and alternatively meritless. 1 SHCR–01 28–40; 4 SHCR–01 792–94, 802–03. Consequently, this claim is now defaulted for the purposes of federal review. In the alternative, the state court's decision on the merits was reasonable under Fifth Circuit precedent, and Hamilton's claim should be denied under AEDPA.

### A. This claim is procedurally barred for lack of a contemporaneous objection.

The state court found that Hamilton did not object at trial on the instant grounds and procedurally barred him from presenting his state habeas claim that the Texas death penalty is unconstitutional in light of *Apprendi* and *Ring*.

4 SHCR–01 792–94, 802–03. A defendant's failure to comply with Texas contemporaneous objection rule constitutes an adequate and independent state-law procedural ground sufficient to bar federal habeas relief. *Hughes v. Johnson*, 191 F.3d 607, 614 (5th Cir. 1999). Hamilton has asserted that he can circumvent the bar because he can demonstrate cause and prejudice and because failure to consider this claim would constitute a miscarriage of justice. Reply, ECF No. 34 at 85–87. Specifically, he asserts that his claim is purportedly novel and could not have been raised at trial. But *Apprendi* (decided June 26, 2000) and *Ring* (decided June 24, 2002) were both available at the time of trial in November 2002. 16 RR 8. And, if Hamilton truly believes that *Hurst* has sufficiently altered his claim that it could not have been raised previously, then the claim must be new and therefore is simply unexhausted and procedurally defaulted.

Moreover, Hamilton's claim for prejudice is just that his claim is meritorious and not hearing it permits him to be sentenced to death without the benefit of the beyond-a-reasonable-doubt standard. However, as shown below, the Fifth Circuit has repeatedly rejected the underlying claim and therefore Hamilton cannot show prejudice on that basis. And Hamilton does not show that failure to consider this claim would result in a fundamental miscarriage of justice because that only occurs when the petitioner is actually

innocent of the offense underlying his conviction or 'actually innocent' of the death penalty." *Roberts*, 681 F.3d at 605. Hamilton pleaded guilty to the underlying offense, meaning he is not innocent of the offense underlying his conviction. Moreover, Hamilton is not actually innocent of the death penalty, since being actually innocent of the death penalty means being ineligible for the death penalty, and Hamilton admitted his eligibility when he pleaded guilty to his capital offense. *Rocha v. Thaler*, 626 F.3d 815, 826 (5th Cir. 2010); *Buck v. Thaler*, 345 F. App'x 923, 928–29 (5th Cir. 2009); *Ex parte Chavez*, 213 S.W.3d 320, 324 n.19 (Tex. Crim. App. 2006) (noting that evidence showing actual innocence of the death penalty does not encompass "evidence that merely informs a jury's *discretionary* authority to assess a punishment *less than* death. It extends only to evidence that negates the statutorily specified *aggravating* factors that *elevate* the offense to capital status") (emphasis in original).

Accordingly, this claim must be denied as procedurally barred.

**B.   Hamilton's claim is meritless.**

Hamilton at least partly acknowledges that these claims have been found meritless under Fifth Circuit precedent. Am. Pet., ECF No. 50 at 192; Pet., ECF No. 19 at 125. Indeed, this Circuit's cases shows that *Apprendi* does not control the pleading and proof requirements for the mitigation issue

because the mitigation issue is not an aggravating factor that increases punishment beyond the prescribed statutory maximum authorized by the jury's verdict. *Scheanette*, 482 F.3d at 828; *Granados v. Quarterman*, 455 F.3d 529, 536–37 (5th Cir. 2006); *Turner v. Quarterman*, 481 F.3d 292, 299–300 (5th Cir. 2007); *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir. 2005). Similarly, "Texas's use of special issue no. 1 in the punishment phase of [Hamilton]'s capital case, which required the jury to answer 'yes' only if the State had proven 'beyond a reasonable doubt that there is a probability that [Hamilton] would commit criminal acts of violence that would constitute a continuing threat to society,' does not violate [] *Apprendi*, or *Ring*." *Rowell*, 398 F.3d at 379.

*Hurst* has not altered the Fifth Circuit's opinion. *Thompson*, 916 F.3d at 462 (the *Hurst* Court's holding does not bear on the Texas procedure, in which a jury reaches findings regarding whether to reduce a sentence from death); *Sparks v. Davis*, 756 F. App'x 397, 404 (5th Cir. 2018) ("Sparks argues that [*Hurst*] now requires this court to apply *Apprendi* to Texas's capital sentencing law. This court has consistently rejected that claim."); *Garcia*, 704 F. App'x at 324 ("Garcia has not shown how the Supreme Court's opinion in *Hurst* disturbs this court's prior analysis and holding.").

Moreover, the Fifth Circuit has explained that "[n]o Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof." *Rowell*, 398 F.3d at 378. Likewise, "[a]ccepting [petitioner]'s argument that special issue no. 1 is unconstitutional because the term 'probability' swallows the reasonable doubt standard under an extension of *Apprendi* and *Ring* [. . .] would be a violation of *Teague*." *Id.* Under *Teague*, Hamilton may not obtain relief based on rules of constitutional law that have yet to be announced, or that were announced after his conviction became final.[76] Accordingly, even assuming that the special issues did require the procedural safeguards set forth in *Apprendi*, the retroactive application of such requirements would be barred by *Teague*.

The state court's rejection of Hamilton's claim was objectively reasonable and not contrary to clearly established federal law. Consequently, Hamilton is

---

[76]    There were formerly only two limited exceptions to *Teague*'s non-retroactivity principle. The first exception was for rules that would place primary conduct beyond the government's power to proscribe or a class of persons beyond its power to punish in certain ways. *Graham v. Collins*, 506 U.S. 461, 477 (1993). The second *Teague* exception was reserved for bedrock rules of criminal procedure that are necessary to ensure a fundamentally fair trial. *Id.* The Supreme Court recently dispatched the second exception. *Edwards v. Vannoy*, 141 S. Ct. 1547, 1560, 1562 (2021) ("New procedural rules do not apply retroactively on federal collateral review."). Hamilton asserts that he falls into the first exception. Reply, ECF No. 34 at 88–89. However, he cites no case identifying his proposed group—which is apparently just victims of this alleged error—as valid for *Teague* purposes, and certainly such a group is not clearly defined as the others who have fallen into this *Teague* exception, like the underaged or the intellectually disabled. Indeed, Hamilton's class would encompass all offenders subject to the purported error—in fact, it would likely encompass all Texas death row inmates.

not entitled to federal habeas relief on this claim even if it were not procedurally barred for lack of a contemporaneous objection.

## VIII. The State Court Reasonably Rejected Hamilton's 12–10 Rule Claim. (Claim 8)

In his amended petition's eighth claim for relief, Hamilton complains that Texas' 12–10 rule[77] violated his rights under the Eighth and Fourteenth Amendments. Am. Pet., ECF No. 50 at 196–203; Pet., ECF No. 19 at 129–36. In support, he relies on *Jones v. United States*, 527 U.S. 373, 381–82 (1999).[78] The CCA denied this claim on direct appeal. *Hamilton v. State*, 2004 WL 3094382, at *4 ("*Jones* also recognized that jurors are not affirmatively misled when they are not informed of the consequence of their failure to agree because such an instruction has 'no bearing on the jury's role in the sentencing process' but that it instead 'speaks to what happens in the event that the jury is unable to fulfill its role.'"). This decision is plainly reasonable, as the Fifth Circuit has

---

[77]     The jury was instructed that it could not vote "yes" to the future-dangerousness special issue unless all twelve jurors agreed with that answer or "no" unless ten or more jurors agreed with that answer. 2 CR 322. It was further instructed that it could not vote "yes" to the mitigation special issue unless ten or more jurors agreed with that answer or "no" unless all twelve jurors agreed with that answer. *Id.*

[78]     To the extent that Hamilton now relies on any other basis for relief—for instance, *Mills v. Maryland*, 486 U.S. 367 (1988), or *Simmons*—his claim is unexhausted and procedurally defaulted since he did not raise these issues on direct appeal when he advanced his original *Jones*-based claim. Am. Pet., ECF No. 50 at 198, 200; Brief for Appellant at 58–63; *Young v. Davis*, 835 F.3d 520, 527 n.35 (5th Cir. 2016). That said, the Fifth Circuit has rejected 12–10 claims based on these cases. *Young*, 835 F.3d at 527–29; *Alexander v. Johnson*, 211 F.3d 895, 897 (5th Cir. 2000); *see also Greer v. Thaler*, 380 F. App'x 373, 387–89 (5th Cir. 2010) (per curiam).

previously cited *Jones* in support of denying claims that the 12–10 rule in Texas violated a capital murder defendant's Eighth and Fourteenth Amendment rights. *Young*, 835 F.3d at 527–29; *Sprouse v. Stephens*, 748 F.3d 609, 623 (5th Cir. 2014) (holding Fifth Circuit precedent and *Jones* foreclose certificate of appealability on whether failure to inform jury on consequences of a holdout juror violates the Constitution); *Blue v. Thaler*, 665 F.3d 647, 669–70 (5th Cir. 2011) (holding "*Jones* insulates the [12–10] Rule from constitutional attack"); *Druery*, 647 F.3d at 543–44 (acknowledging *Jones* and rejecting argument that failure to inform jurors of consequence of failure to agree relieves them of individual responsibility)[79]; *Alexander*, 211 F.3d at 897, n.5; *see also Reed v. Stephens*, 739 F.3d 753, 779 (5th Cir. 2014). It has also consistently held that any ruling that the 12–10 rule violates the federal Constitution is a new constitutional rule of criminal procedure as defined in *Teague*.[80] *Blue*, 665 F.3d at 670; *Hughes v. Dretke*, 412 F.3d 582, 593–94 (5th Cir. 2005); *Alexander*, 211 F.3d at 897; *Webb v. Collins*, 2 F.3d 93, 95–96 (5th Cir. 1993). Since the denial of this ground for relief at the state level was not

---

[79]     *Druery* also rejects an argument based on *Kubat v. Thieret*, 867 F.2d 351 (7th Cir. 1989), cited by Hamilton. Am. Pet., ECF No. 50 at 199–200.

[80]     Hamilton argued in his initial petition's reply brief that *Teague* would not apply because *Jones* and *Mills* existed prior to Hamilton's trial. But Hamilton wishes to extend the holdings of those cases to disparate circumstances. Reply, ECF No. 34 at 90–91. That extension—which is not dictated by precedent, breaks new ground, and imposes a new obligation on Texas—is what violates *Teague*.

contrary to clearly established federal law, federal habeas relief is precluded under AEDPA.

## IX.   The State Court Reasonably Determined That the Trial Court Was Not Required to Define All Terms in Its Instructions. (Claim 9)

In his amended petition's ninth claim for relief, Hamilton argues that he was denied his rights to due process of law, an impartial jury, and freedom from cruel and unusual punishment because the Texas death-penalty statute purportedly uses inherently vague terms that allow the arbitrary imposition of capital punishment. Am. Pet., ECF No. 50 at 203–09; Pet., ECF No. 19 at 136–41. Specifically, Hamilton complains of the trial court's failure to define the terms "probability," "criminal acts of violence," and "continuing threat to society" in the future dangerousness special issue. *Id*. The CCA denied this claim during Hamilton's direct appeal. *Hamilton v. State*, 2004 WL 3094382, at *5. This decision was clearly reasonable, and AEDPA now precludes this Court from granting any relief on Hamilton's claim.

The future dangerousness special issue is part of the Texas capital-punishment scheme that has been repeatedly upheld by the United States Supreme Court. *See Johnson v. Texas*, 509 U.S. 350, 373 (1993); *Franklin v. Lynaugh*, 487 U.S.164, 171 (1988); *Jurek v. Texas*, 428 U.S. 262, 273 (1976); *see also Pulley v. Harris*, 465 U.S. 37, 50 n.10 (1984) (noting that Texas's

184

punishment issues are not impermissibly vague because they have a "common-sense core of meaning"). The Fifth Circuit has also repeatedly rejected claims that the words used in the punishment issues have such imprecise meanings in the context of a capital murder trial that the jury cannot discern what is being asked without having those terms defined in the jury instructions. *See Sprouse*, 748 F.3d at 622–23 ("Texas does not run afoul of *Maynard v. Cartwright*, 486 U.S. 356 (1988), or *Godfrey v. Georgia*, 446 U.S. 420 (1980) by not expressly defining these terms."); *Paredes*, 574 F.3d at 294; *Scheanette*, 482 F.3d at 827–28 (denying certificate of appealability on claim that failure to define "probability" dilutes the State's burden of proof on grounds that the Fifth Circuit has "repeatedly held that the term 'probability' as used in the Texas special issue is not so vague as to require additional instructions (such as definition by the court)"); *Turner*, 481 F.3d at 299–300 (holding terms "probability," "criminal acts of violence," and "continuing threat to society" not unconstitutionally vague); *Leal v. Dretke*, 428 F.3d 543, 553 (5th Cir. 2005) (holding that terms "probability," "criminal acts of violence," and "continuing threat to society" needed no definition); *Hughes*, 191 F.3d 615 (upholding use of term "probability"); *Woods v. Johnson*, 75 F.3d 1017, 1033–34 (5th Cir. 1996) (rejecting argument that the terms used in the special issues are "aggravating factors" and unconstitutionally vague absent definition); *James v. Collins*, 987

F.2d 1116, 1120 (5th Cir. 1993) (upholding use of terms "deliberately," "probability", "criminal acts of violence," and "continuing threat to society" as having a "common-sense core of meaning that criminal juries should be capable of understanding"); *Nethery v. Collins*, 993 F.2d 1154, 1162 (5th Cir. 1993) (upholding use of terms "deliberately," "probability," and "society" without definition); *Milton v. Procunier*, 744 F.2d 1091, 1095–96 (5th Cir. 1984) (the terms "deliberately," "probability," and "criminal acts of violence" have "plain meaning of sufficient content" to warrant their inclusion in sentencing instructions). And because controlling federal law currently upholds the constitutionality of the Texas future dangerousness issue, acceptance of Hamilton's argument is barred by *Teague. See Scheanette*, 482 F.3d at 827 (noting that district court *Teague*-barred this argument); *Leal*, 428 F.3d at 553 (same).

Hamilton's argument that the state court's adjudication of this claim was unreasonable is flatly contradicted by Fifth Circuit precedent. Accordingly, this Court should deny any federal habeas relief on this claim.

## X. One of Hamilton's Claims Under *Bush* Is Procedurally Barred for Lack of a Contemporaneous Objection, and Both Are Meritless. (Claims 10 & 11)

In his amended petition's tenth and eleventh claims for relief, Hamilton alleges that the Texas death-penalty system discriminates on the basis of race

and that the Texas death penalty is arbitrarily imposed based on a defendant's geographic location. Am. Pet., ECF No. 50 at 209–16; Pet., ECF No. 19 at 141–50. In support, Hamilton asserts that statistical analysis shows that African Americans and residents of Harris County are more likely to receive the death penalty for a capital crime than individuals of another race or residents of another Texas county. *Id*. However, the state habeas court found that Hamilton's tenth claim (discrimination based on race) was procedurally barred for lack of a contemporaneous objection. In the alternative, the state court denied both claims on the merits. As shown below, the state habeas court's decision was entirely reasonable. Accordingly, this Court should deny relief under AEDPA.

### A.   Hamilton's tenth claim is procedurally barred for lack of a contemporaneous objection.

The state habeas court found that Hamilton did not preserve a complaint based on racial discrimination for review with a contemporaneous objection. 4 SHCR–01 795–97, 804–05. A finding by a Texas appellate court that a criminal defendant has failed to comply with the Texas contemporaneous objection rule constitutes an independent and adequate basis for a federal habeas court's refusal to address the merits of a claim for federal habeas corpus relief. *Rowell*, 398 F.3d at 374–75. Hamilton complains that the state court's imposition of the bar was improper because he did actually object. Reply, ECF No. 34 at 98.

187

But, again, the Fifth Circuit has held that it will not second-guess the state court's application of a procedural bar. *Buntion*, 982 F.3d at 951; *Smith*, 216 F.3d at 523. In any event, the cited pages make it clear that Hamilton objected based on geography, not race. 1 CR 180–81.

### B.    Alternatively, the state court reasonably found that these two claims were meritless.

#### 1.    Hamilton's race-based claim is meritless.

Hamilton does not adduce any direct evidence of racial discrimination. Am. Pet., ECF No. 50 at 209–12; Pet., ECF No. 19 at 141–45. His arguments do not point to any specific decision in his case directly attributable to racial animus. *Id*. He has not identified any action by the prosecutors, jury, or judge that infused his trial with racial bias. *Id*. Instead, he relies primarily on statistical analysis to show that he was the victim of prejudice. However, the state habeas court noted that in *McCleskey v. Kemp*, 481 U.S. 279, 288–89 (1987), the Supreme Court rejected the use of general statistics and studies to show racial discrimination in the death penalty process. 4 SHCR–01 796, 805. Given the lack of specific proof relating to Hamilton's own case, the state habeas court reasonably denied Hamilton's claim.

"'One of society's most basic tasks is that of protecting the lives of its citizens and one of the most basic ways in which it achieves the task is through criminal laws against murder.' Implementation of these laws necessarily

requires discretionary judgments." *McCleskey*, 481 U.S. at 297 (quoting *Gregg v. Georgia*, 428 U.S. 153, 226 (1976) (White, J., concurring)). "Whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion," *United States v. Batchelder*, 442 U.S. 114, 124 (1979), so long as the prosecutor "has probable cause to believe that the accused committed an offense defined by statute." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). Though it is subject to constitutional restraints, the sound exercise of prosecutorial discretion is a core constitutional function of the executive branch of government, is essential to protecting societal interests in the effective enforcement of criminal law, and is thus ill-suited to judicial review. *United States v. Armstrong*, 517 U.S. 456, 464–65 (1996); *Wayte v. United States*, 470 U.S. 598, 607 (1985); *United States v. Goodwin*, 457 U.S. 368, 382 (1982); *Bordenkircher*, 434 U.S. at 365. "Exceptionally clear proof" is therefore required before courts will infer abuse of prosecutorial discretion. *McCleskey*, 481 U.S. at 297. Accordingly, "[t]he conscious exercise of some selectivity in [criminal law] enforcement is not in itself a federal constitutional violation" unless the selection was "deliberately based upon an unjustifiable standard such as race, religion or other arbitrary classification." *Oyler v. Boles*, 368 U.S. 448, 456 (1962).

Moreover, the *McCleskey* Court held that to establish an equal protection violation in the capital sentencing context, a defendant must prove that the decisionmakers in his case acted with a discriminatory purpose. *McCleskey*, 481 U.S. at 292–93; *White v. Thaler*, 522 F. App'x 226, 235 (5th Cir. 2013) ("A defendant claiming an equal protection violation in a death penalty case must prove that the prosecutor acted with a discriminatory purpose in that particular case."). Hamilton presents no direct evidence of racial bias in his case, only statistics. *See Hughes v. Dretke*, 160 F. App'x 431, 436 (5th Cir. 2006) (petitioner presented no direct evidence that conviction obtained as a result of racially discriminatory practice); *Goss v. Johnson*, 199 F.3d 439, 1999 WL 1067676 at *5 (5th Cir. 1999) (newspaper articles and statistics insufficient); *Johnson v. Stephens*, CIV.A. H–11–2466, 2013 WL 4482865, at *23 (S.D. Tex. Aug. 19, 2013) (unpublished) (denying *McCleskey* claim where petitioner relied on "various social-science studies and 'a long history of racial discrimination in the application of the death penalty in the United States' to argue that 'his chances of receiving the death penalty in the United States, and in particular Harris County, Texas, are far greater simply because he is an African-American'"); *White v. Thaler*, H–02–1805, 2011 WL 4625361, at *9 (S.D. Tex. Sept. 30, 2011) (unpublished) ("the Supreme Court foreclosed this argument more than 20 years ago"); *Cannady v. Dretke*, CIV. A. C–01–273, 2005 WL

5226384, at \*16 (S.D. Tex. Apr. 29, 2005) (unpublished) (*McClesky* "requires a petitioner making an equal protection challenge to show purposeful discrimination. While Cannady makes general arguments about discrimination toward Hispanic, indigent, and/or incarcerated defendants, he points to nothing showing purposeful discrimination in his case."); *United States v. Sanders*, CRIM.A. 10–00351, 2014 WL 3122418, at \*3 (W.D. La. July 3, 2014) (unpublished) ("[The Defendant] relies solely on law review articles and general statistical data that purport to show a racial and geographical bias in capital-sentencing decisions generally, which is insufficient to sustain his burden of proof under the Fifth or Eighth Amendments."); *see also United States v. Duran-Gomez*, 4:10–CR–0459–S, 2019 WL 11853411, at \*1–\*2 (S.D. Tex. Oct. 7, 2019); *Young v. Stephens*, MO–07–CA–002–RAJ, 2014 WL 509376, at \*50–\*52 (W.D. Tex. Feb. 10, 2014), *opinion vacated in part*, CIV. MO–07–CA–002, 2014 WL 2628941 (W.D. Tex. Jun. 13, 2014), aff'd, 795 F.3d 484 (5th Cir. 2015), *as revised* (July 30, 2015).

Hamilton reads *Bush* as removing the requirement that he adduce specific evidence of racism. But the Fifth Circuit "previously has discussed *Bush*'s utter lack of implication in the criminal procedure context." *Chi v. Quarterman*, 223 F. App'x 435, 439 (5th Cir. 2007). In fact, the Fifth Circuit has found that it "is beyond debate" that *Bush* does not require federal courts

to examine "if the decision to seek the death penalty and the Texas clemency process are unconstitutionally infused with racial considerations[.]" *Coleman v. Quarterman*, 456 F.3d 537, 543–44 (5th Cir. 2006); *see also Chi*, 223 F. App'x at 439; *Wyatt v. Dretke*, 165 F. App'x 335, 339–40 (5th Cir. 2006); *Hughes*, 160 F. App'x at 436. Furthermore, application of the equal protection principles of *Bush* to Hamilton's state criminal conviction is foreclosed by *Teague*.[81] *Coleman*, 456 F.3d at 542 (noting district court found claim *Teague*-barred).

Hamilton provides no evidence that he, specifically, was treated differently because he is a member of protected class. There is no suggestion that a specific prosecutor took a specific action in his specific case that was product of racial bias, let alone one that led to the decision to seek the death penalty. Rather, "a legitimate and unchallenged explanation for the decision is apparent from the record: [Hamilton] committed an act for which the United States Constitution and [Texas] laws permit the imposition of the death penalty." *McCleskey*, 481 U.S. at 297 (footnote omitted). That is, he brutally murdered Matalkah while committing a robbery. The state court's merits denial of this claim was entirely reasonable.

---

[81]   Hamilton asserts that his claim is not *Teague*-barred because *Bush* was rendered before his trial. Reply, ECF No. 34 at 99. But it is Hamilton's proposed extension of *Bush* to the disparate circumstances at hand that is *Teague*-barred, not *Bush* itself. That extension is hardly dictated by *Bush*.

### 2.    Hamilton's geography-based claim is meritless.

In his amended petition's eleventh claim, Hamilton complains that the Harris County prosecutor chooses to utilize the death penalty statute more frequently than other counties. Am. Pet., ECF No. 50 at 213–16; Pet., ECF No. 19 at 146–50. But, since a suspect[82] classification is not implicated, the Texas death-penalty statute "is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). Given that prosecutorial discretion is essential to the criminal justice process, *see McCleskey*, 481 U.S. at 297, Hamilton cannot satisfy this standard.

Hamilton complains that the death penalty is disproportionately applied in Harris County as compared to other states and counties, but the fact remains Hamilton committed an act for which the United States Constitution and Texas laws permit the imposition of the death penalty. *McCleskey*, 481 U.S. at 297. Hamilton was not the victim of happenstance; he *chose* to commit this capital murder in Harris County. As demonstrated by the precedent in the previous section, the decision to seek the death penalty was clearly within the prosecutor's discretion, and Hamilton fails to demonstrate that a prosecutor

---

[82]    The Supreme Court has never held that capital murderers constitute a suspect class and has even indicated otherwise. *See Gregg*, 428 U.S. at 186–87 (decision to authorize capital punishment for some classes of crimes was one best left to legislature).

would not have sought the death penalty if Hamilton had only committed this capital murder in a different county. And while he argues again that *Bush* supports his claim, the Director reiterates the Fifth Circuit has opined that *Bush* has an "utter lack of implication in the criminal procedure context." *Chi*, 223 F. App'x at 440; *White*, 2011 WL 4625361, at \*10 ("White contends that Harris County seeks the death penalty more frequently than rural Texas counties. The only authority he cites in support of his claim that this violates equal protection is *Bush*. As noted above, *Bush* is irrelevant.").

Hamilton's briefing generally suggests that it is constitutionally intolerable that some death-eligible defendants are subjected to the possible imposition of capital punishment, while others are not. But "[t]he Constitution permits qualitative differences in meting out punishment and there is no requirement that two persons convicted of the same offense receive identical sentences." *Williams v. Illinois*, 399 U.S. 235, 243 (1970). Moreover, Hamilton's geography-based claim is *Teague*-barred.

For the foregoing reasons, the state habeas court's rejection of these two related claims was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1). Accordingly, federal habeas relief should be denied.

## XI. Hamilton's Claim That the Texas Mitigation Special Issue Sends Mixed Signals to the Jury Is Procedurally Barred for Lack of a Contemporaneous Objection. Alternatively, the State Court Reasonably Found That This Claim Is Meritless. (Claim 12)

In his amended petition's twelfth claim for relief, Hamilton contends that the mitigation special issue sends "mixed signals" to the jury, thereby rendering any verdict reached in response to that special issue intolerably unreliable under *Penry II*. Am. Pet., ECF No. 50 at 217–23; Pet., ECF No. 19 at 150–56 (citing *Penry v. Johnson*, 532 U.S. 782 (2001) ("*Penry II*")). These "mixed signals" apparently refer to: (1) the *Apprendi* burden-of-proof issue discussed above; and (2) the fact that the mitigation instruction purportedly limits mitigating evidence to evidence that could be considered as reducing a defendant's moral blameworthiness. *Id*. However, the state court found that this claim was barred for lack of a contemporaneous objection. 4 SHCR–01 794–95, 803–04. Alternatively, the state habeas court found that this claim failed on the merits. *Id*. As shown below, the state court's conclusion is indisputably correct in view of the fact that Hamilton received the current mitigation special issue, which has been cited approvingly by both the Supreme Court and the Fifth Circuit. Accordingly, AEDPA precludes relief on this claim.

### A.     Hamilton's claim is procedurally barred for lack of a contemporaneous objection.

The state habeas court found that Hamilton did not preserve this complaint for review with a contemporaneous objection. 4 SHCR–01 794–95, 803–04. Again, a finding by a Texas appellate court that a criminal defendant has failed to comply with the Texas contemporaneous objection rule constitutes an independent and adequate basis for a federal habeas court's refusal to address the merits of a claim for federal habeas corpus relief. *Rowell*, 398 F.3d at 374–75. Hamilton's initial petition's reply brief states that he raised this claim to the trial court. Reply, ECF No. 34 at 102 (citing 1 CR 168–70). But, again, the Fifth Circuit has held that federal habeas courts cannot second-guess a state court's application of a procedural bar. *Buntion*, 982 F.3d at 951. And, in any event, the pages cited by Hamilton seem mostly limited to arguing that that the mitigation special issue impermissibly shifted the burden of proof to him, which does not fairly encompass the current claim. 1 CR 168–70. The state court thus correctly found that no objection was made.

**B.    Alternatively, the state court reasonably determined that this claim is meritless.**

A review of the instruction given clearly shows that Hamilton's capital-sentencing jury was not denied a vehicle for expressing its reasoned moral response to Hamilton's mitigating evidence. The trial court instructed the jury on the mitigation issue as follows:

> Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Ronald James Hamilton[,] Jr., that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

2 CR 330 (jury charge on punishment).

The Fifth Circuit has repeatedly held that "Texas' definition 'encompasses 'virtually any mitigating evidence.'" *Roach v. Quarterman*, 220 F. App'x 270, 277 (5th Cir. 2007) (quoting *Beazley*, 242 F.3d at 260); *see also McCoskey v. Thaler*, 478 F. App'x 143, 150 (5th Cir. 2012) ("The capacious definition of mitigating evidence employed in the Texas statute can encompass virtually any mitigating evidence.") (cleaned up). Furthermore, the Supreme Court has suggested that the Texas instruction is a "[a] clearly drafted catchall instruction on mitigating evidence" and displays "brevity and clarity." *Penry II*, 532 U.S. at 803.

197

With respect to Hamilton's argument that the jury received "mixed signals" because no burden of proof is placed on the mitigation special issue, the Supreme Court does not require the states to assign a burden of proof to mitigating evidence. In fact, the Supreme Court "doubt[s] whether it is even possible to apply a standard of proof to the mitigating-factor determination" because the existence of a mitigating factor is a "judgment call" and subject to the individual juror's discretion. *Kansas v. Carr*, 577 U.S. 108, 119 (2016). "[T]he ultimate question whether mitigating circumstances outweigh aggravating circumstances is mostly a question of mercy[.]" *Id*. The Fifth Circuit has likewise rejected "mixed signals" arguments based upon a lack of burden of proof for the mitigating special issue. *Blue*, 665 F.3d at 668–69 (rejecting argument that failure to assign burden of proof to the mitigating special issue violates the Due Process Clause or *Ring* and *Apprendi*); *Manns v. Quarterman*, 236 F. App'x 908, 912 (5th Cir. 2007); *Oliver v. Quarterman*, 254 F. App'x 381, 386–87 (5th Cir. 2007) (rejecting argument that the Texas special issues send "mixed signals" to the jury, noting that the Supreme Court has implicitly upheld Texas' current scheme); *Scheanette*, 482 F.3d at 824–27 (rejecting argument that additional mitigation instructions sent "mixed signals" and effectively nullified the mitigation special issue because it did not apply a burden of proof); *Coleman*, 456 F.3d at 542. Hamilton "fail[s] to make

any plausible argument that Texas's mitigation special issue does not allow the jury to consider and give effect to a defendant's mitigating evidence." *Oliver*, 254 F. App'x at 387.

Hamilton also claims that Texas's capital-sentencing statute is invalid because it limits his mitigating evidence to evidence that could be considered as reducing his moral blameworthiness. This argument has been rejected by the Fifth Circuit as well. *Rhoades*, 914 F.3d at 366; *Hummel v. Davis*, 908 F.3d 987, 994 (5th Cir. 2018); *Rockwell v. Davis*, 853 F.3d 758, 763 (5th Cir. 2017); *Blue*, 665 F.3d at 665–66 (citing *Beazley*, 242 F.3d at 259). In fact, Supreme Court justices have broadly used the term "moral blameworthiness" to describe that which a jury considers in effectuating the mitigation inquiry. *Landrigan*, 550 U.S. at 499 (Steven, J., dissenting); *South Carolina v. Gathers*, 490 U.S. 805, 817–18 (1984). Specifically, the justices have used the term to describe how a jury gives effect to good character evidence that is not "directly relevant" to the crime. *Gathers*, 490 U.S. at 817–18 (O'Connor, J., dissenting).

Accordingly, Hamilton has not shown that the state court proceedings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly-established federal law, as determined by the Supreme Court of the United States, or that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court

proceeding. For the same reasons, Hamilton's claim is *Teague*-barred. No relief should issue on this claim.

## XII. Hamilton's Claim That Execution by Lethal Injection Is Cruel and Unusual Is Without Merit. (Claim 13)

In his amended petition's thirteenth claim for relief, Hamilton argues that execution by lethal injection is cruel and unusual punishment. Am. Pet., ECF No. 50 at 223–35; Pet., ECF No. 19 at 156–67. However, this Court should dismiss this claim because federal habeas corpus review is not the proper vehicle for such a challenge. This claim is not an attack on the validity of Hamilton's conviction or death sentence but a challenge to the proposed method of execution. For this reason, this claim must be raised as a civil rights action under 42 U.S.C. § 1983. Alternatively, the state court reasonably denied this claim, and federal habeas relief should now be denied under AEDPA.

### A. This claim must be raised under § 1983, not § 2254.

Hamilton's challenge to the lethal-injection protocol is more appropriately raised as a civil rights action under 42 U.S.C. § 1983, rather than as a habeas corpus claim under 28 U.S.C. § 2254. *See Glossip v. Gross*, 576 U.S. 863, 879 (2015) ("a method-of-execution claim must be brought under § 1983 because such a claim does not attack the validity of the prisoner's conviction or death sentence") (citing *Hill v. McDonough*, 547 U.S. 573, 579–80 (2006)); *see also Thompson v. Davis*, CV H–13–1900, 2017 WL 1092309, at *21 (S.D. Tex.

Mar. 23, 2017), aff'd, 941 F.3d 813 (5th Cir. 2019). Hamilton's citations to pre-*Hill* precedent are not compelling. Am. Pet., ECF No. 50 at 225–26.

It is further worth noting that the Fifth Circuit holds that a statute of limitations applies to § 1983 method-of-execution challenges, and such attacks are appropriately filed either after a plaintiff's conviction and sentence become final on direct review, or the date that an execution protocol change becomes effective. *See Walker v. Epps*, 550 F.3d 407, 411–15 (5th Cir. 2008). Because § 1983 has no statute of limitation, Texas' two-year statute for personal-injury actions governs this challenge. *Whitaker v. Collier*, 862 F.3d 490, 494 (5th Cir. 2017). In this case, the statute of limitations began to run on the later of the two relevant dates—when the protocol changed July 9, 2012, *see Sells v. Livingston*, 750 F.3d 478, 480–81 (5th Cir. 2014)—and expired on July 9, 2014. Consequently, even if he were to file under § 1983, Hamilton's time for seeking relief on this claim has already expired. *See*, *e.g.*, *Swearingen v. Collier*, 4:19–CV–3079, 2019 WL 3935285, at *4 n.8 (S.D. Tex. Aug. 20, 2019) ("The defendants convincingly argue that Swearingen's claims are time-barred. A two-year limitations period exists for the relevant portions of Texas' protocol. Despite recent changes to an unrelated portion of the Texas protocol, the core issues at play have been available to Swearingen since 2012, at least.").

**B.      The state court's disposition is entitled to deference.**

To the extent that this Court believes that this claim is properly raised as a habeas challenge under § 2254, the state court's ultimate rejection of this claim on state habeas review was correct and entitled to deference by this Court. Therefore, federal habeas corpus relief, if allowed, must nevertheless be denied. *See*, *e.g.*, *Thompson*, 2017 WL 1092309, at *21.

Here, the state court denied relief on Hamilton's claim, concluding first that the claim was not cognizable in an application for state writ of habeas corpus.[83] 4 SHCR–01 797–98, 806. This finding is reasonable because such claims are indeed barred by state law. *See Ex parte Chi*, 256 S.W.3d 702 (Tex. Crim. App. 2008). In the alternative, the court concluded that Hamilton failed to show that the Texas lethal-injection procedure creates a demonstrated risk of severe pain that is substantial when compared to a known alternative, or that the Texas lethal-injection procedure is cruel and unusual punishment. 4 SHCR–01 797–98, 806. The state court's alternative conclusion that Hamilton failed to demonstrate that the current method of execution amounts to cruel

---

[83]      The state court also concluded that the claim was not ripe for review because Hamilton does not have an execution date. The Fifth Circuit now allows inmates to challenge the manner of their execution in federal court even though no date has been set. *See Whitaker v. Livingston*, 597 F. App'x 771, 774 (5th Cir. 2015). Hamilton's complaints about the state court's interpretation of *Ex parte Barber*, 879 S.W.2d 889 (Tex. Crim. App. 1994), are therefore superfluous—he is not impeded from raising his lethal-injection claim in federal court due to lack of ripeness. Am. Pet., ECF No. 50 at 233–34.

and unusual punishment is entitled to deference by this Court and is reasonable under Supreme Court precedent.[84]

Indeed, the Supreme Court "has yet to hold that a State's method of execution qualifies as cruel and unusual." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1124 (2019) (affirming denial of challenge to single-drug pentobarbital challenge); *see also Barr v. Lee*, 140 S. Ct. 2590, 2591 (2020) (holding that challenge to federal single-drug pentobarbital protocol was unlikely to succeed on the merits in preliminary injunction context). To make out an Eighth Amendment method-of-execution claim, an inmate must establish that the chosen method creates "a risk that is '*sure or very likely* to cause serious illness and needless suffering,' and give rise to 'sufficiently *imminent* dangers.'" *Glossip*, 576 U.S. at 877 (emphasis in original) (quoting *Baze v. Rees*, 553 U.S. 35, 50 (2008)). This requires showing "'a substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" *Id.* (quoting *Baze*, 553 U.S. at 50). An inmate must also provide a "'feasible, readily implemented'" execution-method alternative that is not

---

[84]     Hamilton's amended petition cites to several news articles that appear not have been cited to the state court in his state habeas application. 1 SHCR–01 60–75. To the extent that this claim is considered, those articles are *Pinholster*-barred.

"'slightly or marginally safer,'" but "significantly reduce[s] a substantial risk of severe pain.'" *Id.* (quoting *Baze*, 553 U.S. at 51–52).

Even if this claim could be considered, Hamilton has not adequately demonstrated either a substantial risk of serious harm from pentobarbital or a feasible and readily-implemented alternative that significantly reduces a substantial risk of severe pain. In state court, Hamilton raised his claim as a challenge to the prior three-drug protocol. 1 SHCR–01 60–75. The Fifth Circuit has rejected challenges to Texas's three-drug lethal injection process. *See generally Raby v. Livingston*, 600 F.3d 552 (5th Cir. 2010). However, at this point, Texas is currently using a single-drug pentobarbital protocol, which is also acceptable. *Bucklew*, 139 S. Ct. at 1120, 1134; *Lee*, 140 S. Ct. at 2591; *Wood v. Collier*, 836 F.3d 534, 540 (5th Cir. 2016) ("The reality is that pentobarbital, when used as the sole drug in a single-drug protocol, has realized no . . . risk" that it "is sure or very likely to cause serious illness and needless suffering, and give rise to sufficiently *imminent* dangers.") (quotation omitted); *Sepulvado v. Jindal*, 729 F.3d 413, 417 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1789 (2014); *Thorson v. Epps*, 701 F.3d 444, 447 n.3 (5th Cir. 2012) ("Though Texas recently adopted a one drug protocol—also acceptable under the flexible *Baze* standard—the method at issue here exactly parallels the one cleared for use in *Raby*."). Use of pentobarbital has been upheld by many courts. *See Ringo*

*v. Lombardi*, 677 F.3d 793, 798–99 (8th Cir. 2012) (noting that challenges to the use of pentobarbital have been denied). Moreover, the Fifth Circuit has denied certificates of appealabilty on challenges to the Texas lethal-injection protocol. *See, e.g.*, *Rivas v. Thaler*, 432 F. App'x 395, 404–05 (5th Cir. 2011); *Kerr v. Thaler*, 384 F. App'x 400, 404–05 (5th Cir. 2010).

### C.    Hamilton's request for discovery should be denied.

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997); *United States v. Fields*, 761 F.3d 443, 483 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 2803 (2015); *Reed*, 504 F.3d at 471. It is well settled that a federal habeas petitioner is only entitled to discovery where there is a showing of "good cause" why discovery should be allowed. Rule 6(a), Rules Governing Habeas Corpus Cases Under § 2254. Although "good cause" is not defined, the Advisory Committee Notes to Rule 6 explain that the rule is consistent with the Supreme Court's decision in *Harris v. Nelson*, 394 U.S. 286 (1969). In *Harris*, the Supreme Court concluded that a federal district court must provide discovery only "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief." 394 U.S. at 300. The Court reasoned that habeas actions are

particularly unsuited for literal application of the civil discovery rules because "[s]uch a broad-ranging preliminary inquiry is neither necessary nor appropriate in the context of a habeas corpus proceeding." *Id*. at 297. A petitioner also cannot show "good cause" for discovery where the federal court cannot reach the claim's merits. *See Thompson v. Stephens*, CIV.A. H–13–1900, 2014 WL 2765666, at *2 (S.D. Tex. Jun. 18, 2014) (unpublished).

Here, Hamilton is not entitled to relief under 28 U.S.C. § 2254 and is barred by the statute of limitations if he proceeds under 42 U.S.C. § 1983. And even if Hamilton could proceed under § 2254, any new evidence would be barred by *Pinholster*, and any new claims would be unexhausted and procedurally defaulted. Since the Court cannot reach the merits of Hamilton's lethal-injection claim, he fails to show good cause for discovery. Furthermore, his claims fail to state a prima facie claim for relief under controlling Circuit and Supreme Court precedent. *Montoya v. Scott*, 65 F.3d 405, 417 (5th Cir. 1995). Accordingly, granting discovery under these circumstances would constitute an abuse of discretion.

## XIII. Hamilton's Cumulative-Error Claim Is Time-Barred, Defaulted, and Meritless (Claim 14).

In his amended petition's fourteenth claim for relief, Hamilton argues that he is entitled to relief based on cumulative error. Am. Pet., ECF No. 50 at 236–38. But this claim is time-barred, defaulted, and meritless. First, this

claim was not included in Hamilton's original federal habeas petition and was raised for the first time in his amended petition. *Compare* Pet., ECF No. 19 at iii–vii (table of contents) *with* Am. Pet., ECF No. 50 at 3–6 (table of contents). Most (if not all) of the claims in his amended petition that Hamilton wishes to cumulate were in his original petition. There is no reason that this claim could not have been raised in Hamilton's original petition, and therefore it is time-barred under AEDPA's one-year statute of limitations.[85] 28 U.S.C. § 2244(d). Second, Hamilton does not identify where he raised this claim to the state court. It does not appear that he raised a cumulative-error claim on direct appeal or state habeas review. *See* Brief for Appellant; 1 SHCR–01 2–78. And it does not appear that he presented it in the subsequent application that the CCA dismissed as an abuse of the writ. 1 SHCR–02 1–123. Therefore, the claim is unexhausted and procedurally defaulted. *Beatty*, 759 F.3d at 465. Third, the Fifth Circuit has repeatedly held that individual errors not of constitutional dimension cannot be cumulated to form an error worthy of relief. *United States*

---

[85]    Direct review of Hamilton's conviction was not complete and/or Hamilton received tolling for his initial state habeas proceedings until June 24, 2015. 28 U.S.C. §§ 2244(d)(1)(A), (d)(2); *Ex parte Hamilton*, 2015 WL 3899185. Hamilton filed his federal petition for a writ of habeas corpus on June 17, 2016, with seven days left on the clock. Pet., ECF No. 19. Federal habeas proceedings did not toll the statute of limitations for this new claim, *Duncan v. Walker*, 533 U.S. 167, 181–82 (2001), so the statute of limitations expired on June 24, 2016. While Hamilton seeks cumulate the alleged errors resulting from the purported constitutional violations raised in his original petition, his cumulative-error claim does not relate back to the date the original petition was filed because his cumulative-error claim is a separate and distinct claim for relief. *See Mayle v. Felix*, 545 U.S. 644, 656–57 (2005); *Ramey v. Davis*, 314 F. Supp. 3d 785, 797, 800 (S.D. Tex. 2018) (holding the petitioner's claim eight— alleging cumulative error—did not relate back to the filing of his original petition).

*v. Thomas*, 724 F.3d 632, 648 (5th Cir. 2013) ("there is no precedent supporting the idea that a series of 'errors' that fail to meet the standard of objectively unreasonable can somehow cumulate to meet the high burden set forth in *Strickland*"); *Coble*, 496 F.3d at 440; *Turner*, 481 F.3d at 301 ("[W]here individual allegations of error are not of constitutional stature or are not errors, there is 'nothing to cumulate.'") (quoting *Yohey v. Collins*, 985 F.2d 222, 229 (5th Cir. 1993)). As shown throughout this amended answer, none of Hamilton's claims have merit; thus, cumulation would afford him no relief. Further, under the Fifth Circuit's precedent, a cumulative-error analysis is only warranted when errors were not procedurally defaulted for habeas purposes, and the errors so infected the entire trial that the resulting conviction violates due process or fundamental fairness. *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996). Some of Hamilton's claims are procedurally defaulted, and none of his claims involved errors that deprived his conviction and sentence of fundamental fairness.

The Fifth Circuit has also recognized that the Supreme Court has never accepted cumulative error as a valid constitutional claim. *Hill v. Davis*, 781 F. App'x 277, 280–81 (5th Cir. 2019). As such, this claim is barred under the non-retroactivity doctrine of *Teague*. And even the Fifth Circuit has acknowledged

that its own views concerning the applicability of cumulative error are scattershot. In *Hill*, the Fifth Circuit stated:

> Although Hill is correct that we have employed a cumulative framework at times to assess ineffective assistance of counsel claims, there is no hard and fast rule governing its use, even as a matter of circuit precedent. On multiple occasions, this court has either declined to apply a cumulative prejudice analysis or questioned its relevance altogether. *See*, *e.g.*, *Pondexter v. Quarterman*, 537 F.3d 511, 525 (5th Cir. 2008) (holding that "[m]eritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised") [ ]; *see also Allen v. Vannoy*, 659 F. App'x 792, 818 (5th Cir. 2016) (per curiam); *Zimmerman v. Cockrell*, 69 F. App'x 658, 2003 WL 21356018, at *12 (5th Cir. 2003) (per curiam).

781 F. App'x at 281 n.2. Given the multiple occasions the Fifth Circuit has rejected a cumulative error analysis, and that the Supreme Court has never recognized it, this Court should likewise reject its use in this case.

## CONCLUSION

For the foregoing reasons, the Court should deny Hamilton's petition for a writ of habeas corpus and his requests for discovery and a hearing. Am. Pet., ECF No. 50 at 238–39.[86] Furthermore, because the resolution of Hamilton's claims is not debatable among jurists of reason, the Court should sua sponte deny a certificate of appealability. *See Alexander*, 211 F.3d at 898 (explaining

---

[86]     Hamilton's prayer includes a cursory request for a stay to exhaust his state remedies. But this Court has already granted one stay for this purpose, and Hamilton does not elaborate on why a second stay would be necessary.

that the district court has the power to sua sponte deny a certificate of appealability without prior briefing and argument by counsel).

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division


                                    s/ Stephen M. Hoffman
*Attorney-in-charge                 *STEPHEN M. HOFFMAN
                                    Assistant Attorney General
                                    Texas Bar No. 24048978
                                    Southern District Bar No. 602073
                                    P. O. Box 12548, Capitol Station
                                    Austin, Texas 78711
                                    Tel: (512) 936–1400
                                    Fax: (512) 320–8132
                                    Email: Stephen.Hoffman@oag.texas.gov

                                    ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I do hereby certify that August 24, 2021, I electronically filed the foregoing pleading with the Clerk of the Court for the United States District Court, Southern District of Texas, using the electronic case-filing system of the Court. The electronic case-filing system sent a "Notice of Electronic Filing" to the following attorneys of record, who consented in writing to accept this Notice as service of this document by electronic means:

Jonathan Landers, Esq.
917 Franklin St., Suite 300
Houston, TX 77002
Email: jlanders.law@gmail.com

&

Bryan Garris, Esq.
300 Main St., Ste. 300
Houston, TX 77002
Email: bryan@txdefense.net

s/ Stephen M. Hoffman
STEPHEN M. HOFFMAN
Assistant Attorney General

211